David Mincin, Esq.
Nevada Bar No. 5427
MINCIN LAW, PLLC
7465 W. Lake Mead Boulevard, #100
Las Vegas, Nevada 89128
dmincin@mincinlaw.com
Phone: 702-852-1957
Fax: N/A
*36 Circles, LLC*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Re:<br><br>T1 PAYMENTS, LLC,<br><br>Debtor. | Case No.: BK-S-23-10290-MKN<br><br>Chapter: 7<br><br>Hearing Date: May 22, 2024<br>Hearing Time: 2:30 p.m. |

**OPPOSITION TO MOTION TO APPROVE SALE OF ESTATE'S INTEREST IN CERTAIN LITIGATION CLAIMS (11 U.S.C. § 363)**

## I. INTRODUCTION

1. On April 19, 2024, Trustee Schwartzer filed his "Motion to Approve Sale of Estate's Interest in Certain Litigation Claims" with an error in reasoning that made its way into the proposed order in four simple steps. First, Schwartzer's error began as follows:

> **"The Trustee determined that the assets of this bankruptcy estate include numerous litigation claims that are pending in various courts, including United States District Court for the District of Nevada, and in Clark County District Court, and also potential claims against parties pursuant to the Bankruptcy Code (collectively the "Estate Litigation Claims")."** Id at ¶2.

Schwartzer did not qualify his "determination" by stating the Estate Litigation Claims only included the <u>debtor's rights</u> in each of those claims-he just grouped together all those "numerous" claims brought by plaintiffs, whole cloth.

2. Second, in paragraph seven, he defined the "numerous claims" that fall under the label "Estate Litigation Claims" to include *all* of the claims filed by 36 Circles, LLC against Kasdon, King, and Fairchild in Nevada state court:

///

- Fraud against Kasdon, Fairchild & King;
- Conversion against Kasdon, Fairchild & King;
- Theft against Kasdon, Fairchild & King;
- Money had and received against Kasdon, Fairchild & King;
- Breach of contract against Kasdon, Fairchild & King;
- Breach of implied covenant of good faith and fair dealing against Kasdon, Fairchild & King;
- Unjust Enrichment against Kasdon, Fairchild & King;
- Declaratory and injunctive relief against Kasdon, Fairchild & King; and
- Fraudulent transfer against Kasdon, Fairchild & King;

Id at ¶7.

Schwartzer further described all these claims as: "'Alter Ego Claims' which are Estate Litigation Claims.'" Id. In actual fact, *none* of the claims above asserted by 36 Circles alleged that T1 Payments had any alter egos, or that T1 Payments was generally injured as a result of being an alter ego of someone else, or that T1 Payments made any fraudulent transfers. Indeed, *T1 Payments was not operating when 36 Circles' claims accrued.*

3. Third, Schwartzer failed to present any of the pleadings from the Nevada lawsuit to show how those claims were "general alter ego claims" that would justify being a part of the Estate Litigation Claims. He merely "determined" it. Id at ¶2. He also failed to discuss the difference between "general" versus "particularized" alter ego claims, and how a non-debtor's particularized alter ego claims are not a part of any bankruptcy estate. He simply lumped all the "claims" together into a file labeled "alter ego claims," then bundled those "alter ego claims" into a box called Estate Litigation Claims, and then called it a day.

4. In the fourth and final step, the baselessly defined term "Estate Litigation Claims" made its way into the proposed order that states: "the Trustee is authorized to sell and transfer 100% of the bankruptcy estate's interest in the Estate Litigation Claims (as that term is defined in the Motion)[1] to DONALD KASDON…"

5. Regardless of any qualifier ahead of the term "Estate Litigation Claims" in the Order, the result of a ruling with this language creates a presumption that all the claims filed by 36 Circles were alter ego claims owned by the debtor, and that *were* sold to Donald Kasdon.

---

[1] This caveat was part of a footnote in the Order.

Indeed, Kasdon is already telling other courts he owns all of 36 Circles claims against him because of this pending motion and order, as written.

6. Donald Kasdon has already been holding out the motion and proposed order to a Nevada state court as proof that he already purchased all of Respondent's claims against him from Schwartzer, presumptively arguing that Respondent's entire case will have to be dismissed, rendering further discovery or litigation useless. Specifically, Kasdon's attorney told a Nevada state court on April 22, 2024:

> **"The trustee solicited the sale of those alter ego claims, including 36 Circles, and Defendant Kasdon has purchased those claims, 36 Circles claims specifically."** *See April 22, 2024 Transcript at 4:6-10,* attached as Exhibit A.

On April 8, 2024, he told the Nevada court all alter ego and fraudulent transfer claims were sold to Kasdon by the trustee, regardless of who actually owns the claim or whether it is a personal or general alter ego claim. He stated:

> "…from the T1 Payments trustee and what it shows, ultimately, **any claims rooted in alter ego or theories that there was fraudulent mistransfers are claims to be brought by the trustee**. No such claims have been brought. **There's currently an agreement between the trustee and the defendant Kasdon to purchase those claims."** *See April 8, 2024 Transcript at 9:9-15*, attached as Exhibit B.

Kasdon has also included these same misrepresentations in an April 3, 2024 brief, stating:

> **"Now that the chapter 7 bankruptcy trustee has agreed to sell all known and unknown alter ego claims to defendants, the thrust of plaintiffs' case is lost…[Because all of 36 Circles' claims against Kasdon are] at their core, rooted in theories of alter ego…Plaintiffs have no standing or ability to bring such claims. Also, any benefit from any such claims belong to the bankruptcy estate and would ultimately be divided pro rata amongst the creditors of the estate"** *See Kasdon's Opposition to Plaintiffs' Motion for Leave to File SAC*, at p. 2-3, attached hereto as Exhibit C.

In addition, on the day of the filing of this opposition, Kasdon;s counsel has submitted a declaration in state court proclaiming the following:

> 4. On April 19, 2024, Defendant T1 Payments LLC's Chapter 7 Bankruptcy Trustee filed a Motion to Approve Sale of Estate Interest in Certain Litigation Claims under 11 U.S.C. 363 ("Motion to Approve Sale") in Bankruptcy Court, Case No. BK-23-10290-MKN. See Motion to Approve Sale.
>
> 5. Included in the Motion to Approve Sale are claims made by Plaintiffs in the instant case Kasdon, King, and Fairchild in their individual capacities based on alter ego theories and which are Bankruptcy Estate Litigation Claims. Id. at 3:24-28. The

> Motion to Approve Sale includes but is not limited to Plaintiffs' claims in this action for: fraud against the individual defendants; conversion against the individual defendants; theft against the individual defendants; money had and received against the individual defendants; breach of contract against the individual defendants; breach of the implied covenant of good faith and fair dealing against the individual defendants; unjust enrichment against the individual defendants; declaratory and injunctive relief against the individual defendants; and fraudulent transfer against the individual defendants. Id. at 3:24-28; 4:8-16. The Motion to Approve Sale is set for Hearing in Bankruptcy Court on May 22, 2024.
>
> 6. The sale of the Bankruptcy Estate Litigation Claims will almost certainly impact the discoverable issues in this case. Indeed, the claims asserted in this case by 36 Circles are identified specifically in the Motion to Approve Sale. Kasdon has negotiated the currently pending sale and has provide the Bankruptcy Trustee with the funds called for in the motion to complete the sale. If the Bankruptcy Court approves the sale, the issues in this case will narrow substantially, if not entirely.
>
> (Exhibit H).

These false statements made by Donald Kasdon stem from Schwartzer's bare "*determination*" that all of 36 Circles' claims are general alter ego claims that belong to the bankruptcy estate and the trustee's arbitrary definition of the Estate Litigation Claims in his motion and proposed order.

7. In the event the motion to sell is approved, in order to correct the misstatement of the law, Respondent 36 Circles requests this Court to tailor the language of the Proposed Order so that it properly states the law on bankruptcy estate property, and so that it removes any reference to the trustee's Motion's definition of Estate Litigation Claims, since the motion's definition lumps all the Respondent's claims into Estate Litigation Claims-*without legal basis*.

## II. ARGUMENT

8. Trustees cannot sell property that is not owned by the bankruptcy estate. *Kurtz v. Olson (In re Olson)*, Nos. 19-01285-NGH, 22-06005-NGH, 2023 Bankr. LEXIS 1451, at *7 (Bankr. D. Idaho June 2, 2023). In the present case, the Bankruptcy Estate owns only T1 Payments, LLC's assets. A creditor's claims against non-debtors are not assets of the bankruptcy estate. *In re T1 Payments, LLC*, No. 23-10290-MKN, 2023 Bankr. LEXIS 2558, at *1 (Bankr. D. Nev. Oct. 5, 2023). The assets of T1 Payments, LLC's co-defendants in the 36 Circles case, including T1 Payments, LTD, TGlobal Services, LLC or TGlobal Services

LTD are likewise not owned by the bankruptcy estate. Each of these entities are owned by their sole shareholder-Debra King-who is not a debtor. *See Shareholder Certifications* T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, LTD, attached as Exhibits D, E, & F.

9. In his "Motion to Approve Sale of Estate's Interest in Certain Litigation Claims (11 U.S.C. § 363)" trustee Schwartzer somehow "determined" that each and every one of 36 Circles' claims against Donald Kasdon, Amber Fairchild and Debra King (the "Individual Defendants") are bankruptcy estate property, regardless of what is alleged in each claim. (Doc 83 at 2). He asserts that they are all considered alter-ego claims owned by T1 Payments, LLC. (Doc 83 at 3). Specifically, Schwartzer's motion alleges the following claims-all filed against the non-debtor Individual Defendants-are his to sell as the estate's alter ego claims, including: (i) Fraud, (ii) Conversion, (iii) Theft, (iv) Money Had and Received, (v) Breach of Contract, (vi) Breach of Implied Covenant of Good Faith and Fair Dealing, (vii) Unjust Enrichment, (viii) Declaratory and Injunctive Relief, and (ix) Fraudulent Transfer claims.

10. However, the claims brought by 36 Circles, LLC against Donald Kasdon, Amber Fairchild, Debra King, TGlobal Services, LLC, TGlobal Services Limited (Isel of Man), TGlobal Services, LTD, Pixxles Global, LTD, Pixxles, LTD, Pixxles, LLC, PXLS, LLC, among others, are particularized claims against those defendants, including Kasdon, King and Fairchild, with damages personal to 36 Circles, LLC. They are not generalized alter ego claims that allege general injury to T1 Payments.

### A. THE ESTATE DOES NOT OWN ANY OF 36 CIRCLES' CLAIMS DIRECTLY AGAINST THE INDIVIDUAL DEFENDANTS

11. 36 Circles' live pleadings in the Nevada District Court include several claims directly against Kasdon, Fairchild and King, due to their participation as the ringleaders of a fraudulent conspiracy going back a dozen years. The pleadings affirmatively allege T1 Payments was not in operation at the time 36 Circles' claims accrued.

///

12. In fact, when the claims in 36 Circles' SAC accrued, T1 Payments had been barred from operating as a credit card payment processor. *See 36 Circles Second Amended Complaint* at p.3, l.21, attached as Exhibit G. Further, T1 Payments did not have a bank account to hold customer funds at the time the claims accrued. Id at p.21, l.25. Further still, the pleadings allege T1 Payments, LLC was defunct since 2017. Id at p.6, l.1-2. The SAC also alleges that T1 Payments, LLC was only a a name and logo put on 36 Circles' contract, while Kasdon's TGlobal companies were actually in contract to act as merchant service providers. Id at ¶55. Indeed, the claims in the Plaintiff's live pleadings are in general that:

> "Donald Kasdon secretly relied on Actum Processing, LLC and Payvision, B.V. to process the transactions Kasdon promised T1 Payments, LLC would handle. He also relied on T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, Limited (Isle of Man), and TGlobal Services, LTD to hold and transfer the Plaintiff's funds. Neither Kasdon, Fairchild, King, nor any of the T-Companies had any ability to process credit card payments while T1 Payments was claimed to have serviced 36 Circles." Id at p.5, l.12-18.

and

> "According to bank records just produced in T1 Payments, LLC's bankruptcy on November 20, 2023, Kasdon's T1 scheme required him to use all of his shell companies to handle parts of each transaction that 36 Circles' customers initiated, **except T1 Payments, LLC**. That includes each of the other T Companies. The T-Companies held and transferred between themselves 36 Circles' funds, as those funds traveled to, and from, Payvision, B.V., and Actum Processing, LCC, before being distributed to one of Kasdon's shell companies…" Id at p.7, l.7-12.

13. The SAC also includes a roadmap of the pathways of funds that are the basis for the fraud claims against Kasdon and his two strawmen, King, and Fairchild:

> "(1) 36 Circles LLC's United States customers input their orders and credit card numbers into 36 Circles' website-the same website that Kasdon's employees directed 36 Circles to change to include a UK company name and address at the bottom, "36 Circles, LTD"; (2) **instead of T1 Payments, LLC processing the U.S. transactions from the website as promised, a foreign company in the UK "T1 Payments, LTD" received the orders (along with all other merchants' orders who signed up with T1 Payments, LLC in the U.S.)** and aggregated them all into one portfolio which it sent to TGlobal Services, LTD, its subsidiary; (3) TGlobal Services, LTD then initiated large credit card transactions from the UK to Payvision in Amsterdam as if 36 Circles LLC's customers' requests in the U.S. were TGlobal Service, LTDs customer's requests in the UK; next (4) Payvision processed what appears to be one huge TGlobal Services, LTD transaction; then (5) Payvision paid some of the funds to TGlobal Services Limited (Isle of Man) or TGlobal Services, LTD (UK), and then some of the funds to its subsidiary, PayVision Risk, Inc., in New York City, New York. It may have also made payments to T1 Payments, LTD before

> 2021; (6) Payvision Risk, Inc., then paid the remaining funds to TGlobal Services, LLC's bank account in Nevada, while; (7) T1 Payments, LTD may have paid some funds from its UK bank account to T1 Payments, LLC's bank account in Nevada before 2021; then (8) TGlobal Services, LLC transferred the bulk of the merchant funds it received to Actum Processing, LLC in Austin, Texas for processing; then (9) Actum Processing separated the funds into the 500 separate merchant accounts T1 Payments, LLC was supposedly servicing; and (10) made payments to T1 Payments, LLC's customers; (11) & (12) some funds were received by T1 Payments, LLC (before 2021) and 36 Circles, LLC, respectively." Id at p.25-26.

It is important to note that <u>T1 Payments, LLC was not involved in Kasdon's scheme after 2020</u>, as the bankruptcy trustee's Wells Fargo bank records revealed.

14. Next, the SAC alleges that Kasdon, King, and Fairchild created new entities in the UK and US named "Pixxles" that were used to receive stolen funds and business from TGlobal Services, LLC's bank accounts when it was shut down. Id at 28.

15. Accordingly, the fraud and theft claims against Kasdon, King and Fairchild related to the Pixxles companies is likewise not an asset of the bankruptcy estate. Nor is the fraudulent transfer claim against TGlobal Services, LLC for diverting funds to the Pixxles companies.

16. All of the claims are ultimately directly against the Kasdon, King, and Fairchild without any need for T1 Payments, LLC to be in the line of events. **In fact, the inoperative and defunct "T1 Payments, LLC" was the <u>perfect</u> choice for Kasdon to put into bankruptcy to create delays in state court proceedings, because it had no ties to the actual business operations in 36 Circles' lawsuit.**

*i. Conspiracy To Defraud and To Fraudulently Induce*

17. 36 Circles' first cause of action alleges Donald Kasdon fraudulently induced the Plaintiffs into signing a contract with T1 Payments, LLC by falsely holding it out as a real credit card processing company, while King and Fairchild assisted him in the fraud by allowing Kasdon to utilize their other defendant entities so that he could transfer funds between real credit processors Payvision and Actum Processing. Plaintiffs alleged that all of these other defendants concealed themselves from 36 Circles, so that 36 Circles would believe T1 Payments, LLC was a real company. Id at ¶213, *et seq*.

///

18. None of the allegations in this cause of action require a general alter-ego theory of liability, and as such, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*ii. Fraud by Omission*

19. This cause of action alleges that Kasdon, King, and Fairchild defrauded 36 Circles by not telling 36 Circles that T1 Payments, LLC was a defunct company that did not process credit cards. It also alleges that Kasdon did not tell 36 Circles that he received a termination notice from Payvision regarding TGlobal Services, LTD. Id at ¶231, *et seq*.

20. None of these allegations require a general alter-ego theory of liability, and as such, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*iii. Fraudulent Inducement*

21. This cause of action alleges that Kasdon lied to 36 Circles after the May 28, 2021 termination of TGlobal Services LTD by Payvision by stating that he would pay 36 Circles ten percent of the funds it was owed every month so long as 36 Circles did not sue him. That turned out to be a lie when TGlobal made five percent payments to 36 Circles, and then stopped making them after only a few months, without 36 Circles bringing attorneys into the matter. Id at ¶238, *et seq*.

22. None of these allegations require a general alter-ego theory of liability, and as such, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*iv. Violation of Nevada DTPA*

23. This cause of action alleges that Kasdon, King, Fairchild, and all of the Defendant Companies named therein committed a lawful act by unlawful means-specifically they agreed to perform the credit card services under the contract through violations of the Card Rules and various federal statutes, by utilizing companies not named on the contract to actually carry out the terms of the contract. Id at ¶242, *et seq*.

24. None of these allegations require a general alter-ego theory of liability, and as such, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*v. Conspiracy to Commit Conversion*

25. This cause of action alleges that all of the Defendants intentionally and substantially interfered with 36 Circles' right to possession by taking possession of $333,718.18 through agreement in their network of companies, preventing 36 Circles from having access to these funds, and refusing to return these funds to 36 Circles after it demanded their return. There is no allegation that T1 Payments, LLC withheld any funds. Id at ¶248, *et seq*.

26. None of these allegations require a general alter-ego theory of liability, and as such, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*vi. Conspiracy to Commit Theft*

27. This cause of action alleges that all of the named Defendants conspired to engage in acts of theft with respect to Plaintiff's property by allowing Kasdon to control and keep no less than $333,718.18 in funds belonging to 36 Circles with the intent to deprive 36 Circles of those funds. The allegation is against each entity and each individual defendant, working as a team. Id at ¶255, *et seq*.

28. None of these allegations require a general alter-ego theory of liability, and as such, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*vii. Money Had and Received*

29. This cause of action alleges that Kasdon received no less than $333,718.18 in funds due and owing to 36 Circles by falsely telling 36 Circles their credit card transactions were being handled by T1 Payments, LLC. Id at ¶260, *et seq*.

30. None of these allegations require a general alter-ego theory of liability, and as such, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets

owned by T1 Payments, LLC.

*viii. Breach of Contract*

31. This cause of actions alleges that *Kasdon* used T1 Payments, LLC as *his* alter ego, breaching the promises he made through his alter-ego, resulting in 36 Circles' loss of $333, 718.18. This is an example of a particularized alter-ego claim that is *not* a claim that T1 Payments, LLC was injured, and is *not* a claim that T1 Payments, LLC could bring on its own. The difference between a "general" alter ego claim belonging to the bankruptcy estate, and a "particularized" or "personal" alter ego claim that does not belong to the bankruptcy court will be set forth in more detail below. Id at ¶264, *et seq*.

32. On the whole, when a defendant uses an alter ego shell company to harm someone else, he cannot escape his personal liability by putting the alter-ego company into bankruptcy, and then purchasing the shell company's assets from the trustee.

33. Further, because none of these allegations require a "general" alter-ego theory of liability, *i.e. those belonging to the shell company*, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*ix. Breach of Implied Covenant*

34. This cause of action also alleges that Kasdon used *his* alter ego company to harm 36 Circles in the amount of $333,780.18. This is another example of a particularized alter ego claim (described below) with a damage to 36 Circles that no one else can bring against Kasdon. Id at ¶274, *et seq*.

35. Further, because none of these allegations require a "general" alter-ego theory of liability, *i.e. those belonging to the shell company*, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*x. Unjust Enrichment*

36. This cause of action alleges that 36 Circles conferred benefits to Kasdon, his alter ego T-Companies, King and Fairchild, and the Pixxles Companies in the amount of at least $333,718.18 in the form of cash and Defendants appreciated and retained those benefits.

These funds were withheld from 36 Circles ultimately at the direction of Kasdon, using the network of Defendants described above. Id at ¶279, *et seq*. This cause of action is against Kasdon, Fairchild, King, and all of the rest of the entities in the lawsuit, as individuals working together.

37. It also included a particularized alter ego claim against Kasdon as T1's principal, who directly caused the harm through a shell company.

38. Because none of these allegations require a "general" alter-ego theory of liability, *i.e. those belonging to the shell company*, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*xi. Violation of Nevada RICO Statute*

39. This cause of action alleges Kasdon, King and Fairchild, in conspiracy with all of their shell companies, (i) obtained possession of money or property valued at $650 or more, or obtained a signature by means of false pretenses; (ii) embezzled money or property valued at $650 or more; (iii) fraudulent conduct under NRS 91.230; and (iv) multiple transactions involving fraud or deceit in course of enterprise under NRS 205.377. Id at ¶284, *et seq*. This cause of action alleges an enterprise that included Pixxles, TGlobal Services, LTD, TGlobal Services, LLC, etc., to perform the predicate acts.

40. Because none of these allegations require a "general" alter-ego theory of liability, *i.e. those belonging to the shell company*, this cause of action cannot be lumped into the bankruptcy estates' general alter ego assets owned by T1 Payments, LLC.

*xii. Declaratory Relief*

41. This section of the lawsuit requests that the court declare the contract void as illegal, and that T1 Payments, LLC was not involved in the underlying transaction made the basis of 36 Circles' lawsuit, and that Kasdon personally used all the entities in the lawsuit as his alter-ego to carry out the harm to 36 Circles.

42. Because none of these allegations require a "general" alter-ego theory of liability, i.e. those belonging to the shell company, this cause of action cannot be lumped into the

bankruptcy estates' general alter ego assets owned by T1 Payments, LLC. Also, 36 Circles' claims for declaratory relief against the numerous non-debtor defendants in that case disallows the trustee to scoop all the declaratory relief into the "Estate Litigation Claims" basket.

*xiii. Appointment of Receiver*

43. This cause of action requests a receiver be appointed over Pixxles, LLC, Pixxles, LTD, PXLS, LLC, Pixxles Global, LTD (n/k/a Premium Services Global LTD), TGlobal Services, LLC, TGlobal Services LTD (UK), TGlobal Services Limited (Isle of Man), TGlobal Capital, LTD, T1 Payments, LLC, and T1 Payments LTD, as well as Deep Pockets, LLC and Deep Pockets Trust. Id at ¶313, *et seq*.

44. The SAC was made subjective to the bankruptcy stay regarding T1 Payments, LLC, and any reference to it that was grandfathered in from the previous pleadings was left as is.

45. The requests for placement of Receivers over these non-debtors cannot be lumped into the Estate Litigation Claims.

*xiv. Violation of the Uniform Fraudulent Transfers Act*

46. This cause of action alleges fraudulent transfers directed by Kasdon from **TGlobal Services, LLC**, to Kaplan Cottner, LLC, Kaplan Young, LLC, The Cottner Firm, LLC, Deep Pockets LLC, Deep Pockets Trust, TGlobal Capital, LTD, Pixxles, LTD; Pixxles, LLC; PXLS, LLC, Pixxles Global, LTD, (n/k/a Premium Services Global, LTD); Lending Club Bank; Kasdon, Fairchild, and King. Id at ¶318, *et seq*.

47. This cause of action does not allege T1 Payments, LLC fraudulently transferred money away after May 28, 2021-because it did not even have a bank account.

48. Accordingly, because 36 Circles' fraudulent transfer claims to not allege they originated from the debtor, they are not property of the bankruptcy estate and should not be lumped into the Estate Litigation Claims as defined by trustee Schwartzer.

49. In summary, none of these causes of action should have been shot gunned into the definition of the Estate Litigation Claims being offered for sale by the trustee, in its motion and in its proposed order.

## III. THE BANKRUPTCY ESTATE DOES NOT OWN "PERSONAL ALTER EGO CLAIMS" AGAINST KASDON, FAIRCHILD, KING

50. As the precedent makes clear: bankruptcy estate property does not include direct claims as shown above. The case law is also clear that there is delineation between general alter ego claims and "particularized" personal alter ego claims where a plaintiff's damages stem directly from the company's owner's actions.

51. 11 U.S.C.S. §363(b)(1) permits a trustee to sell only the property of the estate. Section 541 of the Bankruptcy Code defines property of the bankruptcy estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. The provision is construed broadly and includes causes of action. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983).

52. While defining property of the estate is a matter of federal law, the nature and extent of a debtor's interest in property is determined by state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979); *Foothill Capital Corp. v. Clare's Food Mkt., Inc. (In re Coupon Clearing Serv., Inc.)*, 113 F.3d 1091, 1099 (9th Cir. 1997).

53. Whether an alter ego claim belongs to the bankruptcy estate or to an individual creditor is decided under state law. *CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378, 386 (B.A.P. 9th Cir. 1997.

54. Nevada state law recognizes both general and particularized/personalized alter ego claims. *Capriati Constr. Corp. v. SPER, Inc.* (In re Capriati Constr. Corp.), No. NV-17-1200-BHTa, 2018 Bankr. LEXIS 818, at *17 (B.A.P. 9th Cir. 2018).

55. Bankruptcy courts in the Ninth Circuit have held that alter ego claims alleging generalized injury to the debtor corporation and all of its creditors are property of the bankruptcy estate under §541 and may be asserted only by the bankruptcy trustee. *See In re Davey Roofing*, 167 B.R. at 605-08 ("[I]n the context of bankruptcy, only the Debtor or Trustee has standing to assert the alter ego claim where injury to the corporation is alleged.

Debtor's exclusivity to assert the claim follows from the conclusion that [general] alter ego claims are property of the bankrupt estate."); *CBS, Inc. v. Folks (In re Folks)*, 211 B.R. 378, 386 (B.A.P. 9th Cir. 1997) ("The trustee has the right to bring any action in which the debtor has an interest' because this is property of the estate, the trustee is acting to benefit the debtor's estate, and is ultimately benefitting the estate's creditors upon distribution," citing *Koch*, 831 F.2d at 1348). A particularized claim belongs to an individual creditor and does not become property of the estate. *In re Davey Roofing*, 167 B.R. at 605-08.

56. Because California law also recognizes both types of alter ego claims set forth above, and since it has a greater number of cases on point, discussion of California law can help explain Nevada law on the subject. *See In re Folks*, 211 B.R. at 385 ("In California, two types of alter ego claims are recognized. The first alleges 'injury to the corporation giving rise to a right of action in it against defendants'[; the second involves] 'causes of action belong[ing] to each creditor individually,'" quoting *In re Davey Roofing*, 167 B.R. at 608). A general claim is property of the debtor corporation and becomes property of the bankruptcy estate. *Id.* at 387. A particularized claim belongs to an individual creditor and does not become property of the estate. *Id.*

***Differentiating Between General and Particularized Alter Ego Claims***

57. "To determine whether the action is personalized to an individual creditor or accrues generally to [the bankruptcy estate], the court must look to the alter ego claim and the injury for which relief is sought." *See id.* A particularized, i.e., personal, claim exists where "the claimant himself is harmed and no other claimant or creditor has an interest in his cause." *Id.* (quoting *Koch Refining*, 831 F.2d at 1348-49; and see *Capriati at 18.* The only plaintiff that can bring its claim for $333,718.80 is 36 Circles, LLC. Certainly, T1 Payments, LLC cannot because it was not operating when this claim accrued on May 28, 2021, and it was not owed 36 Circles' $333,718.80 at any time.

58. A general claim, by contrast, exists where "the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors."

*Id.* (quoting *Koch Refining*, 831 F.2d at 1349). "If a claim is a general one, with no particularized injury [to the plaintiff] arising from it, and if that [same] claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *Id.* (quoting *Kalb, Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130, 132 (2d Cir. 1993).

***Generalized Alter Ego Claims***

59. Applying this standard, the *In re Davey Roofing* court held that alter ego claims alleging generally that a principal had misappropriated corporate funds were general claims belonging to the bankruptcy estate. 167 B.R. at 608. A creditor of Davey Roofing, Inc. had filed a state court claim alleging that the corporation's principal had commingled corporate funds with his own, withdrawn corporate funds for personal use and left the corporation undercapitalized to pay its creditors, in general. *Id.* at 606. After the company filed a bankruptcy petition, the trustee sought a determination by the bankruptcy court as to whether these claims were the property of the estate. *Id.* Finding that the misappropriation of corporate funds was an action that affected all creditors, the court held that the trustee was the proper party to assert the alter ego claim. *Id.* at 608. *Davey Roofing* involved a quintessential general alter ego claim because the conduct that supported piercing the corporate veil depleted the corporation's finances, leaving it unable to pay its creditors. *See, e.g., In re Folks*, 211 B.R. at 387 ("The alter ego claim alleges that Folks failed to observe any corporate formalities with respect to BYCA and used bank accounts and funds of BYCA for personal and family expenditures. This is a general claim because all creditors are affected and no particularized injury to [plaintiff] exists"). *See also Koch Refining*, 831 F.2d at 1349 ("[Creditors] have sought a declaration that the Member-Owners harmed [the corporation, and that the Member-Owners' manipulation of [the corporation] had a detrimental effect on them; this secondary or resultant effect is not a sufficient showing that they themselves were injured by the Member-Owners"); *In re Real Marketing Services, LLC*, 309 B.R. 783, 788 (S.D. Cal. 2004) ("[A]n action is derivative of the corporation's rights, and hence not independent of

them, if 'the gravamen of the complaint is injury to the corporation . . . or it seeks to recover assets for the corporation or to prevent the dissipation of its assets,'" quoting *PacLink Communications Int'l, Inc. v. Super. Ct.*, 90 Cal.App.4th 958, 964, 109 Cal. Rptr. 2d 436 (2001)).

***Particularized Alter Ego Claims***

60. In contrast, courts have found a particularized injury to a creditor when the conduct that supports piercing the corporate veil is the same conduct that directly harmed the creditor. In *Variable-Parameter Fixture Development Corp. v. Morpheus Lights, Inc.*, 945 F.Supp. 603, 607-08 (S.D.N.Y. 1996), for example, the court found that the plaintiff asserted an individualized alter ego claim against the director and president of a bankrupt company because it alleged that he had participated "directly and actively" in infringing its patent and was liable for damages as a result. *Id.* at 607. The court noted plaintiff's additional allegation that the officer had "withdrawn the corporate funds available to satisfy a judgment for plaintiff," *Id.*, but concluded that this was not the "gist" of the claim. Rather, it held, the injury was particularized because "[plaintiff] claims that as the alter ego of [the corporation], Richardson caused harm directly to the plaintiff." *Id.* at 608.

61. Similarly, a union that alleged an alter ego principal had sub-contracted workers to an undercapitalized "front" corporation "'specifically to avoid paying the wages and fringe benefits required by the collective bargaining agreement'" pleaded particularized injury arising from its actions. *Trustees of the Bricklayers Local 7 Pension Trust v. Stileitaliano International*, No. C-04-952 SC, 2004 U.S. Dist. LEXIS 15928, 2004 WL 1774223, *4 (N.D. Cal. Aug. 6, 2004. The court noted that "[p]laintiffs allege[d] that the unity of interest between [the alter ego] Defendants and [the bankrupt corporation], along with [the corporation's] inadequate capitalization, was accomplished 'solely for the purpose of avoiding their obligations to Plaintiffs. . . .'" *Id.*

***This Case Involves Particularized Alter Ego Claims***

62. The Plaintiffs' Second Amended Complaint tracks indisputable evidence that

conclusively proves T1 Payments, LLC was not involved with performing the Plaintiff's credit card processing agreement. As shown in the new exhibits, T1 Payments, LLC did not have a bank account to hold merchant funds (See Exhibit 36 at 2) and that T1 Payments, LLC had been forbidden from handling merchant funds since its license to do so was revoked by Vantiv/Worldbank in 2017 after Vantiv discovered T1 Payments' fraudulent and criminal use of the same. See Exhibit 32.

63. The SAC also states clearly that Kasdon directed non-debtors TGlobal Services, LTD (UK), TGlobal Services, LLC, TGlobal Services, LTD (Isle of Man), Pixxles Global, LTD, Pixxles, LTD, Pixxles, LLC, and PXLS, LLC, (among other non-debtors), to process the Plaintiff's credit card purchases in Amsterdam with Payvision, B.V., without help from T1 Payments, LLC, after which those funds were paid to TGlobal Services, LLC which then withheld the money from 36 Circles. Debtor T1 Payments was never involved in any of these transactions.

64. As set forth in more detail below, the SAC also tracks the new evidence that conclusively proves Kasdon still operates these several alter ego companies as his alter ego to circumvent his prohibition from operating a credit card company, and to evade creditors and claimants like the Plaintiffs after stealing merchant funds.

65. Because 36 Circles has alleged that Kasdon participated "directly and actively" in using a front company (T1 Payments, LLC) to steal 36 Circles' funds, and that Kasdon was liable for damages as a result, these are considered particularized and personal to 36 Circles.

***36 Circles' Particularized Alter Ego Claims***

66. The only two causes of action that rest on Kasdon's utilization of T1 Payments, LLC's name to steal money from 36 Circles were its (i) breach of contract claim, and its (ii) breach of covenant claims. And they are both particularized alter ego claims.

67. As such, the trustee had absolutely no colorable argument for ever placing the following claims in the definition of Estate Litigation Claims including 36 Circles': i) Fraud claim against Kasdon, Fairchild & King; ii) Conversion claim against Kasdon, Fairchild &

King; iii) Theft claim against Kasdon, Fairchild & King; iv) Money had and received claim against Kasdon, Fairchild & King; v) Unjust Enrichment claim against Kasdon, Fairchild & King; vi) Declaratory and injunctive relief requests against Kasdon, Fairchild & King; and vii) Fraudulent transfer claims against Kasdon, Fairchild & King).

## IV. THE PROPOSED SALE IS NOT IN THE BEST INTERESTS OF CREDITORS.

68. The only ostensible intangible benefit that the "alter ego claims" have is they present Kasdon with an opportunity to make false statements of law and fact to state and federal court judges in a sordid attempt to obtain relief he is plainly not entitled to. In turn, state and federal court judges do not always have the legal experience and training to adjudicate subtle and complex issues of bankruptcy law that often emerge in this court. The opportunity for confusion in other forums is massive. Kasdon has defrauded dozens of creditors of millions of dollars. He will not hesitate to, and has already, launched a campaign of creating confusion in other forums.

69. The court should not give Kasdon free reign to engage these tactics in other forums. Given that the only tangible benefit that appears to exist is to give Kasdon a platform to make legally and factually baseless assertions in other forums, the sale of the so called "alter ego asset" is not in the best interests of creditors and it should not be approved.

70. In the alternative, in the event the court permits the sale to proceed, the court must include language in any such order explicitly stating that the trustee does not have jurisdiction or authority to sell the claims delineated above, and that nothing in its order should be construed as approving or acknowledging a sale of the claims delineated above.

///

///

## <u>V.</u> <u>CONCLUSION</u>

71. As such, 36 Circles, LLC and 36 Circles, LTD respectfully request that the proposed sale not be approved, or, in the alternative, proposes that the claims listed as part of the Estate Litigation Claims in the trustee's motion be conspicuously precluded by name in the order approving the sale of Estate Litigation Claims.

DATED this 8th day of May, 2024.

MINCIN LAW, PLLC

By: /s/ David Mincin
David Mincin, Esq.
Nevada State Bar No. 5427
7465 W. Lake Mead Boulevard, #100
Las Vegas, Nevada 89128
*Attorney for 36 Circles, LLC*

**CERTIFICATE OF SERVICE**

Pursuant to Fed.R.Bank.P. 2002 and LR 2002, I certify that I am an employee of Mincin Law, PLLC, and on the 8th day of May, 2024, service of a true and correct copy of the OPPOSITION TO MOTION TO APPROVE SALE OF ESTATE'S INTEREST IN CERTAIN LITIGATION CLAIMS (11 U.S.C. § 363) was made by:

[X] ECF SERVICE: That service was made by electronic transmission through the ECF filing system of the U.S. Bankruptcy Court, District of Nevada to the parties as listed below: and/or

JEFFREY A. COGAN on behalf of Debtor T-1 PAYMENTS, LLC
jeffrey@jeffreycogan.com, jeffreyacogan@gmail.com

U.S. TRUSTEE - LV - 7 USTPRegion17.LV.ECF@usdoj.gov

LENARD E. SCHWARTZER trustee@sailawfirm.com, lbenson@sailawfirm.com; jelliott@sailawfirm.com;nv17@ecfcbis.com;clea11@trustesolutions.net; les@trustesolutions.net

JASON A. IMES on behalf of Trustee LENARD E. SCHWARTZER
info@FICLegal.com, jimes@ficlegal.com

TAYLOR SIMPSON on behalf of Creditor Vida Divina, LLC taylor@kerrsimpsonlaw.com

OGONNA M. BROWN on behalf of Creditor New U Life Corporation
obrown@lewisroca.com, ogonna-brown-4984@ecf.pacerpro.com,dberhanu@lewisroca.com, ombcalendar@lewisroca.com;jhess@lewisroca.com,klopez@lewisroca.com;gmercado1@lewisroca.com,gmercado@lewisroca.com

BRIAN K WALTERS on behalf of Creditor D.N.G.FZE, Creditor G Com Pte Ltd and Creditor Hyper Sls Ltd bwalters@gordonrees.com

JEFFREY R. HALL on behalf of Creditor Amber Lynn Fairchild, Creditor Debra King and Creditor Donald Kasdon jhall@hutchlegal.com, bbenitez@hutchlegal.com

/s/ Carol Burke
An Employee of Mincin Law, PLLC

# EXHIBIT A

Electronically Filed
5/3/2024 8:52 AM
Steven D. Grierson
CLERK OF THE COURT

**RTRAN**

DISTRICT COURT

CLARK COUNTY, NEVADA

| | |
|---|---|
| 36 CIRCLES, LLC,<br>Plaintiff(s),<br>vs.<br>T1 PAYMENTS, LLC,<br>Defendant(s). | CASE NO: A-22-851903-B<br>DEPT. XIII |

BEFORE THE HONORABLE MARK R. DENTON, DISTRICT COURT JUDGE

MONDAY, APRIL 22, 2024

***RECORDER'S TRANSCRIPT OF HEARING RE: PLAINTIFF'S MOTION FOR LEAVE TO FILE THEIR SECOND AMENDED COMPLAINT SUBJECT TO THE BANKRUPTCY STAY OVER T1 PAYMENTS, LLC***

APPEARANCES:

For the Plaintiff(s): ADAM ALLEN, ESQ. (Via videoconferencing)

For the Defendant(s): MATTHEW S. MCLAUGHLIN, ESQ. JEFFREY R. HALL, ESQ.

RECORDED BY: JENNIFER GEROLD, COURT RECORDER

**Las Vegas, Nevada; Monday, April 22, 2024**

[Proceeding commenced at 9:57 a.m.]

THE COURT: Page 16, 36 Circles, LLC versus T1 Payments, LLC.

MR. ALLEN: Hi, Your Honor, Adam Allen for the Plaintiff, 36 Circles, LLC and the subsidiary, 36 Circles, Ltd.

MR. MCLAUGHLIN: Good morning, Your Honor, Matt McLaughlin and Jeff Hall for Donald Kasdon, Amber Fairchild, Debra King, Pixxles, LLC; Pixxles, Ltd.; and PXLS, LLC.

THE COURT: All right. Plaintiff's motion for leave to file re second amended complaint subject to the bankruptcy stay over T1 Payments, LLC. Go ahead.

MR. ALLEN: Correct. We filed a motion for leave to replay the -- most of the body of the complaint, in the second amended complaint, after discovery of numerous new claims and new defendants in the documents that we received and reviewed from the bankruptcy trustee, as well as, from subpoenaing banks that have -- that was -- that were doing business with Kasdon, Fairchild, and King. None of these documents were produced by the Defendants.

In fact, I'm not sure if the Court's aware, but the Defendants were just ordered on April 8th to appear for their depositions within 30 days and to respond to the disclosures and the request for production by May 8th without objection except attorney privilege. So any -- because of the lack of production and the lack of Defendants' participation in this

case, we -- we had to make those subpoenas happen. And we also reviewed those trustee documents that came in.

After reviewing them, we found there were several new claims that had to be brought. There were several new defendants we could see in the bank records that were transacting with TGlobal, not T1. And so we just -- we didn't have an option but to file an amended complaint. And in fact, depending on what the deposition shows coming up in a week or so for Mr. Kasdon, we, I mean, it's possible we're going to have to file a third amended complaint because we just haven't seen any discovery from those folks yet. So that's -- that's still even on the horizon. The documents that we attached to the stack are Exhibits 29 though 39. And I know -- I know that you don't have time for me to go through all of those and what those mean, but I included them all in the reply brief, in some detail, I'm sure you can see.

Those records demonstrate, without a doubt, certain -- certain things that support the new complaint, including in general, the T1 Payments was never allowed to hold merchant funds during anytime it was allegedly in contract with the Plaintiffs. It was always prohibitive from operating as it was because of some -- I don't want to go into all that detail, but at no point was T1 actually involved in the transactions that made the basis of this case.

THE COURT: All right. Let me hear from Defense counsel. You'll have the last word.

MR. MCLAUGHLIN: Morning, Your Honor. Quickly, this is a -- started out as a breach of contract claim against T1 Payments, LLC.

We are not T1 Payments, LLC. The T1 Payments filed for bankruptcy. Plaintiff filed a creditor's claim for the same relief they're seeking in this case. There the bankruptcy trustee obtained some documents, went through these same documents that are now being relied upon by Plaintiffs to amend their complaint, and decided that there was nothing there in terms of -- of claims. The trustee solicited the sale of those alter ego claims, including 36 Circles, and Defendant Kasdon has purchased those claims, 36 Circles claims specifically. The reply brief states that there is no such an agreement; that I, personally, made a misstatement of fact to the Court in the pleading by stating there is such an agreement.

On Friday, the bankruptcy -- counsel for the bankruptcy trustee filed a motion to approve the sale of the estate's interest in certain litigation claims. We have copies of that for Your Honor if you'd like to review it. So yeah, at this point, the -- this deal from the sale of the claims is pending approval by the bankruptcy and that's up for a hearing on May 22nd.

THE COURT: All right. Plaintiff's counsel, last word.

MR. ALLEN: Yes, Your Honor. The document he's referring to, filed Friday, is not an agreement that Kasdon can purchase those -- those claims. It's a proposed -- it's a bid that Kasdon made that has yet to be approved by that court. The hearing date for that is May 22nd, which also means all the bids are open until May 22nd.

Now, the Defendant's counsel is conflating alter ego claims that are generalized with alter ego claims that are particularized. And they're trying to shoehorn in all of the claims personal to 36 Circles into

what this proposed order says. And it doesn't -- it does not encompass the claims that we're making in the stack, Your Honor. And even -- and here's the thing, you know, if somehow this order gets through all of the other Plaintiffs that are about to bid and becomes signed by the Court. It still only settles the Court's -- the bankruptcy estate's rights to Donald Kasdon. It does not sell 36 Circles' rights to Donald Kasdon or any -- or any particularized alter ego claims where 36 Circles claims Donald did something that damaged 36 Circles through one of his entities. And we've got claims of alter ego, go from Kasdon to TGlobal, LLC, TGlobal, Ltd. in the UK, TGlobal, Ltd. in the Isle of Man. Our claims -- we had to put a chart in the new second --

THE COURT: All right. Thank you. All things considered, the motion -- Plaintiff's motion for leave to file their second amended complaint is granted. And that's without prejudice to your contentions as to further development by way of motion to dismiss or motion for summary judgment or whatever. This is an amendment motion and I determine that it has merit from the standpoint of permitting Plaintiff to amend their pleading and the motion is thus granted. Please submit a proposed order and run it by opposing counsel, okay?

MR. ALLEN: Thank you, Your Honor.

MR. MCLAUGHLIN: Thank you, Your Honor.

THE COURT: Thank you.

[Proceeding concluded at 10:04 a.m.]

* * * * * * *

///

ATTEST: I do hereby certify that I have truly and correctly transcribed the audio/video proceedings in the above-entitled case to the best of my ability.

Jennifer P. Gerold
Court Recorder/Transcriber

# EXHIBIT B

Electronically Filed
4/23/2024 11:58 AM
Steven D. Grierson
CLERK OF THE COURT

TRAN

DISTRICT COURT
CLARK COUNTY, NEVADA

| | |
|---|---|
| 36 CIRCLES, LLC,<br>Plaintiff(s),<br>vs.<br>T1 PAYMENTS, LLC,<br>Defendant(s). | Case No. A-22-851903-B<br>DEPT. XIII |

BEFORE THE HONORABLE ELIZABETH GONZALEZ,
DISTRICT COURT JUDGE

MONDAY, APRIL 8, 2024

***TRANSCRIPT OF PROCEEDINGS RE:***
**PLAINTIFF'S MOTION TO STRIKE ANSWERS AND ENTER DEFAULTS FOR DISCOVERY ABUSES**

APPEARANCES:

For the Plaintiff(s): ADAM ALLEN, ESQ. (Via Zoom)

For the Defendant(s): MATTHEW S. McLAUGHLIN, ESQ.

RECORDED BY: JENNIFER GEROLD, COURT RECORDER

**LAS VEGAS, NEVADA, MONDAY, APRIL 8, 2024**

[Proceeding commenced at 9:13 a.m.]

THE COURT: 36 Circles versus T1.

MR. ALLEN: Good morning.

THE COURT: Good morning.

MR. McLAUGHLIN: Good morning, Your Honor. Matt McLaughlin for Donald Kasdon, Debra King, Amber Fairchild, Pixxles, LLC, Pixxles LTD, and PXLS, LLC.

THE COURT: It's your motion, Mr. Allen.

MR. ALLEN: Thank you, Your Honor.

Plaintiffs have filed a Motion to Compel and a Motion to Strike pleadings for the comprehensive refusal of the defendants to participate in discovery in this case.

Plaintiff sent out notice -- or interrogatories, Requests for Production, back in October. And to date, there were no substantive answers given and no documents produced. There was 115 Requests for Production to each of the six defendants that they were sent to. Not a single document.

The 16.1 disclosures also included no documents. I believe they included three statements or declarations that indicated that the remaining defendants in this case didn't do anything, so you can't ask them any questions. That's the theory of their case.

We set some depositions to verify that for

February 20th, 21, and 22. We set those unilaterally in order to get the ball rolling on getting good dates. The defendants refuse to give us any good dates, they just said they're not coming.

THE COURT: And that maybe they'd be available in July.

MR. ALLEN: They didn't give those dates until after we filed this motion, Your Honor. So, right, they finally gave us some dates after the discovery deadline, after we filed this motion.

So the sum and substance of the defendant's refusal, it's across the board, refusal to engage in discovery is this, it's that T1 Payments was the sole party that worked for the plaintiffs. And because -- and T1 filed bankruptcy last year, last January. And so the case, according to the defendants, is all but finished. And all the allegations that the plaintiffs are making against all the other interrelated companies are baseless and pure speculation. They argue that none of those other entities or persons were involved. So none of them are obligated to answer any discovery or to even participate.

So what we've done is scrape together what we can to show the Court that that statement is false and that they knew it was false when it was made. And the specific objection that they made repeatedly through these interrogatories and Requests for Production, it was the defendants object to the requests, because it's unduly burdensome, not proportional to the needs of the case, as it seeks information that is outside of the reasonable scope of inquiry for the issues in this matter. So that objection stands in the

way of any discovery responses.

So what we've done, because T1 Payments filed bankruptcy, we were able to get documents through the bankruptcy trustee. And the documents clearly show that T1 Payments was not the lone gunman. And, in fact, that it wasn't even involved in servicing the plaintiffs when it was sued or -- when the funds were withheld.

So May 28th, 2021, was the day that T1 Payments notified everyone that it was out of business and they weren't getting their money back. Well, on that date, they didn't have a bank account, Your Honor. So we started digging. We found the deposition of one of PayVision's employees, his name was Joe Emig. He confirmed in his deposition that PayVision dealt directly with Don Kasdon on all their business. And it also confirmed PayVision was not allowed to handle any merchant funds from the United States. And PayVision was the company we found out that was actually processing our American Merchant credit card payments.

The next exhibit that we've added to this case, the declaration of Maria Terpstra, she's another PayVision employee, she confirmed that PayVision had a contract with T1 Payments, LTD, TGlobal Services, Ltd, from the Isle of Man, and then the other TGlobal Services, Ltd. from the U.K., but never with T1 Payments, LLC, the supposed lone gunman here.

So PayVision never had a contract with the defendant, who is saying it was the only one involved in the contract with the

plaintiffs.

That declaration also confirmed that PayVision paid merchants -- merchant funds to TGlobal Services, LLC, that's a Nevada company, another one of the companies involved, and then there were 30 pages of e-mails attached to that declaration that confirmed Donald Kasdon, as he called it, he was the CEO of T1 Payments and TGlobal Services, and the London entities named the same for those companies, and that he was the sole contact for PayVision between 2015 and 2021.

Eventually, PayVision called Donald Kasdon out of control, that's their language, with the way he ran his business. And that ultimately led to PayVision terminating his ability to pretend that T1 Payments was a credit card processor.

So from just those two documents that we've collected, we can confirm that the lone gunman theory doesn't fly. T1 Payments was not involved in this case. All it had was a name on a website and a name on the contract. That was it.

The second thing we learned from those two documents is that the plaintiff had its funds processed by PayVision and TGlobal Services, Ltd. in the U.K., both of which 36 Circles did not contract with -- neither of which.

The -- we added a few different exhibits, Your Honor. And I really do want to go through these, so the Court has a good, clear understanding of how false this --

THE COURT: I've read it all, counsel. You do not need to

go through it individually. Thank you.

MR. ALLEN: Okay. Well, if you let me just mention one more. We do have the Wells Fargo account for T1 Payments, that was closed on January 4th, 2021, four months before it allegedly withheld money from these merchants.

Those bank statements show that T1 Payments was equipping Pixxles LTD's office in London. It also showed that T1 Payments was paying for the London offices shared by those U.K. entities. It also showed the directors of Pixxles LTD, Amber Fairchild, Claudia Machado Buatista, Scott Dawson, Andrea Strachan, and a D. Hellicar Bowman, were all using T1 Payments' AmEx card in London beginning in 2019 to set up and furnish and put equipment in to Pixxles' offices. And it even paid for all of their fees with the Financial Conduct Authority in the U.K. to get licensed, as well as paid for the visas for the Pixxles employees and directors.

And this is just -- I've just gone over four of the 10 documents that I was going to discuss here today, Your Honor. There's an incredible intertwined nature to this group of defendants. And the defendants' objection, based on only T1 Payments was involved, is absolutely 100 percent provably false, these 10 documents.

So, obviously, Defendants have a duty under NRCP 34 to produce the documents requested by the plaintiff, limited to matters that are not privileged, but which are relevant to the subject

matter. Our pleadings contain very clear pleadings that there was a conspiracy amongst these defendants to withhold and hide away money after May 28, 2021.

So for our pleadings to directly state that all of these entities are involved, and the defendants to say, well, we don't agree with you, so we don't have to produce anything or respond to anything, I think it's a gross abuse of discovery process, Your Honor. And that's why we moved to strike the pleadings and we also moved to compel them to withdraw specifically at least that objection and serve answers to the interrogatories and respond to the Requests for Production. And we've also sought to get their deposition set before the discovery deadline in this case.

And I'd love to go through all the rest of the documents with you, but I don't want to take up --

THE COURT: Thank you.

MR. ALLEN: -- the entire morning.

THE COURT: Everybody appreciates that.

Mr. McLaughlin.

MR. McLAUGHLIN: Good morning, Your Honor.

First off, all the arguments that counsel just made were raised for the first time in their reply to our opposition to their Motion to Strike. The documents --

THE COURT: Do you want additional time to respond to them?

MR. McLAUGHLIN: Not at this time, Your Honor.

THE COURT: Okay.

MR. McLAUGHLIN: We don't believe it's necessary.

The documents that counsel's referring to were subpoenaed from the T1 Payments bankruptcy trustee. Apparently, they were obtained no later than November 20th of 2023. We have never been served these documents. On Friday counsel e-mailed myself a link to documents. Apparently, these are the documents that were obtained. No separator sheets, no Bates numbers, no index of any kind to identify what these documents are, copy of the subpoena themselves, et cetera.

The Motion to Strike filed -- that's at issue here was filed, and then two weeks later a Motion to Amend the complaint was filed, which would render null and void the -- any order to strike the answers and enter defaults in this case.

There was no proper 2.34 meeting. Counsel simply advised that our responses were deficient. When asked for specifics as to the -- why the certain responses were deficient, there was no argument made, no points given.

The motion itself fails to abide by 2.4, as I'm sure you're aware. It's on our opposition. Doesn't set forth the -- all but four of the requests and the responses or any argument as to why those responses are deficient.

As far as the depositions are concerned, they were set unilaterally. We notified counsel unequivocally that our clients were not available to attend --

THE COURT: February to July. Seems a little long to me.

MR. McLAUGHLIN: We were trying to herd three witnesses across country with national counsel.

And then in terms of the timing of it, there's a Motion for Leave to file a second amended complaint, which would add 11 new defendants to this case. We've also offered to continue discovery in this case, the deadline, so that these depositions can get done.

To the extent that the documents counsel referenced regarding what was obtained by -- from the T1 Payments trustee and what it shows, ultimately, any claims rooted in alter ego or theories that there was fraudulent mistransfers are claims to be brought by the trustee. No such claims have been brought. There's currently an agreement between the trustee and the defendant Kasdon to purchase those claims. That's going to be submitted to the bankruptcy court for approval.

THE COURT: So how are you going to defend the cases with no documents?

MR. McLAUGHLIN: In this case, we're the defendant, Your Honor. Any --

THE COURT: I understand.

MR. McLAUGHLIN: Yeah.

THE COURT: How are you going to defend it with no documents?

MR. McLAUGHLIN: The allegation is that T1 Payments

misdirected --

THE COURT: I got that. But how are you going to defend the case with no documents at all? Just relying on what the plaintiff gathers.

MR. McLAUGHLIN: We are being asked to prove the existence of a negative.

THE COURT: Okay.

MR. McLAUGHLIN: Which, as the defendant, it's not our burden, you know, Your Honor, to --

THE COURT: Well, I understand it's not your burden. That's a different issue. All right.

The motion is granted in part. The Motion to Strike is denied, the Motion to Enter a Default is denied. However, the alternative request for the Request for Productions to be supplemented and the depos to be scheduled are both granted. The depos of Kasdon, King, and Fairchild will be set to go forward within 30 days of this date, where they live.

The Request for Productions of documents must be supplemented without reliance on the they're-relevant-and-it's-not-fair-that-I-have-to-bear-the-burden-of-producing-these-documents objections. If you have a privilege objection, that's great. Otherwise, produce them. And if your clients don't have any documents, that's fine; say they don't have any documents. Got it?

MR. McLAUGHLIN: Understood.

THE COURT: Mr. Allen, if you'll please prepare the orders, run it by counsel, and send it over.

MR. ALLEN: We will, Your Honor. Thank you.

THE COURT: Thank you.

[Proceeding concluded at 9:28 a.m.]

///

ATTEST: I do hereby certify that I have truly and correctly transcribed the audio/video proceedings in the above-entitled case to the best of my ability. Please note: Technical glitches in the Zoom audio/video which resulted in distortion and/or audio cutting out completely were experienced and are reflected in the transcript.

Shawna Ortega, CET*562

# EXHIBIT C

Electronically Filed
4/3/2024 3:01 PM
Steven D. Grierson
CLERK OF THE COURT

OPPM

Jeffrey R. Hall (9572)
Matthew S. McLaughlin (16110)
HUTCHISON & STEFFEN, PLLC
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, NV 89145
Tel: (702) 385-2500
Fax: (702) 385-2086
jhall@hutchlegal.comp
mmclaughlin@hutchlegal.com

*Attorneys for Pixxles, LLC; PXLS, LLC; Pixxles, Ltd; Donald Kasdon, Debra King; Amber Lynn Fairchild*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| 36 CIRCLES, LLC, a California Limited Liability Company dba PAYLESS KRATOM,<br><br>Plaintiff,<br><br>vs.<br><br>T1 PAYMENTS, LLC, a Nevada Limited Liability Company; T1 PAYMENTS, LTD., a Limited Company Organized Under The Laws Of England; 7 PROCESSING, LLC, a Nevada Limited Liability Company; TGLOBAL SERVICES, LLC, a Nevada Limited Liability Company; PIXXLES, LLC, a Nevada Limited Liability Company; PXLS, LLC, a Nevada Limited Liability Company; PIXXLES, LTD, and at all times relevant was, a United Kingdom Private Limited Company; MNJA, LLC, a Nevada Limited Liability Company; AQUANAUT 1, LLC, a Nevada Limited Liability Company; DAK ENTERPRISES, LLC, a Nevada Limited Liability Company; TEQ VENTURES, LLC, a Nevada Limited Liability Company; PAYVISION B.V. is, and at all times relevant was, a Netherlands Limited Company; SCOTT BODILY, an Individual; JOE EMIG, an Individual; DONALD | Case No. A-22-851903-B<br><br>Dept. No. 13<br><br>**OPPOSITION TO MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**<br><br>Hearing Scheduled:<br>April 22, 2024, at 9:00 am |

KASDON, an Individual; DEBRA KING aka KAISEN, an individual, and AMBER LYNN FAIRCHILD, an Individual, DOES 1 through 10, inclusive,

Defendants.

Defendants Donald Kasdon ("Kasdon"), Debra King ("King"), Amber Fairchild ("Fairchild"), Pixxles LLC, Pixxles Ltd., and PXLS LLC (collectively, "Responding Defendants"), by and through their counsel of record, the law firm of Hutchison & Steffen, PLLC ("H&S"), hereby files their opposition to plaintiffs' Motion for Leave to File Their Second Amended Complaint Subject to the Bankruptcy Stay Over T1 Payments, LLC ("Motion").

This Opposition is made and based upon the pleadings and papers on file herein, the following Memorandum of Points and Authorities, the exhibits attached hereto, and any oral argument the Court allows at the hearing on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Introduction

Plaintiffs filed their Motion at the eleventh hour as a ploy to drive up Responding Defendants' litigation costs and coerce a settlement. Plaintiffs' bad faith intent is evidenced by, *inter alia*: (a) that if plaintiffs are granted leave to file their proposed Second Amended Complaint ("SAC"), the defaults plaintiffs requested via their March 6, 2024 motion to strike answers and enter defaults will be moot; (b) the Motion is based on "newly discovered information" that plaintiffs (i) have been in possession of since November 20, 2023, at latest, but have failed to produce as required under NRCP 16.1; and (ii) that is not attached to the Motion and that has not been filed with the Court, thereby preventing the Court and Responding Defendants from assessing the veracity of plaintiffs' allegations regarding the contents of the "newly discovered information" which serves as plaintiffs' justification for the Motion.

Plaintiffs' case started as a breach of contract case against T1 Payments, LLC. Plaintiffs' Complaint and FAC roped in Responding Defendants under strained theories that they are somehow the alter egos of T1 Payments LLC. T1 Payments LLC declared bankruptcy after the FAC was filed. Any alter ego claims are property of the bankruptcy estate, and plaintiffs have no standing or ability to bring such claims. Now that the chapter 7 bankruptcy trustee has agreed to sell all known and unknown alter

ego claims to defendants, the thrust of plaintiffs' case is lost. Plaintiffs wish to file a SAC that adds eleven new defendants that were not a party to the contract between T1 Payments LLC and plaintiffs and reframes the claims as "conspiracies" to muddy the waters and create the illusion that the claims are not, at their core, rooted in theories of alter ego. Plaintiffs' purpose in doing so is to increase Responding Defendants litigation costs and thereby coerce a settlement.

Granting plaintiffs' Motion will cause undue delay and would be prejudicial to Responding Defendants as they will be forced to incur significant litigation fees and costs while defending themselves from plaintiffs' gamesmanship.

The claims in the SAC are also futile. Though they are reframed as conspiracy claims, they are still rooted in theories that the various defendants are alter egos of T1 Payments LLC and/or that T1 Payments LLC made fraudulent transfers. Again, any alter ego claims or fraudulent transfer claims are property of the bankruptcy estate and may only be prosecuted by the trustee. Plaintiffs have no standing or ability to bring such claims. Also, any benefit from any such claims belong to the bankruptcy estate and would ultimately be divided pro rata amongst the creditors of the estate. The SAC would also be futile in that the statute of limitations to file a complaint against the eleven new defendants has run. Plaintiffs' arguments to the contrary are vague, conclusory, and are not supported by evidence. Even assuming *arguendo* plaintiffs' arguments hold water, plaintiffs' prayer for the Court to issue an order finding that the SAC relates back to the filing date of the Complaint for purposes of the statute of limitations is wholly inappropriate at this juncture. Such an order made without input from the eleven new defendants would constitute a deprivation of their due process rights.

Responding Defendants respectfully request that plaintiffs' Motion be denied.

## II. Statement of Facts

Plaintiffs' Verified Complaint and Application for Injunctive Relief ("Complaint") was filed on April 29, 2022. The defendants named in the Complaint included: (1) T1 Payments, LLC; (2) T1 Payments, LTD; (3) 7 Processing LLC; (4) TGlobal Services LLC; (5) Pixxles LLC; (6) PXLS LLC, (7) MNJA LLC; (8) Aquanaut 1 LLC; (9) DAK Enterprises LLC; (10) TEQ Ventures LLC; (11) Donald Kasdon ("Kasdon"); (12) Debra King aka Kaisen ("King"); (13) Amber Lynn Fairchild ("Fairchild"); and DOES 1 through 10. The Complaint included the following claims: (i) fraud – as

against all defendants; (ii) conversion – as against all defendants; (iii) theft – as against all defendants; (iv) money had and received – as against all defendants; (v) breach of contract – as against all defendants; (vi) breach of the implied covenant of good faith and fair dealing – as against all defendants; (vii) unjust enrichment – as against all defendants; (viii) declaratory relief – as against all defendants; (ix) application for temporary injunction and permanent injunction – as against Kasdon, King, Fairchild, Pixxles LLC, Pixxles LTD, PXLS, TGlobal, and T1 Payments; and (x) appointment of a receiver – as against Pixxles, PXLS, TGlobal, TGlobal LTD, T1 Payments, and T1 Payments LTD. The Complaint cited twenty-four (24) exhibits. The exhibits were submitted to the Court on May 2, 2022 without separator sheets or Bates numbers.

Plaintiffs' First Amended Verified Complaint and Application for Injunctive Relief ("First Amended Complaint" or "FAC") was filed on June 7, 2022. The FAC added the following parties as defendants: (14) Pixxles LTD; (15) Payvision B.V. ("Payvision"); (16) Scott Bodily; and (17) Joe Emig. The FAC included all ten claims of the Complaint. The new defendants included in the FAC were added to claims one through eight. Claims nine and ten of the Complaint were not altered in the FAC. The FAC added one additional claim not included in the Complaint: (xi) violation of the uniform fraudulent transfers act. The FAC did not specify which defendants claim eleven was asserted against. The FAC cited 28 exhibits, consisting of the 24 exhibits attached to the Complaint, plus four additional exhibits: (25) the deposition of Kasdon taken on September 22, 2021 in a separate matter; (26) deposition of Amber Fairchild taken on September 9, 2021 in a separate matter; (27) deposition of Debra King taken on September 9, 2021 in a separate matter; and (28) the declaration of Christopher Jepson. Exhibits 25 through 28 were submitted to the Court, without Bates numbers, on June 7, 2022.

On November 28, 2022, after reaching a settlement agreement for an unknown sum, plaintiffs dismissed their claims against: (15) Payvision B.V.; (16) Scott Bodily; and (17) Joe Emig, with prejudice.

///

///

///

///

On January 30, 2023, T1 Payments LLC – the principal defendant with whom plaintiffs contracted with - filed for Chapter 7 bankruptcy. On January 30, 2023, this Court stayed this case as against T1 Payments LLC, and T1 Payments LTD.[1]

Defendants Kasdon, King, and Fairchild answered the FAC on July 24, 2023. Defendants Pixxles LLC, Pixxles LTD, and PXLS LLC answered the FAC on August 11, 2023. On August 31, 2023, the Court entered default judgments against defendants: (3) 7 Processing LLC; (8) Aquanaut 1 LLC; (9) DAK Enterprises LLC; and (10) TEQ Ventures LLC. On October 24, 2023, the Court entered default judgment against defendant (7) MNJA LLC.

On September 27, 2023, the Court issued the Discovery Scheduling Order establishing March 20, 2024 as the deadline for parties to amend pleadings or add parties.

On October 6, 2023, plaintiffs filed their Amended Ex-Parte Application for Issuance of an Order to Show Cause why a Prejudgment Writ of Attachment Should Not be Issued ("Motion for Prejudgment Writ"). Plaintiffs' Motion for Prejudgment Writ was directed at Responding Defendants Kasdon, King, Fairchild, Pixxles LLC, Pixxles LTD, and PXLS LLC. The September 22, 2023 Declaration of Vahan Hadjinian ("September 22, 2023 Hadjinian Decl."), the principal manager for plaintiffs 36 Circles LLC and 36 Circles LTD, was submitted in support of plaintiffs' Motion for Prejudgment Writ. The September 22, 2023 Hadjinian Declaration confirms plaintiffs had received at least some documents produced by the chapter 7 trustee pursuant to their subpoena no later than September 22, 2023. *See* September 22, 2023 Hadjinian Decl. at ¶¶ 4, 14-16. Exhibit A to the September 22, 2023 Hadjinian Decl. includes excerpts of T1 Payments LCC's bank statements from Wells Fargo that plaintiffs subpoenaed from the T1 Payments LLC chapter 7 bankruptcy trustee. Exhibit B to the September 22, 2023 Hadjinian Declaration includes excerpts of TGlobal Services LLC's bank statements from JP Morgan Chase Bank.

Note, Responding Defendants were never served notice of the subpoena plaintiffs served on the bankruptcy trustee. Plaintiffs did not attach a copy of their subpoena to their Motion for Prejudgment

[1] Plaintiffs' Motion states that T1 Payments, LTD is a new party whose existence was discovered through T1 Payments, LLC's bankruptcy. Motion at 3:1-2. In fact, T1 Payments, LTD was named in the original complaint. Plaintiffs' case is currently stayed as to T1 Payments, LTD.

Writ. It is unknown whether a complete copy of the records produced by the chapter 7 trustee was attached to plaintiffs' Motion for Prejudgment Writ. As of April 3, 2024, plaintiffs have disclosed to Responding Defendants the subpoena(s) plaintiffs served on the chapter 7 bankruptcy trustee for T1 Payments LLC sometime before September 22, 2023. As of April 3, 2024, aside from the documents attached as exhibit A and exhibit B to plaintiffs' Motion for Prejudgment Writ, plaintiffs have not disclosed to Responding Defendants any of the records produced by the bankruptcy trustee, and which now serve as the basis for plaintiffs' Motion and proposed SAC.

On December 18, 2023, the Court issued an Order Denying plaintiffs' Amended Application for Prejudgment Writ of Attachment Against Donald Kasdon, Debra King, Amber Fairchild, Pixxles LLC, Pixxles LTD, and PXLS, LLC ("December 18, 2023 Order Denying Prejudgment Writ"). The Court noted that plaintiffs' claims against defendants may not be independent of those that may in the future be contended by the bankruptcy trustee to be claims of the bankruptcy estate. *See* December 18, 2023 Order Denying Prejudgment Writ at 2:21-25. As was noted in Responding Defendants' opposition to plaintiffs' Motion to Strike Answers and Enter Defaults for Discovery Abuses filed on March 20, 2024, Responding Defendants have reached an agreement with the T1 Payments LLC chapter 7 bankruptcy trustee to purchase all known and unknown alter ego claims. The agreement will be submitted to the bankruptcy court for approval by the bankruptcy trustee. *See* Defendants Kasdon, King, Fairchild, Pixxles LLC, Pixxles LTD, PXLS LLC's Opposition to plaintiffs' Motion to Strike Answers and Enter Defaults for Discovery Abuses at FN 1. To the extent any viable alter ego claims against Responding Defendants exists, those are the property of Responding Defendants.

On the morning of March 20, 2024 deadline for parties to amend pleadings or add parties, plaintiffs' counsel emailed Responding Defendants' counsel inquiring whether Responding Defendants will agree to an amended complaint. *See* March 20, 2024 email from Adam Allen to Mattthew McLaughlin, Exhibit A. No additional details were provided. The proposed SAC was not attached. Nor were any of the exhibits cited therein. That afternoon, plaintiffs' Motion was filed.

Plaintiffs' proposed SAC seeks to add eleven new parties as defendants: (18) TGlobal Services LTD (United Kingdom); (19) TGlobal Services Limited (Isle of Man); (20) TGlobal Capital, Limited; (21) Pixxles Global LTD (n/k/a "Premium Service Global LTD"); (22) Scott Adrian Metcalfe Dawson;

(23) Salma Begum Kalamy; (24) Kenneth Pereira; (25) Deep Pockets LLC; (26) Deep Pockets Trust; (27) Kaplan Young LLC; and (28) The Cotter Firm.[2]

The claims of the Complaint and FAC were modified in the SAC to limit the references to the party with whom plaintiffs contracted, T1 Payments LLC, by replacing T1 Payments LLC with Kasdon and other defendants. The claims asserted in the SAC are as follows: (xii) conspiracy to defraud in the inducement – as against all defendants; (xiii) fraud by omission – as against Kasdon, King, and Fairchild; (xiv) fraudulent inducement – as to Kasdon; (xv) violation of the Nevada deceptive trade practices act – as against all defendants; (xvi) conspiracy to commit conversion – as against all defendants; (xvii) conspiracy to commit theft – as against all defendants; (xviii) money had and received – as against Kasdon; (xix) breach of contract – as against "all Kasdon" and his alter ego, T1 Payments LLC; (xx) breach of implied covenant of good faith and fair dealing – as against Kasdon and his alter ego T1 Payments LLC; (xxi) unjust enrichment – as against all defendants; (xxii) violation of Nevada civil RICO statute (defendants against whom the claim is alleged are not specified); (xxiii) declaratory relief; (xxiv) appointment of a receiver – as against T-Companies and Pixxles Companies and Deep Pockets LLC and Deep Pockets Trust; (xxv) violation of the uniform fraudulent transfers act – as against Kaplan Cottner LLC, Kaplan Young LLC, The Cottner Firm LLC, Deep Pockets LLC, Deep Pockets Trust, TGlobal Capital LTD, Pixxles LTD; Pixxles LLC; PXLS LLC; Pixxles Global LTD (n/k/a Premium Services Global, LTD; Kasdon, Fairchild, and King.

The SAC cites 39 exhibits. Exhibits 1 through 24 were included in the FAC; exhibits 1 through 28 were included in the SAC; and exhibits 29 through 39 are new. As of April 3, 2024, plaintiffs have not served exhibits 29 through 39 on Responding Defendants or filed them with the Court.

/ / /

/ / /

/ / /

/ / /

---

[2] Again, plaintiffs' Motion states that it is also adding T1 Payments, LTD as a new party, but T1 Payments LTD has been a named party since the original complaint was filed. This case is currently stayed as to T1 Payments, LTD due to the bankruptcy filing.

## III. Law and Argument

### a. Plaintiffs' Motion should be denied as the five factors considered by courts when assessing a motion for leave to file an amended complaint weigh against it.

Although NRCP 15(a) provides that leave to amend shall be "freely given," this does not mean that a trial judge may not deny a motion to amend. "If that were the intent, leave of the court would not be required." *Stephens v. Southern Nevada Music Co.*, 89 Nev. 104, 105, 507, P.2d 138, 139 (1973). While leave to amend under Rule 15 is freely given "when justice so requires," it "is not to be granted automatically." *In re W. States Wholesale Nat. Gas Antitrust Litig.,* 715 F.3d 716, 738 (9th Cir. 2013), aff'd sub nom. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 135 S. Ct. 1591, 191 L. Ed. 2d 511 (2015).

Courts consider the following five factors to assess whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Id.* (citing *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir.1990).

#### *i. Amending the FAC would be futile as plaintiffs' lack standing to assert the alter ego and fraudulent transfer claims at the heart of the SAC.*

36 Circles sold for profit high-risk kratom products."[3]. As such, 36 Circles was limited in the number of companies that would be willing to offer them payment facilitator services. T1 Payments, LLC, and its subsidiaries, were willing to take on 36 Circles as a high-risk merchant but, in doing so, required certain safeguards be included in the payment services contract. T1 Payments, LLC, a payment facilitator, contracted with Payvision B.V. ("Payvision") to process T1's merchant transactions. Around the time Payvision was being acquired by ING, Payvision decided to cease business with T1 Payments, LLC and "high-risk" merchants like 36 Circles. While the contracts T1 Payments LLC had with its merchants entitled T1 Payments LLC to significant penalties from the merchants, in an effort to make their merchants whole and continue operating the business, T1

---

[3] Kratom is a substance which the Food and Drug Administration warns consumers not to use, has no FDA-approved uses, and "appears to have properties that expose users to the risks of addiction, abuse, and dependence." FDA and Kratom, https://www.fda.gov/news-events/public-health-focus/fda-and-kratom (last visited Sept. 21, 2022). The Drug Enforcement Agency has listed kratom as a "Drug and Chemical of Concern." Drug Fact Sheet: Kratom, Apr. 2020, https://www.dea.gov/sites/default/files/2020-06/Kratom-2020.pdf. In 2016, the DEA "announced its intention to place the active materials in the kratom plant into Schedule I of the Controlled Substances Act in order to avoid an imminent hazard to public safety." DEA Announces Intent to Schedule Kratom, Aug. 30, 2016, https://www.dea.gov/press-releases/2016/08/30/dea- announces-intent-schedule-kratom.

Payments LLC settled with the vast majority of its merchants. T1 Payments LLC was not able to reach an amicable resolution with some of the merchants, such as 36 Circles. Ultimately, T1 Payments LLC was not able to resolve all liabilities and was forced to file for chapter 7 bankruptcy as a result of Payvision pulling the rug out from under them. 36 Circles and other merchants with whom T1 Payments LLC was unable to resolve their disputes, have made creditor claims in the bankruptcy case for T1 Payments LLC and its subsidiaries. Rather than recover damages as creditors under the chapter 7 bankruptcy, 36 Circles seeks to obtain monies from parties with whom they never contracted or had any dealings with pursuant to legally untenable theories. The bankruptcy trustee is privy to all transactions made by T1 Payments LLC and its subsidiaries. If there were any improper transactions made in an effort to conceal monies and thwart creditors, the trustee would be pursuing same.

Although the SAC attempts to blur the allegations of the FAC by adding the term, "conspiracy," the thrust of plaintiffs' FAC and SAC is that Kasdon, the other Responding Defendants, and the eleven new parties plaintiffs seek to add as defendants, are the alter egos of T1 Payments LLC.

As plaintiffs are well aware, alter ego claims are claims that are property of the bankruptcy estate. Plaintiffs have no standing or ability to bring such claims. *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). Plaintiffs' SAC also includes a fraudulent transfer claim. Any such claims are property of the bankruptcy estate and may only be prosecuted by the trustee. *Ahcom, Ltd. v. Smeding* (9th Cir. 2010) 623 F.3d 1248, 1250.

The bankruptcy trustee has not pursued any alter ego or fraudulent transfer claims whatsoever. Not long ago, the bankruptcy trustee solicited offers from plaintiffs and other T1 Payments LLC bankruptcy creditors to purchase all known and unknown alter ego claims of T1 Payments LLC. Responding Defendants reached a purchase agreement with the bankruptcy trustee to purchase all the known and unknown alter ego claims of T1 Payments LLC. This, of course, is a major blow to plaintiffs' case as, again, their claims against Kasdon and the other Responding Defendants hinge on theories of alter ego and fraudulent transfer liability. Now, knowing that the bankruptcy trustee has asserted no such claims and that any such claims are to become property of Responding Defendants, the Motion and proposed SAC are brought as a strategy to increase Responding Defendants litigation costs and compel Responding Defendants to settle this case.

***ii. Plaintiffs' Motion should be denied as having been filed in bad faith.***

On March 6, 2024, plaintiffs filed a Motion to Strike Answers and Enter Defaults for Discovery Abuses. On March 20, 2024, plaintiffs filed the instant Motion. Essentially, plaintiffs moved for an order declaring Responding Defendants in default of the FAC, then just two weeks later, filed a motion to file a SAC, which, if granted, would render the FAC moot. Plaintiffs' have been in possession of Responding Defendants discovery responses since November 8, 2023. Plaintiffs' "newly discovered evidence" was received by plaintiffs no later than November 20, 2023. That plaintiffs would file back-to-back motions that contradict one another in terms of the relief sought demonstrates their ulterior bad faith motives in bringing these motions.

Plaintiffs' Motion asserts that the complaint is being amended because of information discovered in the records produced by the bankruptcy trustee in response to plaintiffs' subpoena that conflicts with the testimony of Kasdon, King, and Fairchild given at their 2021 depositions in another case. Motion at 4:14-18. The depositions of Kasdon, King, and Fairchild were cited in, and attached to, the FAC filed on June 7, 2022. The Hadjinian Declaration confirms that plaintiffs were in possession of records subpoenaed from the bankruptcy trustee by no later than September 22, 2023. *See* September 22, 2023 Hadjinian Decl. at ¶¶ 4, 14-16. The instant Motion states that "none of the newly revealed information was available before November 20, 2023". *See* Motion at 4:8-9.

None of the "newly revealed information" is attached to plaintiffs' Motion. None of the newly revealed information has been filed with the Court. None of the newly revealed information has been disclosed to Responding Defendants.

The SAC cites 39 exhibits, including ten new exhibits that were not included in the FAC. Plaintiffs have not filed any of the ten new exhibits with the Court. Presumably, the ten new exhibits of the SAC include the "newly revealed information" cited in plaintiffs' Motion. None of the "newly revealed information" has been served on Responding Defendants as required under NRCP 16.1 despite plaintiffs' admitting having possessed such information since November 20, 2023 – at latest. As plaintiffs are surely aware, neither Responding Defendants nor the Court can determine the veracity of plaintiff's allegations regarding the content of the records subpoenaed from the bankruptcy trustee without producing the records and/or attaching them to the Motion.

To make matters worse, on March 6, 2024, plaintiffs' filed a motion to strike Responding Defendants' answers, enter defaults against Responding Defendants', award fees and costs, and to sanction Responding Defendants $15,000.00 based, in part, on the allegation that Responding Defendants' failed to comply with NRCP Rule 16.1 by not disclosing all documents which may be used to support claims or defenses or concerning the incident that gives rise to the lawsuit. Now, by way of the instant Motion and proposed SAC, plaintiffs admit to having possessed documents which may be used to support their claims and/or concerning the incident that gives rise to the lawsuit since at least November 20, 2023. As of April 3, 2024, the documents still have not been disclosed.

Assuming plaintiffs' allegations regarding the contents of those records are accurate, plaintiffs sat on them for at least four months, and perhaps more than six months, before moving to amend the complaint for the second time.

Plaintiffs have filed the instant Motion seeking to add additional defendants and additional claims, which if granted would render void the relief sought in their motion to strike answers, enter defaults, and for sanctions filed on March 6, 2024, not to assert valid claims based on a reasonable interpretation of the evidence, but rather as a transparent ploy to increase Responding Defendants' litigation costs and bludgeon Responding Defendants into entering a settlement. Plaintiffs' bad faith in bringing the Motion is apparent.

***iii. Plaintiffs' complaint has been amended once already.***

Plaintiffs filed their FAC on June 7, 2022, adding four additional defendants and asserting one additional claim. Plaintiffs now seek to file their SAC to add eleven new defendants and to assert either new claims or reframed variations of the prior claims under strained theories of conspiracy. Plaintiffs' goal is to circumvent the issue that the claims are rooted in theories of alter ego, to harass parties having no connection whatsoever to the contract at issue, and to thereby coerce Responding Defendants into a settlement.

***iv. Granting plaintiffs' Motion will cause undue delay and is prejudicial to Responding Defendants.***

Plaintiffs filed the instant Motion on the last date permitted by the Court's scheduling order. Granting plaintiffs' Motion will result in eleven new defendants being added to the case. Considering

the strained and unsupported theories of liability against each of the new defendants, including the vague, conclusory, and unsupported argument that the Court should find the SAC relates back to the original complaint, the SAC is sure to be responded to with motions to dismiss. Should plaintiffs somehow manage to overcome the glaring deficiencies of the SAC, it will be several months, if not years, before answers are filed and discovery between plaintiffs' and the new party defendants concluded. Meanwhile, Responding Defendants will continue to incur substantial litigation fees and costs to defend themselves in protracted litigation – which, of course, is plaintiffs' goal.

## IV. Conclusion

For the reasons set forth herein, Responding Defendants respectfully request the Court deny plaintiff's Motion.

DATED this 3rd day of April, 2024.

HUTCHISON & STEFFEN, PLLC

*/s/ Matthew S. McLaughlin*

Jeffrey R. Hall (9572)
Matthew S. McLaughlin (16110)
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, NV 89145

*Attorneys for Pixxles, LLC; PXLS, LLC; Pixxles, Ltd; Donald Kasdon, Debra Kaisen; Amber Lynn Fairchild*

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5(b), I certify that I am an employee of HUTCHISON & STEFFEN, PLLC and that on this 3rd day of April, 2024, I caused the document entitled **OPPOSITION TO MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT** to be served as follows:

[ ] by placing same to be deposited for mailing in the United States Mail, in a sealed envelope upon which first class postage was prepaid in Las Vegas, Nevada; and/or

[✓] pursuant to EDCR 8.05(a) and 8.05(f), to be electronically served through the Eighth Judicial District Court's electronic filing system, with the date and time of the electronic service substituted for the date and place of deposit in the mail; and/or

[ ] to be hand-delivered;

to the attorneys/ parties listed below:

David Mincin, Esq.
MINCIN LAW, PLLC
7465 W. Lake Mead Blvd., #100
Las Vegas, NV 89128
dmincin@mincinlaw.com

Adam Allen, Esq.
ALLEN & ASSOCIATES
2929 Allen Parkway, #200
Houston, TX 77019
adam@aallenlaw.com

*Attorneys for Plaintiff*

*/s/ Heather Bennett*

An employee of Hutchison & Steffen, PLLC

INTENTIONALLY LEFT BLANK
EXHIBIT PAGE ONLY

# EXHIBIT A

HUTCHISON & STEFFEN

A PROFESSIONAL LLC

**From:** Adam Allen <adam@aallenlaw.com>
**Sent:** Wednesday, March 20, 2024 8:35 AM
**To:** Matthew S. McLaughlin
**Subject:** Case No.: A-22-851903-B

**Follow Up Flag:** Follow up
**Flag Status:** Completed

Matt,
Will your clients agree to an amended complaint?
Thanks,
Adam

Adam Allen | Allen & Associates, Attorneys at Law
2777 Allen Parkway, Suite 1000 | Houston, Texas | 77019
T: 832.871.5920 | C: 281.857.3119 | F: 281.503.7671
adam@aallenlaw.com | www.aallenlaw.com

Please direct written correspondence to:
2929 Allen Parkway, Suite 200 | Houston, Texas | 77019

# EXHIBIT D

**File Copy**

# CERTIFICATE OF INCORPORATION
# OF A
# PRIVATE LIMITED COMPANY

Company Number **9484519**

The Registrar of Companies for England and Wales, hereby certifies that

T1 PAYMENTS LIMITED

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales

Given at Companies House, Cardiff, on **11th March 2015**

*N09484519R*

The above information was communicated by electronic means and authenticated by the Registrar of Companies under section 1115 of the Companies Act 2006

Companies House

REGISTRAR OF COMPANIES FOR ENGLAND AND WALES

CH

THE OFFICIAL SEAL OF THE REGISTRAR OF COMPANIES

Companies House

# IN01(ef)

## Application to register a company

*Received for filing in Electronic Format on the:* **11/03/2015**

X42X441F

| | |
|---|---|
| *Company Name in full:* | **T1 PAYMENTS LIMITED** |
| *Company Type:* | **Private limited by shares** |
| *Situation of Registered Office:* | **England and Wales** |
| *Proposed Register Office Address:* | **OFFICE 3 UNIT R1 PENFOLD WORKS<br>IMPERIAL WAY<br>WATFORD<br>UNITED KINGDOM<br>WD24 4YY** |

*I wish to entirely adopt the following model articles:* **Private (Ltd by Shares)**

*Company Director* *1*

*Type:* **Person**
*Full forename(s):* DEBRA KAREN

*Surname:* KING

*Former names:*

*Service Address recorded as Company's registered office*

*Country/State Usually Resident:* USA

*Date of Birth:* 04/05/1958 *Nationality:* AMERICAN
*Occupation:* DIRECTOR

*Consented to Act:* Y *Date authorised:* 11/03/2015 *Authenticated:* YES

## Statement of Capital (Share Capital)

| | | | |
|---|---|---|---|
| **Class of shares** | ORDINARY | *Number allotted* | 1 |
| | | *Aggregate nominal value* | 1 |
| *Currency* | GBP | *Amount paid per share* | 1 |
| | | *Amount unpaid per share* | 0 |

*Prescribed particulars*

EACH SHARE HAS FULL RIGHTS IN THE COMPANY WITH RESPECT TO VOTING, DIVIDENDS AND DISTRIBUTIONS.

## Statement of Capital (Totals)

| | | | |
|---|---|---|---|
| *Currency* | GBP | *Total number of shares* | 1 |
| | | *Total aggregate nominal value* | 1 |

# Initial Shareholdings

*Name:* **DEBRA KAREN KING**

| | | | |
|---|---|---|---|
| *Address:* | **11441 ALLERTON PARK DRIVE 413**<br>**LAS VEGAS**<br>**USA**<br>**NV89135** | *Class of share:* | **ORDINARY** |
| | | *Number of shares:* | **1** |
| | | *Currency:* | **GBP** |
| | | *Nominal value of each share:* | **1** |
| | | *Amount unpaid:* | **0** |
| | | *Amount paid:* | **1** |

## Statement of Compliance

*I confirm the requirements of the Companies Act 2006 as to registration have been complied with.*

*memorandum delivered by an agent for the subscriber(s):* **Yes**

*Agent's Name:* **BMS FIDUCIARY SERVICES LIMITED**

*Agent's Address:*
**OFFICE 3 UNIT R1 PENFOLD WORKS**
**IMPERIAL WAY**
**WATFORD**
**UNITED KINGDOM**
**WD24 4YY**

## *Authorisation*

*Authoriser Designation:* **agent**

*Authenticated:* **Yes**

*Agent's Name:* **BMS FIDUCIARY SERVICES LIMITED**

*Agent's Address:*
**OFFICE 3 UNIT R1 PENFOLD WORKS**
**IMPERIAL WAY**
**WATFORD**
**UNITED KINGDOM**
**WD24 4YY**

# COMPANY HAVING A SHARE CAPITAL

## Memorandum of association of

## T1 PAYMENTS LIMITED

Each subscriber to this memorandum of association wishes to form a company under the Companies Act 2006 and agrees to become a member of the company and to take at least one share.

| Name of each subscriber | Authentication |
|---|---|
| Debra Karen King | Authenticated Electronically |

Dated: 11/03/2015

# EXHIBIT E

BARBARA K. CEGAVSKE
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov
www.nvsilverflume.gov

# Annual or Amended List and State Business License Application

☑ ANNUAL ☐ AMENDED (check one)

**List of Officers, Managers, Members, General Partners, Managing Partners, Trustees or Subscribers:**

**TGLOBAL SERVICES LLC**
NAME OF ENTITY

**NV20161698427**
Entity or Nevada Business Identification Number (NVID)

**TYPE OR PRINT ONLY - USE DARK INK ONLY - DO NOT HIGHLIGHT**

***IMPORTANT:*** *Read instructions before completing and returning this form.*

Please indicate the entity type (check only one):

☐ Corporation
  ☐ This corporation is publicly traded, the Central Index Key number is:

☐ Nonprofit Corporation (see nonprofit sections below)

☑ Limited-Liability Company

☐ Limited Partnership

☐ Limited-Liability Partnership

☐ Limited-Liability Limited Partnership

☐ Business Trust

☐ Corporation Sole

| Filed in the Office of | Business Number E0518212016-2 |
|---|---|
| *Barbara K. Cegavske* (signature) | Filing Number 20211974582 |
| Secretary of State State Of Nevada | Filed On 12/22/2021 16:47:25 PM |
| | Number of Pages 2 |

Additional Officers, Managers, Members, General Partners, Managing Partners, Trustees or Subscribers, may be listed on a supplemental page.

**CHECK ONLY IF APPLICABLE**

Pursuant to NRS Chapter 76, this entity is exempt from the business license fee.
☐ 001 - Governmental Entity
☐ 006 - NRS 680B.020 Insurance Co, provide license or certificate of authority number

**For nonprofit entities formed under NRS chapter 80:** entities without 501(c) nonprofit designation are required to maintain a state business license, the fee is $200.00. Those claiming an exemption under 501(c) designation must indicate by checking box below.

☐ Pursuant to NRS Chapter 76, this entity is a 501(c) nonprofit entity and is exempt from the business license fee. Exemption Code 002

**For nonprofit entities formed under NRS Chapter 81:** entities which are Unit-owners' association or Religious, Charitable, fraternal or other organization that qualifies as a tax-exempt organization pursuant to 26 U.S.C $ 501(c) are excluded from the requirement to obtain a state business license. Please indicate below if this entity falls under one of these categories by marking the appropriate box. If the entity does not fall under either of these categories please submit $200.00 for the state business license.

☐ Unit-owners' Association ☐ Religious, charitable, fraternal or other organization that qualifies as a tax-exempt organization pursuant to 26 U.S.C. $501(c)

**For nonprofit entities formed under NRS Chapter 82 and 80:**<u>**Charitable Solicitation Information - check applicable box**</u>

Does the Organization intend to solicit charitable or tax deductible contributions?

☐ No - no additional form is required

☐ Yes - the "Charitable Solicitation Registration Statement" is required.

☐ The Organization claims exemption pursuant to NRS 82A 210 - the "Exemption From Charitable Solicitation Registration Statement" is required

****Failure to include the required statement form will result in rejection of the filing and could result in late fees.****

BARBARA K. CEGAVSKE
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov
www.nvsilverflume.gov

# Annual or Amended List and State Business License Application - Continued

**Officers, Managers, Members, General Partners, Managing Partners, Trustees or Subscribers:**

CORPORATION, INDICATE THE MANAGER:

| Name | | | | Country |
|---|---|---|---|---|
| DEBRA KAISEN | | | | USA |

| Address | City | State | Zip/Postal Code |
|---|---|---|---|
| 1810 E SAHARA AVENUE | Las Vegas | NV | 89104 |

None of the officers and directors identified in the list of officers has been identified with the fraudulent intent of concealing the identity of any person or persons exercising the power or authority of an officer or director in furtherance of any unlawful conduct.

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X Debra Kaisen

**Signature of Officer, Manager, Managing Member, General Partner, Managing Partner, Trustee, Subscriber, Member, Owner of Business, Partner or Authorized Signer** *FORM WILL BE RETURNED IF UNSIGNED*

| Title | Date |
|---|---|
| Manager | 12/22/2021 |

# EXHIBIT F

**FILE COPY**

# CERTIFICATE OF INCORPORATION
# OF A
# PRIVATE LIMITED COMPANY

Company Number **11302654**

The Registrar of Companies for England and Wales, hereby certifies that

**TGLOBAL SERVICES LTD**

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales

Given at Companies House, Cardiff, on **10th April 2018**

* N113026549 *

Companies House

THE OFFICIAL SEAL OF THE REGISTRAR OF COMPANIES

The above information was communicated by electronic means and authenticated by the Registrar of Companies under section 1115 of the Companies Act 2006

Companies House

# IN01(ef)

**Application to register a company**

*Received for filing in Electronic Format on the:* **10/04/2018**

*X73JQJ9M*

| | |
|---|---|
| *Company Name in full:* | **TGLOBAL SERVICES LTD** |
| *Company Type:* | **Private company limited by shares** |
| *Situation of Registered Office:* | **England and Wales** |
| *Proposed Registered Office Address:* | **WE WORK 138 HOLBORN<br>LONDON<br>UNITED KINGDOM EC1N 2SW** |
| *Sic Codes:* | **82990** |

# *Proposed Officers*

## *Company Director 1*

| | |
|---|---|
| *Type:* | **Person** |
| *Full Forename(s):* | **MS DEBRA KAREN** |
| *Surname:* | **KING** |
| *Service Address:* | **recorded as Company's registered office** |
| *Country/State Usually Resident:* | **USA** |

*Date of Birth:* ****/04/1958** *Nationality:* **AMERICAN**

*Occupation:* **MANAGER**

*The subscribers confirm that the person named has consented to act as a director.*

## *Company Director 2*

| | |
|---|---|
| *Type:* | **Person** |
| *Full Forename(s):* | **MS AMBER LYNN** |
| *Surname:* | **FAIRCHILD** |
| *Service Address:* | **recorded as Company's registered office** |
| *Country/State Usually Resident:* | **USA** |

*Date of Birth:* ****/01/1986** *Nationality:* **AMERICAN**

*Occupation:* **MANAGER**

*The subscribers confirm that the person named has consented to act as a director.*

## *Statement of Capital (Share Capital)*

| | | | |
|---|---|---|---|
| *Class of Shares:* | **ORDINARY** | *Number allotted* | **1** |
| *Currency:* | **GBP** | *Aggregate nominal value:* | **1** |

*Prescribed particulars*

**THE ORDINARY SHARES SHALL BE NON REDEEMABLE BUT SHALL HOLD FULL RIGHTS IN RESPECT OF VOTING, AND SHALL ENTITLE THE HOLDER TO FULL PARTICIPATION IN RESPECT OF EQUITY AND IN THE EVENT OF A WINDING UP OF THE COMPANY. THE SHARES MAY BE CONSIDERED BY THE DIRECTORS WHEN CONSIDERING DIVIDENDS FROM TIME TO TIME.**

### Statement of Capital (Totals)

| | | | |
|---|---|---|---|
| *Currency:* | **GBP** | *Total number of shares:* | **1** |
| | | *Total aggregate nominal value:* | **1** |
| | | *Total aggregate unpaid:* | **0** |

# *Initial Shareholdings*

| | | | |
|---|---|---|---|
| *Name:* | **DEBRA KAREN KING** | | |
| *Address* | **WE WORK 138 HOLBORN<br>LONDON<br>UNITED KINGDOM<br>EC1N 2SW** | *Class of Shares:* | **ORDINARY** |
| | | *Number of shares:* | **1** |
| | | *Currency:* | **GBP** |
| | | *Nominal value of each share:* | **1** |
| | | *Amount unpaid:* | **0** |
| | | *Amount paid:* | **1** |

# *Persons with Significant Control (PSC)*

**Statement of initial significant control**

**On incorporation, there will be someone who will count as a Person with Significant Control (either a registerable person or relevant legal entity (RLE)) in relation to the company**

# *Individual Person with Significant Control details*

*Names:* **MS DEBRA KAREN KING**

*Country/State Usually Resident:* **USA**

*Date of Birth:* ****/04/1958** *Nationality:* **AMERICAN**

*Service address recorded as Company's registered office*

*The subscribers confirm that each person named as an individual PSC in this application knows that their particulars are being supplied as part of this application.*

| | |
|---|---|
| *Nature of control* | **The person holds, directly or indirectly, 75% or more of the shares in the company.** |

## *Statement of Compliance*

*I confirm the requirements of the Companies Act 2006 as to registration have been complied with.*

| | |
|---|---|
| *Name:* | **DEBRA KAREN KING** |
| *Authenticated* | **YES** |

## *Authorisation*

*Authoriser Designation:* **subscriber** *Authenticated* **YES**

# COMPANY HAVING A SHARE CAPITAL

Memorandum of Association of

TGLOBAL SERVICES LTD

Each subscriber to this Memorandum of Association wishes to form a company under the Companies Act 2006 and agrees to become a member of the company and to take at least one share.

| Name of each subscriber | Authentication by each subscriber |
| --- | --- |
| Ms Debra Karen King | Ms Debra Karen King |

Dated 10/4/2018

**The model articles of association for private companies limited by shares as contained in Schedule 1 to The Companies (Model Articles) Regulations 2008 (SI 2008 No. 3229) apply to the company save in so far as they are excluded or modified. These model articles of association for private companies limited by shares are reprinted without the index below.**

# Companies Act 2006
# Model Articles
# Private Company Limited by Shares

**PART 1 - INTERPRETATION AND LIMITATION OF LIABILITY**

**Defined terms**

1. In the articles, unless the context requires otherwise—

"articles" means the company's articles of association;

"bankruptcy" includes individual insolvency proceedings in a jurisdiction other than England and Wales or Northern Ireland which have an effect similar to that of bankruptcy;

"chairman" has the meaning given in article 12;

"chairman of the meeting" has the meaning given in article 39;

"Companies Acts" means the Companies Acts (as defined in section 2 of the Companies Act 2006), in so far as they apply to the company;

"director" means a director of the company, and includes any person occupying the position of director, by whatever name called;

"distribution recipient" has the meaning given in article 31;

"document" includes, unless otherwise specified, any document sent or supplied in electronic form;

"electronic form" has the meaning given in section 1168 of the Companies Act 2006;

"fully paid" in relation to a share, means that the nominal value and any premium to be paid to the company in respect of that share have been paid to the company;

"hard copy form" has the meaning given in section 1168 of the Companies Act 2006;

"holder" in relation to shares means the person whose name is entered in the register of members as the holder of the shares;

"instrument" means a document in hard copy form;

"ordinary resolution" has the meaning given in section 282 of the Companies Act 2006;

"paid" means paid or credited as paid;

"participate", in relation to a directors' meeting, has the meaning given in article 10;

"proxy notice" has the meaning given in article 45;

"shareholder" means a person who is the holder of a share;

"shares" means shares in the company;

"special resolution" has the meaning given in section 283 of the Companies Act 2006;

"subsidiary" has the meaning given in section 1159 of the Companies Act 2006;

"transmittee" means a person entitled to a share by reason of the death or bankruptcy of a shareholder or otherwise by operation of law; and

"writing" means the representation or reproduction of words, symbols or other information in a visible form by any method or combination of methods, whether sent or supplied in electronic form or otherwise.

Unless the context otherwise requires, other words or expressions contained in these articles bear the same meaning as in the Companies Act 2006 as in force on the date when these articles become binding on the company.

**Liability of members**

2. The liability of the members is limited to the amount, if any, unpaid on the shares held by them.

**PART 2 - DIRECTORS**

DIRECTORS' POWERS AND RESPONSIBILITIES

**Directors' general authority**

3. Subject to the articles, the directors are responsible for the management of the company's business, for which purpose they may exercise all the powers of the company.

**Shareholders' reserve power**

4. (1) The shareholders may, by special resolution, direct the directors to take, or refrain from taking, specified action.

(2) No such special resolution invalidates anything which the directors have done before the passing of the resolution.

**Directors may delegate**

5. (1) Subject to the articles, the directors may delegate any of the powers which are conferred on them under the articles—

(a) to such person or committee;

(b) by such means (including by power of attorney);

(c) to such an extent;

(d) in relation to such matters or territories; and

(e) on such terms and conditions;

as they think fit.

(2) If the directors so specify, any such delegation may authorise further delegation of the directors' powers by any person to whom they are delegated.

(3) The directors may revoke any delegation in whole or part, or alter its terms and conditions.

**Committees**

6. (1) Committees to which the directors delegate any of their powers must follow procedures which are based as far as they are applicable on those provisions of the articles which govern the taking of decisions by directors.

(2) The directors may make rules of procedure for all or any committees, which prevail over rules derived from the articles if they are not consistent with them.

DECISION-MAKING BY DIRECTORS

**Directors to take decisions collectively**

7. (1) The general rule about decision-making by directors is that any decision of the directors must be either a majority decision at a meeting or a decision taken in accordance with article 8.

(2) If—

(a) the company only has one director, and

(b) no provision of the articles requires it to have more than one director,

the general rule does not apply, and the director may take decisions without regard to any of the provisions of the articles relating to directors' decision-making.

**Unanimous decisions**

8. (1) A decision of the directors is taken in accordance with this article when all eligible directors indicate to each other by any means that they share a common view on a matter.

(2) Such a decision may take the form of a resolution in writing, copies of which have been signed by each eligible director or to which each eligible director has otherwise indicated agreement in writing.

(3) References in this article to eligible directors are to directors who would have been entitled to vote on the matter had it been proposed as a resolution at a directors' meeting.

(4) A decision may not be taken in accordance with this article if the eligible directors would not have formed a quorum at such a meeting.

**Calling a directors' meeting**

9. (1) Any director may call a directors' meeting by giving notice of the meeting to the directors or by authorising the company secretary (if any) to give such notice.

(2) Notice of any directors' meeting must indicate—

(a) its proposed date and time;

(b) where it is to take place; and

(c) if it is anticipated that directors participating in the meeting will not be in the same place, how it is proposed that they should communicate with each other during the meeting.

(3) Notice of a directors' meeting must be given to each director, but need not be in writing.

(4) Notice of a directors' meeting need not be given to directors who waive their entitlement to notice of that meeting, by giving notice to that effect to the company not more than 7 days after the date on which the meeting is held. Where such notice is given after the meeting has been held, that does not affect the validity of the meeting, or of any business conducted at it.

**Participation in directors' meetings**

10. (1) Subject to the articles, directors participate in a directors' meeting, or part of a directors' meeting, when—

(a) the meeting has been called and takes place in accordance with the articles, and

(b) they can each communicate to the others any information or opinions they have on any particular item of the business of the meeting.

(2) In determining whether directors are participating in a directors' meeting, it is irrelevant where any director is or how they communicate with each other.

(3) If all the directors participating in a meeting are not in the same place, they may decide that the meeting is to be treated as taking place wherever any of them is.

**Quorum for directors' meetings**

11. (1) At a directors' meeting, unless a quorum is participating, no proposal is to be voted on, except a proposal to call another meeting.

(2) The quorum for directors' meetings may be fixed from time to time by a decision of the directors, but it must never be less than two, and unless otherwise fixed it is two.

(3) If the total number of directors for the time being is less than the quorum required, the directors must not take any decision other than a decision—

(a) to appoint further directors, or

(b) to call a general meeting so as to enable the shareholders to appoint further directors.

**Chairing of directors' meetings**

12. (1) The directors may appoint a director to chair their meetings.

(2) The person so appointed for the time being is known as the chairman.

(3) The directors may terminate the chairman's appointment at any time.

(4) If the chairman is not participating in a directors' meeting within ten minutes of the time at which it was to start, the participating directors must appoint one of themselves to chair it.

**Casting vote**

13. (1) If the numbers of votes for and against a proposal are equal, the chairman or other director chairing the meeting has a casting vote.

(2) But this does not apply if, in accordance with the articles, the chairman or other director is not to be counted as participating in the decision-making process for quorum or voting purposes.

**Conflicts of interest**

14. (1) If a proposed decision of the directors is concerned with an actual or proposed transaction or arrangement with the company in which a director is interested, that director is not to be counted as participating in the decision-making process for quorum or voting purposes.

(2) But if paragraph (3) applies, a director who is interested in an actual or proposed transaction or arrangement with the company is to be counted as participating in the decision-making process for quorum and voting purposes.

(3) This paragraph applies when—

(a) the company by ordinary resolution disapplies the provision of the articles which would otherwise prevent a director from being counted as participating in the decision-making process;

(b) the director's interest cannot reasonably be regarded as likely to give rise to a conflict of interest; or

(c) the director's conflict of interest arises from a permitted cause.

(4) For the purposes of this article, the following are permitted causes—

(a) a guarantee given, or to be given, by or to a director in respect of an obligation incurred by or on behalf of the company or any of its subsidiaries;

(b) subscription, or an agreement to subscribe, for shares or other securities of the company or any of its subsidiaries, or to underwrite, sub-underwrite, or guarantee subscription for any such shares or securities; and

(c) arrangements pursuant to which benefits are made available to employees and directors or former employees and directors of the company or any of its subsidiaries which do not provide special benefits for directors or former directors.

(5) For the purposes of this article, references to proposed decisions and decision-making processes include any directors' meeting or part of a directors' meeting.

(6) Subject to paragraph (7), if a question arises at a meeting of directors or of a committee of directors as to the right of a director to participate in the meeting (or part of the meeting) for voting or quorum purposes, the question may, before the conclusion of the meeting, be referred to the chairman whose ruling in relation to any director other than the chairman is to be final and conclusive.

(7) If any question as to the right to participate in the meeting (or part of the meeting) should arise in respect of the chairman, the question is to be decided by a decision of the directors at that meeting, for which purpose the chairman is not to be counted as participating in the meeting (or that part of the meeting) for voting or quorum purposes.

**Records of decisions to be kept**

15. The directors must ensure that the company keeps a record, in writing, for at least 10 years from the date of the decision recorded, of every unanimous or majority decision taken by the directors.

**Directors' discretion to make further rules**

16. Subject to the articles, the directors may make any rule which they think fit about how they take decisions, and about how such rules are to be recorded or communicated to directors.

APPOINTMENT OF DIRECTORS

**Methods of appointing directors**

17. (1) Any person who is willing to act as a director, and is permitted by law to do so, may be appointed to be a director—

(a) by ordinary resolution, or

(b) by a decision of the directors.

(2) In any case where, as a result of death, the company has no shareholders and no directors, the personal representatives of the last shareholder to have died have the right, by notice in writing, to appoint a person to be a director.

(3) For the purposes of paragraph (2), where 2 or more shareholders die in circumstances rendering it uncertain who was the last to die, a younger shareholder is deemed to have survived an older shareholder.

**Termination of director's appointment**

18. A person ceases to be a director as soon as—

(a) that person ceases to be a director by virtue of any provision of the Companies Act 2006 or is prohibited from being a director by law;

(b) a bankruptcy order is made against that person;

(c) a composition is made with that person's creditors generally in satisfaction of that person's debts;

(d) a registered medical practitioner who is treating that person gives a written opinion to the company stating that that person has become physically or mentally incapable of acting as a director and may remain so for more than three months;

(e) *by reason of that person's mental health, a court makes an order which wholly or partly prevents that person from personally exercising any powers or rights which that person would otherwise have;*[1]

(f) notification is received by the company from the director that the director is resigning from office, and such resignation has taken effect in accordance with its terms.

**Directors' remuneration**

**19.** (1) Directors may undertake any services for the company that the directors decide.

(2) Directors are entitled to such remuneration as the directors determine—

(a) for their services to the company as directors, and

(b) for any other service which they undertake for the company.

(3) Subject to the articles, a director's remuneration may—

(a) take any form, and

(b) include any arrangements in connection with the payment of a pension, allowance or gratuity, or any death, sickness or disability benefits, to or in respect of that director.

(4) Unless the directors decide otherwise, directors' remuneration accrues from day to day.

(5) Unless the directors decide otherwise, directors are not accountable to the company for any remuneration which they receive as directors or other officers or employees of the company's subsidiaries or of any other body corporate in which the company is interested.

**Directors' expenses**

**20.** The company may pay any reasonable expenses which the directors properly incur in connection with their attendance at—

(a) meetings of directors or committees of directors,

(b) general meetings, or

(c) separate meetings of the holders of any class of shares or of debentures of the company,

or otherwise in connection with the exercise of their powers and the discharge of their responsibilities in relation to the company.

**PART 3 - SHARES AND DISTRIBUTIONS**

SHARES

**All shares to be fully paid up**

**21.** (1) No share is to be issued for less than the aggregate of its nominal value and any premium to be paid to the company in consideration for its issue.

(2) This does not apply to shares taken on the formation of the company by the subscribers to the company's memorandum.

**Powers to issue different classes of share**

**22.** (1) Subject to the articles, but without prejudice to the rights attached to any existing share, the company may issue shares with such rights or restrictions as may be determined by ordinary resolution.

(2) The company may issue shares which are to be redeemed, or are liable to be redeemed at the option of the company or the holder, and the directors may determine the terms, conditions and manner of redemption of any such shares.

**Company not bound by less than absolute interests**

**23.** Except as required by law, no person is to be recognised by the company as holding any share upon any trust, and except as otherwise required by law or the articles, the company is not in any way to be bound by or recognise any interest in a share other than the holder's absolute ownership of it and all the rights attaching to it.

**Share certificates**

**24.** (1) The company must issue each shareholder, free of charge, with one or more certificates in respect of the shares which that shareholder holds.

(2) Every certificate must specify—

(a) in respect of how many shares, of what class, it is issued;

(b) the nominal value of those shares;

(c) that the shares are fully paid; and

(d) any distinguishing numbers assigned to them.

(3) No certificate may be issued in respect of shares of more than one class.

(4) If more than one person holds a share, only one certificate may be issued in respect of it.

(5) Certificates must—

(a) have affixed to them the company's common seal, or

(b) be otherwise executed in accordance with the Companies Acts.

**Replacement share certificates**

**25.** (1) If a certificate issued in respect of a shareholder's shares is—

(a) damaged or defaced, or

(b) said to be lost, stolen or destroyed,

that shareholder is entitled to be issued with a replacement certificate in respect of the same shares.

(2) A shareholder exercising the right to be issued with such a replacement certificate—

(a) may at the same time exercise the right to be issued with a single certificate or separate certificates;

(b) must return the certificate which is to be replaced to the company if it is damaged or defaced; and

(c) must comply with such conditions as to evidence, indemnity and the payment of a reasonable fee as the directors decide.

**Share transfers**

**26.** (1) Shares may be transferred by means of an instrument of transfer in any usual form or any other form approved by the directors, which is executed by or on behalf of the transferor.

(2) No fee may be charged for registering any instrument of transfer or other document relating to or affecting the title to any share.

(3) The company may retain any instrument of transfer which is registered.

(4) The transferor remains the holder of a share until the transferee's name is entered in the register of members as holder of it.

(5) The directors may refuse to register the transfer of a share, and if they do so, the instrument of transfer must be returned to the transferee with the notice of refusal unless they suspect that the proposed transfer may be fraudulent.

**Transmission of shares**

**27.** (1) If title to a share passes to a transmittee, the company may only recognise the transmittee as having any title to that share.

(2) A transmittee who produces such evidence of entitlement to shares as the directors may properly require—

(a) may, subject to the articles, choose either to become the holder of those shares or to have them transferred to another person, and

(b) subject to the articles, and pending any transfer of the shares to another person, has the same rights as the holder had.

(3) But transmittees do not have the right to attend or vote at a general meeting, or agree to a proposed written resolution, in respect of shares to which they are entitled, by reason of the holder's death or bankruptcy or otherwise, unless they become the holders of those shares.

**Exercise of transmittees' rights**

**28.** (1) Transmittees who wish to become the holders of shares to which they have become entitled must notify the company in writing of that wish.

(2) If the transmittee wishes to have a share transferred to another person, the transmittee must execute an instrument of transfer in respect of it.

(3) Any transfer made or executed under this article is to be treated as if it were made or executed by the person from whom the transmittee has derived rights in respect of the share, and as if the event which gave rise to the transmission had not occurred.

**Transmittees bound by prior notices**

[1] The Mental Health (Discrimination) Act 2013 provides that 18(e) is omitted as from 28 April 2013.

**29.** If a notice is given to a shareholder in respect of shares and a transmittee is entitled to those shares, the transmittee is bound by the notice if it was given to the shareholder before the transmittee's name has been entered in the register of members.

DIVIDENDS AND OTHER DISTRIBUTIONS

**Procedure for declaring dividends**

**30.** (1) The company may by ordinary resolution declare dividends, and the directors may decide to pay interim dividends.

(2) A dividend must not be declared unless the directors have made a recommendation as to its amount. Such a dividend must not exceed the amount recommended by the directors.

(3) No dividend may be declared or paid unless it is in accordance with shareholders' respective rights.

(4) Unless the shareholders' resolution to declare or directors' decision to pay a dividend, or the terms on which shares are issued, specify otherwise, it must be paid by reference to each shareholder's holding of shares on the date of the resolution or decision to declare or pay it.

(5) If the company's share capital is divided into different classes, no interim dividend may be paid on shares carrying deferred or non-preferred rights if, at the time of payment, any preferential dividend is in arrear.

(6) The directors may pay at intervals any dividend payable at a fixed rate if it appears to them that the profits available for distribution justify the payment.

(7) If the directors act in good faith, they do not incur any liability to the holders of shares conferring preferred rights for any loss they may suffer by the lawful payment of an interim dividend on shares with deferred or non-preferred rights.

**Payment of dividends and other distributions**

**31.** (1) Where a dividend or other sum which is a distribution is payable in respect of a share, it must be paid by one or more of the following means—

(a) transfer to a bank or building society account specified by the distribution recipient either in writing or as the directors may otherwise decide;

(b) sending a cheque made payable to the distribution recipient by post to the distribution recipient at the distribution recipient's registered address (if the distribution recipient is a holder of the share), or (in any other case) to an address specified by the distribution recipient either in writing or as the directors may otherwise decide;

(c) sending a cheque made payable to such person by post to such person at such address as the distribution recipient has specified either in writing or as the directors may otherwise decide; or

(d) any other means of payment as the directors agree with the distribution recipient either in writing or by such other means as the directors decide.

(2) In the articles, "the distribution recipient" means, in respect of a share in respect of which a dividend or other sum is payable—

(a) the holder of the share; or

(b) if the share has two or more joint holders, whichever of them is named first in the register of members; or

(c) if the holder is no longer entitled to the share by reason of death or bankruptcy, or otherwise by operation of law, the transmittee.

**No interest on distributions**

**32.** The company may not pay interest on any dividend or other sum payable in respect of a share unless otherwise provided by—

(a) the terms on which the share was issued, or

(b) the provisions of another agreement between the holder of that share and the company.

**Unclaimed distributions**

**33.** (1) All dividends or other sums which are—

(a) payable in respect of shares, and

(b) unclaimed after having been declared or become payable,

may be invested or otherwise made use of by the directors for the benefit of the company until claimed.

(2) The payment of any such dividend or other sum into a separate account does not make the company a trustee in respect of it.

(3) If—

(a) twelve years have passed from the date on which a dividend or other sum became due for payment, and

(b) the distribution recipient has not claimed it,

the distribution recipient is no longer entitled to that dividend or other sum and it ceases to remain owing by the company.

**Non-cash distributions**

**34.** (1) Subject to the terms of issue of the share in question, the company may, by ordinary resolution on the recommendation of the directors, decide to pay all or part of a dividend or other distribution payable in respect of a share by transferring non-cash assets of equivalent value (including, without limitation, shares or other securities in any company).

(2) For the purposes of paying a non-cash distribution, the directors may make whatever arrangements they think fit, including, where any difficulty arises regarding the distribution—

(a) fixing the value of any assets;

(b) paying cash to any distribution recipient on the basis of that value in order to adjust the rights of recipients; and

(c) vesting any assets in trustees.

**Waiver of distributions**

**35.** Distribution recipients may waive their entitlement to a dividend or other distribution payable in respect of a share by giving the company notice in writing to that effect, but if—

(a) the share has more than one holder, or

(b) more than one person is entitled to the share, whether by reason of the death or bankruptcy of one or more joint holders, or otherwise,

the notice is not effective unless it is expressed to be given, and signed, by all the holders or persons otherwise entitled to the share.

CAPITALISATION OF PROFITS

**Authority to capitalise and appropriation of capitalised sums**

**36.** (1) Subject to the articles, the directors may, if they are so authorised by an ordinary resolution—

(a) decide to capitalise any profits of the company (whether or not they are available for distribution) which are not required for paying a preferential dividend, or any sum standing to the credit of the company's share premium account or capital redemption reserve; and

(b) appropriate any sum which they so decide to capitalise (a "capitalised sum") to the persons who would have been entitled to it if it were distributed by way of dividend (the "persons entitled") and in the same proportions.

(2) Capitalised sums must be applied—

(a) on behalf of the persons entitled, and

(b) in the same proportions as a dividend would have been distributed to them.

(3) Any capitalised sum may be applied in paying up new shares of a nominal amount equal to the capitalised sum which are then allotted credited as fully paid to the persons entitled or as they may direct.

(4) A capitalised sum which was appropriated from profits available for distribution may be applied in paying up new debentures of the company which are then allotted credited as fully paid to the persons entitled or as they may direct.

(5) Subject to the articles the directors may—

(a) apply capitalised sums in accordance with paragraphs (3) and (4) partly in one way and partly in another;

(b) make such arrangements as they think fit to deal with shares or debentures becoming distributable in fractions under this article (including the issue of fractional certificates or the making of cash payments); and

(c) authorise any person to enter into an agreement with the company on behalf of all the persons entitled which is binding on them in respect of the allotment of shares and debentures to them under this article.

**PART 4 - DECISION-MAKING BY SHAREHOLDERS**

ORGANISATION OF GENERAL MEETINGS

**Attendance and speaking at general meetings**

**37.** (1) A person is able to exercise the right to speak at a general meeting when that person is in a position to communicate to all those attending the meeting, during the meeting, any information or opinions which that person has on the business of the meeting.

(2) A person is able to exercise the right to vote at a general meeting when—

(a) that person is able to vote, during the meeting, on resolutions put to the vote at the meeting, and

(b) that person's vote can be taken into account in determining whether or not such resolutions are passed at the same time as the votes of all the other persons attending the meeting.

(3) The directors may make whatever arrangements they consider appropriate to enable those attending a general meeting to exercise their rights to speak or vote at it.

(4) In determining attendance at a general meeting, it is immaterial whether any two or more members attending it are in the same place as each other.

(5) Two or more persons who are not in the same place as each other attend a general meeting if their circumstances are such that if they have (or were to have) rights to speak and vote at that meeting, they are (or would be) able to exercise them.

**Quorum for general meetings**

**38.** No business other than the appointment of the chairman of the meeting is to be transacted at a general meeting if the persons attending it do not constitute a quorum.

**Chairing general meetings**

**39.** (1) If the directors have appointed a chairman, the chairman shall chair general meetings if present and willing to do so.

(2) If the directors have not appointed a chairman, or if the chairman is unwilling to chair the meeting or is not present within ten minutes of the time at which a meeting was due to start—

(a) the directors present, or

(b) (if no directors are present), the meeting,

must appoint a director or shareholder to chair the meeting, and the appointment of the chairman of the meeting must be the first business of the meeting.

(3) The person chairing a meeting in accordance with this article is referred to as "the chairman of the meeting".

**Attendance and speaking by directors and non-shareholders**

**40.** (1) Directors may attend and speak at general meetings, whether or not they are shareholders.

(2) The chairman of the meeting may permit other persons who are not—

(a) shareholders of the company, or

(b) otherwise entitled to exercise the rights of shareholders in relation to general meetings,

to attend and speak at a general meeting.

**Adjournment**

**41.** (1) If the persons attending a general meeting within half an hour of the time at which the meeting was due to start do not constitute a quorum, or if during a meeting a quorum ceases to be present, the chairman of the meeting must adjourn it.

(2) The chairman of the meeting may adjourn a general meeting at which a quorum is present if—

(a) the meeting consents to an adjournment, or

(b) it appears to the chairman of the meeting that an adjournment is necessary to protect the safety of any person attending the meeting or ensure that the business of the meeting is conducted in an orderly manner.

(3) The chairman of the meeting must adjourn a general meeting if directed to do so by the meeting.

(4) When adjourning a general meeting, the chairman of the meeting must—

(a) either specify the time and place to which it is adjourned or state that it is to continue at a time and place to be fixed by the directors, and

(b) have regard to any directions as to the time and place of any adjournment which have been given by the meeting.

(5) If the continuation of an adjourned meeting is to take place more than 14 days after it was adjourned, the company must give at least 7 clear days' notice of it (that is, excluding the day of the adjourned meeting and the day on which the notice is given)—

(a) to the same persons to whom notice of the company's general meetings is required to be given, and

(b) containing the same information which such notice is required to contain.

(6) No business may be transacted at an adjourned general meeting which could not properly have been transacted at the meeting if the adjournment had not taken place.

VOTING AT GENERAL MEETINGS

**Voting: general**

**42.** A resolution put to the vote of a general meeting must be decided on a show of hands unless a poll is duly demanded in accordance with the articles.

**Errors and disputes**

**43.** (1) No objection may be raised to the qualification of any person voting at a general meeting except at the meeting or adjourned meeting at which the vote objected to is tendered, and every vote not disallowed at the meeting is valid.

(2) Any such objection must be referred to the chairman of the meeting, whose decision is final.

**Poll votes**

**44.** (1) A poll on a resolution may be demanded—

(a) in advance of the general meeting where it is to be put to the vote, or

(b) at a general meeting, either before a show of hands on that resolution or immediately after the result of a show of hands on that resolution is declared.

(2) A poll may be demanded by—

(a) the chairman of the meeting;

(b) the directors;

(c) two or more persons having the right to vote on the resolution; or

(d) a person or persons representing not less than one tenth of the total voting rights of all the shareholders having the right to vote on the resolution.

(3) A demand for a poll may be withdrawn if—

(a) the poll has not yet been taken, and

(b) the chairman of the meeting consents to the withdrawal.

(4) Polls must be taken immediately and in such manner as the chairman of the meeting directs.

**Content of proxy notices**

**45.** (1) Proxies may only validly be appointed by a notice in writing (a "proxy notice") which—

(a) states the name and address of the shareholder appointing the proxy;

(b) identifies the person appointed to be that shareholder's proxy and the general meeting in relation to which that person is appointed;

(c) is signed by or on behalf of the shareholder appointing the proxy, or is authenticated in such manner as the directors may determine; and

(d) is delivered to the company in accordance with the articles and any instructions contained in the notice of the general meeting to which they relate.

(2) The company may require proxy notices to be delivered in a particular form, and may specify different forms for different purposes.

(3) Proxy notices may specify how the proxy appointed under them is to vote (or that the proxy is to abstain from voting) on one or more resolutions.

(4) Unless a proxy notice indicates otherwise, it must be treated as—

(a) allowing the person appointed under it as a proxy discretion as to how to vote on any ancillary or procedural resolutions put to the meeting, and

(b) appointing that person as a proxy in relation to any adjournment of the general meeting to which it relates as well as the meeting itself.

**Delivery of proxy notices**

**46.** (1) A person who is entitled to attend, speak or vote (either on a show of hands or on a poll) at a general meeting remains so entitled in respect of that meeting or any adjournment of it, even though a valid proxy notice has been delivered to the company by or on behalf of that person.

(2) An appointment under a proxy notice may be revoked by delivering to the company a notice in writing given by or on behalf of the person by whom or on whose behalf the proxy notice was given.

(3) A notice revoking a proxy appointment only takes effect if it is delivered before the start of the meeting or adjourned meeting to which it relates.

(4) If a proxy notice is not executed by the person appointing the proxy, it must be accompanied by written evidence of the authority of the person who executed it to execute it on the appointor's behalf.

**Amendments to resolutions**

**47.** (1) An ordinary resolution to be proposed at a general meeting may be amended by ordinary resolution if—

(a) notice of the proposed amendment is given to the company in writing by a person entitled to vote at the general meeting at which it is to be proposed not less than 48 hours before the meeting is to take place (or such later time as the chairman of the meeting may determine), and

(b) the proposed amendment does not, in the reasonable opinion of the chairman of the meeting, materially alter the scope of the resolution.

(2) A special resolution to be proposed at a general meeting may be amended by ordinary resolution, if—

(a) the chairman of the meeting proposes the amendment at the general meeting at which the resolution is to be proposed, and

(b) the amendment does not go beyond what is necessary to correct a grammatical or other non-substantive error in the resolution.

(3) If the chairman of the meeting, acting in good faith, wrongly decides that an amendment to a resolution is out of order, the chairman's error does not invalidate the vote on that resolution.

**PART 5 - ADMINISTRATIVE ARRANGEMENTS**

**Means of communication to be used**

**48.** (1) Subject to the articles, anything sent or supplied by or to the company under the articles may be sent or supplied in any way in which the Companies Act 2006 provides for documents or information which are authorised or required by any provision of that Act to be sent or supplied by or to the company.

(2) Subject to the articles, any notice or document to be sent or supplied to a director in connection with the taking of decisions by directors may also be sent or supplied by the means by which that director has asked to be sent or supplied with such notices or documents for the time being.

(3) A director may agree with the company that notices or documents sent to that director in a particular way are to be deemed to have been received within a specified time of their being sent, and for the specified time to be less than 48 hours.

**Company seals**

**49.** (1) Any common seal may only be used by the authority of the directors.

(2) The directors may decide by what means and in what form any common seal is to be used.

(3) Unless otherwise decided by the directors, if the company has a common seal and it is affixed to a document, the document must also be signed by at least one authorised person in the presence of a witness who attests the signature.

(4) For the purposes of this article, an authorised person is—

(a) any director of the company;

(b) the company secretary (if any); or

(c) any person authorised by the directors for the purpose of signing documents to which the common seal is applied.

**No right to inspect accounts and other records**

**50.** Except as provided by law or authorised by the directors or an ordinary resolution of the company, no person is entitled to inspect any of the company's accounting or other records or documents merely by virtue of being a shareholder.

**Provision for employees on cessation of business**

**51.** The directors may decide to make provision for the benefit of persons employed or formerly employed by the company or any of its subsidiaries (other than a director or former director or shadow director) in connection with the cessation or transfer to any person of the whole or part of the undertaking of the company or that subsidiary.

DIRECTORS' INDEMNITY AND INSURANCE

**Indemnity**

**52.** (1) Subject to paragraph (2), a relevant director of the company or an associated company may be indemnified out of the company's assets against—

(a) any liability incurred by that director in connection with any negligence, default, breach of duty or breach of trust in relation to the company or an associated company,

(b) any liability incurred by that director in connection with the activities of the company or an associated company in its capacity as a trustee of an occupational pension scheme (as defined in section 235(6) of the Companies Act 2006),

(c) any other liability incurred by that director as an officer of the company or an associated company.

(2) This article does not authorise any indemnity which would be prohibited or rendered void by any provision of the Companies Acts or by any other provision of law.

(3) In this article—

(a) companies are associated if one is a subsidiary of the other or both are subsidiaries of the same body corporate, and

(b) a "relevant director" means any director or former director of the company or an associated company.

**Insurance**

**53.** (1) The directors may decide to purchase and maintain insurance, at the expense of the company, for the benefit of any relevant director in respect of any relevant loss.

(2) In this article—

(a) a "relevant director" means any director or former director of the company or an associated company,

(b) a "relevant loss" means any loss or liability which has been or may be incurred by a relevant director in connection with that director's duties or powers in relation to the company, any associated company or any pension fund or employees' share scheme of the company or associated company, and

(c) companies are associated if one is a subsidiary of the other or both are subsidiaries of the same body corporate.

# EXHIBIT G

Electronically Filed
4/23/2024 1:41 PM
Steven D. Grierson
CLERK OF THE COURT

David Mincin, Esq.
State Bar No. 5427
MINCIN LAW, PLLC
7465 W. Lake Mead Boulevard, Suite 100
Las Vegas, NV 89128
PH: (702) 852-1957
dmincin@mincinlaw.com

Adam Allen, Esq.
ALLEN & ASSOCIATES
2777 Allen Parkway, Suite 1000
Houston, Texas 77019
Phone: 832-871-5920
Fax: 281-503-7671
adam@aallenlaw.com
*Pro Hac Vice*

*Attorneys for plaintiff 36 Circles, LLC*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| 36 CIRCLES, LLC, a California Limited Liability Company dba PAYLESS KRATOM<br><br>Plaintiff,<br><br>v.<br><br>T1 PAYMENTS LLC, et. al. AND DOES 1-10 AND ROES 1-10<br><br>Defendants. | Case No.: A-22-851903-B<br><br>Dept. No.: 13<br><br>**PLAINTIFFS' SECOND AMENDED VERIFIED COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF** |

**PLAINTIFF'S SECOND AMENDED COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF**

Plaintiffs, 36 Circles, Ltd., a Northern Ireland limited company, and 36 Circles, LLC, a limited liability company organized under the laws of the State of California, together doing business as Payless Kratom, ("36 Circles") by and through their attorneys, files their Second Amended Complaint against Defendants T1 Payments, LLC, T1 Payments, Limited, TGlobal Services, LLC, TGlobal Services, LTD (UK), TGlobal Services Limited (Isle of Man), TGlobal Capital, Limited, Pixxles Global, LTD (n/k/a Premium Services Global, LTD), Pixxles, LLC, PXLS, LLC, Pixxles, LTD, MNJA, LLC, Lendingclub Bank, N.A., Deep Pockets, LLC, Deep Pockets Trust, Kaplan Cottner, LLC, Kaplan Young, LLC, The Cottner Firm, Scott Dawson, Salma Begum Kalamy, Kenneth Pereira, Aquanaut 1, LLC, 7 Processing, LLC, DAK Enterprises, LLC, TEQ Ventures, LLC, Donald Kasdon, Debra King (a/k/a Debra Kaisen), and Amber Lynn Fairchild. Plaintiffs assert causes of action for Fraud, Fraud by Nondisclosure, Fraud by Omission, Civil Conspiracy to Defraud, Conversion, Theft, Money Had and Received, Breach of Contract, Breach of Implied Covenant of Goof Faith and Fair Dealing, Unjust Enrichment, Violation of the Nevada Uniform Fraudulent Transfers Act, violations of the Nevada Civil RICO Statute, violation of the Nevada Deceptive Trade Practices Act, and seek a Declaratory Judgment concerning the rights and duties of the parties. Plaintiffs further apply for injunctive relief and request a and the Appointment of a Receiver.

Plaintiff fully intends to pursue their claims to completion at trial.

## I. INTRODUCTION

1. Donald Kasdon, Amber Fairchild and Debra King were the ring leaders that defrauded $333,780.18 from 36 Circles, LLC in an online and telephone scheme. Kasdon posed as the principal of a real credit card payment facilitator, but actually used an illegal, unauthorized, and convoluted international conspiracy that only made his company, T1 Payments, LLC, *appear* to be a real processor. Kasdon sold these illegal and unauthorized services to at least five hundred other merchants before he identified 36 Circles, LLC as his next victim. Defendant Fairchild, his fiancé,

and Defendant King, his mother, acted as conspirators and strawmen for Kasdon, allowing him to use their identities in the formation of a network of shell companies that supported his fraud. The full scheme, begun in 2012, will be laid out in more detail in the Facts Section *infra.*

2. Kasdon's actions against 36 Circles commenced August 2020, when Defendant Kasdon, through T1 Payments, LLC, directed a cold call to 36 Circles, LLC. 36 Circles, LLC responded to the call, a T1 Payments, LLC employee, Jason Ford, acting as a "Partner Relationship Manager" arranged to forward information to 36 Circles, LLC. After a series of emails with Ford and Elisabeth Ravelo, and a review of the literature on T1 Payments' website, and its promises that T1 Payments, LLC was a real credit card payment processor with direct relationships with Visa and Mastercard ("Card Brands") and Acquiring Banks, and that T1 Payments, LLC would process electronic sales 36 Circles legitimately, pursuant to the Payment Brand Rules[1], program rules and policies of its third party processors, and all applicable laws and regulations, 36 Circles, LLC agreed to apply for T1 Payments, LLC's "card services."

3. T1 Payments, LLC, at Kasdon's direction, instructed 36 Circles, LLC to form a new company in the UK, with a name identical to 36 Circles, as a way to "insure 36 Circles' longevity." After the Plaintiff agreed to the new entity, T1 Payments, LLC, at Kasdon's direction, formed the new company "36 Circles, LTD" in Ireland.

4. Astonishingly, and unknown to 36 Circles at the time, *T1 Payments, LLC and Donald Kasdon had both been banned from processing credit card transactions since 2017*. That year, Kasdon was MATCH Listed[2], and T1 Payments, LLC's "Payment Facilitator" license was revoked, leaving it unable to handle merchant funds. As it turned out, instead of being in business with T1 Payments, LLC, 36 Circles was unwittingly doing business through an entire network of shell companies

[1] The requirements from Visa, MasterCard, Discover, and American Express that all handlers of merchant funds and merchant credit card transactions must follow in order to be allowed to participate in credit card processing.
[2] The MATCH List is a list of people whose rights to transact credit card business has been terminated.

controlled by Kasdon, and Payvision, a Dutch bank that was not legally allowed to service merchants from the U.S.

5. Kasdon used his fake and defunct payment processing company T1 Payments, LLC to induce 36 Circles into a contract that allowed Kasdon to control, and ultimately to abscond with, 36 Circles' funds. Since 2012 he had used Fairchild and King to create a web of his alter-ego and/or conspiring shell companies including: (i) T1 Payments, LTD; (ii) TGlobal Services, LLC; (iii) TGlobal Services, LTD (UK); and (iv) TGlobal Service Limited (Isle of Man)[3], (all together referred to as "T-Companies").[4] By the time Kasdon met 36 Circles, his scheme also included the assistance and agreement of the following conspiring companies: (i) the Dutch company Payvision, B.V. (including its CEO Rudolf Booker); (ii) Payvision Risk, Inc.; (iii) Actum Processing, LLC.

6. Kasdon used these entities to deceive 36 Circles (and its new foreign entity subsidiary 36 Circles, LTD) into entering the payment card processing relationship whereby T1 Payments, LLC falsely promised it would legitimately process credit card and debit card transactions for 36 Circles' on-line business. Instead, since 2012, Kasdon had been using merchant money at his whim, periodically taking a merchant's entire reserve account under his control, usually once it was worth over a million dollars. But Kasdon's misdeeds did not stop there.

7. After three months of 36 Circles accruing funds at T1 Payments, LLC through hundreds of thousands of customer purchases, on December 16, 2020, Kasdon received a notice from Payvision that it was terminating his ability to run his illegal scheme on or after March 16, 2021 due to sloppy, illegal and fraudulent activities that were no longer hidden and that would likely affect Payvision. Instead of notifying 36 Circles that it should seek a new processing company, Kasdon kept that information hidden from 36 Circles, LLC and continued to allow 36 Circles LLC to continue to

---

[3] The T1 Payments brand had mirroring companies in the U.S., UK, and Isle of Man for ease of moving funds.
[4] Kasdon could not be on any corporate charters because he was in hiding from a judgment creditor since 2009.

accrue more funds at T1 Payments, LLC for five more months until Kasdon had Four Hundred Fourteen Thousand, Three Hundred Thirty-Two Dollars & Ten Cents ($414,332.10) of 36 Circles, LLC's merchant funds.

8. On May 28, 2021, when Payvision followed through with its termination of Kasdon's scheme, Kasdon stole those funds from 36 Circles, LLC, along with approximately $9,009,314.03 belonging to hundreds of other merchants who Kasdon had also duped.

9. Importantly, there was never a time between January 2017 and May 28, 2021, that T1 Payments, LLC had a contract with any acquiring bank or with any credit card company to process the transactions for 36 Circles' customers. That was always a lie, both before and after the contract was signed, because that same fraudulent statement was also contained *within the contract* at the introduction, and at §4.1. Kasdon secretly relied on Actum Processing LLC and Payvision, to process the transactions Kasdon promised T1 Payments, LLC would handle. He also relied on T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, Limited (Isle of Man), and TGlobal Services, LTD to hold and transfer the Plaintiff's funds. Neither Kasdon, Fairchild, King, nor any of the T-Companies had any ability to process credit card payments while T1 claimed to service the Plaintiff 36 Circles.

10. Further, at the time 36 Circles though it was entering into the credit card services contract with T1 Payments, LLC (on September 2, 2020), Kasdon was *already* planning to leave the country with all the money he absconded from merchants since 2012. To that end, Kasdon directed Defendants Fairchild, Pereira, Kamaly, and Dawson[5] to form and run a new brand of payment processing companies with mirroring entities in the U.S. and UK called "Pixxles," which all agreed to help him do.

---

[5] Scott Dawson, a UK citizen, was one of T1 Payments LLC's most trusted employees, having his own American Express card through Defendant King's account named "T1 Payments, LLC" which he used to help set up Pixxles, LTD in the U.K.

11. Beginning in 2017, after he was MATCH listed for theft of merchant funds and T1 Payments, LLC became defunct, Kasdon used King, Fairchild, Pereira, Kamaly, and Dawson's identities to form and operate a new set of shell companies including: (i) Pixxles, LLC; (ii) Pixxles, LTD; (iii) PXLS, LLC; and (iv) Pixxles Global, LTD (n/n/a Premium Services Global, LTD), (all together referred to as the "Pixxles Companies"). King, Fairchild, Pereira, Kamaly, and Dawson signed the formation documents and/or annual reports in the UK, or the Isle of Man, for the company or companies they were operating for Kasdon.

12. After Kasdon was notified by Payvision that his scheme would no longer be supported by the bank on December 16, 2020, those Pixxles companies began reporting large influxes of capital. Since Kasdon had apparently already planned for his U.S. business to end, he immediately directed King to begin to withdraw and wire transfer large amounts of money out of Kasdon's T-Companies, some of which was transferred to Kasdon's former attorneys at Kaplan Cottner, LLC, among other recipients, ultimately for transmitting to the Pixxles venture in the UK and personal funds such as his Deep Pockets Trust and its holder, Deep Pockets, LLC.

13. At all times complained of, Defendant King's only responsibility for the above companies she "directed" (T1 Payments, LTD, TGlobal Service, LTD, TGlobal Services Limited (Isle of Man, T1 Payments, LLC, and TGlobal Services, LLC), is to do what Kasdon directed her to do. She became his intermediary at his direction.

14. Likewise, Defendant Fairchild's only responsibility for the above companies she "directed" (Pixxles LLC, PXLS, LLC, Pixxles, LTD) was to do what Kasdon directed her to do. She also became his intermediary at his direction.

15. Further, Defendants Dawson, Kamaly and Pereira's only responsibilities for Kasdon were to place their names on the rolls of Pixxles, LTD and do what Kasdon directed them to do. They also became his intermediary at his direction.

16. 36 Circles now understands that Kasdon directed his employees (Elisabeth Ravelo) to create a United Kingdom company for the Plaintiff called "36 Circles, LTD" because Kasdon's scheme required the use of the Dutch bank to process credit card payments, and it was only supposed to operate in the European Economic Area. Neither Kasdon, nor his agents or conspirators, told the Plaintiff about the foreign bank.

17. According to bank records just produced in T1 Payments, LLC's bankruptcy on November 20, 2023, Kasdon's T1 scheme required him to use all of his shell companies to handle parts of each transaction that 36 Circles' customers initiated, *except T1 Payments, LLC*. That includes each of the other T Companies. The T-Companies held and transferred between themselves 36 Circles' funds, as those funds traveled to, and from, Payvision, B.V., and Actum Processing, LCC, before being distributed to one of Kasdon's shell companies, minus all the fees along the way. Additionally, funds were transferred from TGlobal Services, LLC to Lending Club Bank after the scheme was abruptly ended. Those funds total in the millions. The scheme will be explained in more detail hereinbelow.

## <u>II.</u> <u>PARTIES</u>

18. Plaintiff, 36 Circles, Ltd. (referred to interchangeably herein as "36 Circles" or "Plaintiffs"), is, and at all times relevant herein has been, a private limited company organized under the laws of Northern Ireland which does business as Payless Kratom, and maintains its principal place of business in Glendale, California.

19. Plaintiff, 36 Circles, LLC (referred to interchangeably as "36 Circles" or "Plaintiffs"), is, and at all times relevant herein has been, a limited liability company organized under the laws of the State of California, which does business as Payless Kratom, and maintains its principal place of business in Glendale, California.

20. Defendant, T1 Payments, LLC ("T1 Payments"), is a limited liability company organized under the laws of the State of Nevada with its principal place of business in Las Vegas, Nevada. T1

Payments, LLC can be served by serving its registered agent Northwest Registered Agent, LLC at 401 Ryland Street, Suite 200-A, Reno, Nevada 89502.

21. Defendant T1 Payments, Limited ("T1 Payments LTD") is a limited company organized under the laws of England with its registered office at Wilson Business Park, Monsall Road, Manchester, England, M40 8WN.

22. Defendant TGlobal Services, LLC ("TGlobal") is a limited liability company organized under the laws of the State of Nevada with its registered agent Northwest Registered Agents, Inc. located at 401 Ryland Street, Suite 200-A, Reno, Nevada, 89502.

23. Defendant TGlobal Services, Ltd. ("TGlobal LTD"), is a limited company organized under the laws of England with its registered office at We Work, 138 Holborn, London, United Kingdom, EC1N 2SW.

24. Defendant TGlobal Services Limited ("TGlobal Limited") is a limited company organized under the laws of the Isle of Man with its registered office at Alma House, 7 Circular Road, Douglas, IM1 1AF, Isle of Man.

25. Defendant TGlobal Capital, Limited ("TGlobal Capital LTD"), a private limited company organized under the laws of England and Wales, with its registered office at Newton Business Park, Thorncliffe Park, Chapeltown, Sheffield, England S35 2PG.

26. Defendant Pixxles, LLC ("Pixxles") is a limited liability company organized under the laws of the State of Nevada. It can be served by serving its registered agent Registered Agents, Inc. at their address 401 Ryland Street, Suite 200-A, Reno, Nevada, 89502.

27. Defendant PXLS, LLC ("PXLS") is a limited liability company organized under the laws of the State of Nevada. It can be served by serving its registered agent Northwest Registered Agents, Inc. at their address 401 Ryland Street, Suite 200-A, Reno, Nevada, 89502.

28. Defendant Pixxles, LTD ("Pixxles LTD") is, and at all times relevant was, a United Kingdom private limited company, with its registered business address listed in London, England.

29. Defendant Pixxles Global, LTD, (now known as "Premium Service Global LTD") a United Kingdom private limited company, with its registered address at 39 Lilestone, Green Laundrette Street, London, NW8 8SS.

30. Defendant Scott Adrian Metcalfe Dawson, director of Pixxles LTD and NEOPay LTD, and former employee of T1 Payments, LLC, is an individual whose address is Cannon Place, 78 Cannon Street, London, United Kingdom, EC4N 6AF

31. Defendant Salma Begum Kalamy, Director of Pixxles Cannon Place, whose address is 78 Cannon Street, London, United Kingdom, EC4N 6AF.

32. Defendant Kenneth Pereira, director of Pixxles Global LTD, whose address is 14 Wareham Close, Hounslow, England, TW3 3PX.

33. Defendant Deep Pockets, LLC, a Wyoming Limited Liability Company, whose registered agent is Northwest Registered Agent, LLC whose address is 401 Ryland St. Ste 200 A, Reno, NV, 89502, USA, and

34. Defendant Deep Pockets Trust, whose registered address is 1810 E Sahara Avenue, Las Vegas, Nevada 89104.

35. Defendant 7 Processing, LLC ("7 Processing") is a limited liability company organized under the laws of the State of Nevada with its principal place of business located at 10161 Park Run Dr, Ste. 150, Las Vegas, Nevada, 89145. Its registered agent, Ghandi Deeter Law Offices can be served at 707 S. 10th Street, Las Vegas, Nevada 89101.

36. Defendant MNJA, LLC ("MNJA") is a limited liability company organized under the laws of the State of Nevada and it can be served by serving its officer Amber Lynn Fairchild at 1810 E. Sahara Avenue, Las Vegas, Nevada 89104.

37. Defendant Aquanaut 1, LLC ("Aquanaut") is a limited liability company organized under the laws of the State of Nevada and it can be served by serving its registered agent Larson & Zirzow, LLC at their registered address located at 850 Bonneville Avenue, Las Vegas Nevada, 89101.

38. Defendant DAK Enterprises, LLC ("DAK") is a limited liability company organized under the laws of the State of Nevada and it can be served by serving its registered agent Larson & Zirzow, LLC at their registered address located at 850 Bonneville Avenue, Las Vegas Nevada, 89101.

39. Defendant TEQ Ventures, LLC ("TEQ") is a limited liability company organized under the laws of the State of Nevada and it can be served by serving its registered agent Larson & Zirzow, LLC at their registered address located at 850 Bonneville Avenue, Las Vegas Nevada, 89101.

40. Defendant Kaplan Cottner, LLC is a limited liability company organized under the laws of the State of Nevada and it can be served by serving its registered agent whose registered address is 10091 Park Run Drive, Suite 190, Las Vegas, NV, 89145.

41. Defendant Kaplan Young, LLC is a limited liability company organized under the laws of the State of Nevada and it can be served by serving its registered agent whose registered address is 10091 Park Run Drive, Suite 190, Las Vegas, NV, 89145.

42. Defendant The Cottner Firm is a limited liability company organized under the laws of the State of Nevada and it can be served by serving its registered agent 10091 Park Run Drive, Ste 190, Las Vegas, NV, 89145, USA.

43. Lending Club Bank is a bank organized under the laws of the State of California and it can be served by serving its registered agent 595 Market Street, Suite 200, San Francisco, California 94105.

44. Defendant Donald Kasdon ("Kasdon") is the beneficial owner and manager of all of the corporate defendants in this case and primarily resides in the State of Nevada. At all times relevant herein, T1 Payments, LLC, T1 Payments LTD, TGlobal Services, LLC, TGlobal Services Limited

(Isle of Man), TGlobal Services, LTD (UK), Pixxles, LTD, Pixxles, LLC, Pixxles Global, LTD, and PXLS, LLC, Fairchild and King were completely controlled by Kasdon, who accessed the Pixxles Companies through Fairchild and the T-Companies through Kaisen and others, acting at his behest to accomplish the fraud set forth herein. Kasdon has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of T1 Payments, LLC, T1 Payments LTD, TGlobal Services, LLC, TGlobal Services Limited (Isle of Man), TGlobal Services, LTD (UK), TGlobal Capital, LTD, Pixxles, LTD, Pixxles, LLC, Pixxles Global, LTD (n/k/a Premium Services Global, LTD), and PXLS, LLC as described herein that constitute a joint and/or common enterprise and/or Conspiracy. There is also such a unity of interest between Kasdon and T1 Payments, LLC, T1 Payments LTD, TGlobal Services, LLC, TGlobal Services Limited (Isle of Man), TGlobal Services, LTD (UK), TGlobal Capital, LTD, Pixxles, LTD, Pixxles, LLC, Pixxles Global, LTD, and PXLS, LLC (collectively, "Defendant Companies"), that Kasdon is an alter ego of these sham companies. All the above-described Defendant Companies are dominated and controlled by Kasdon directly or through others he directly controls that have been involved in the fraud scheme described hereinbelow. The Defendant Companies were created to facilitate Kasdon's fraudulent and unlawful payment processing activities described herein.

45. Defendant Debra King ("King" or used in conjunction with the other Defendants collectively, "Defendants"), manager of all of the T-Companies, is an individual residing in the State of Nevada and who can be served at 1810 E. Sahara Avenue, Las Vegas, Nevada 89104.

46. Defendant Amber Lynn Fairchild ("Fairchild" or used in conjunction with the other Defendants collectively, "Defendants"), manager of all of the Pixxles Companies, is an individual who resides in the State of Nevada and who can be served at 1810 E. Sahara Avenue, Las Vegas, Nevada 89104.

47. At present, Plaintiffs are unaware of the true names and capacities, whether corporate or otherwise, of those defendants sued herein as the Doe Defendants. Therefore, such defendants are sued by fictitious names under Doe Defendants 1-10. Plaintiffs will request leave of Court to amend this Complaint when the true names of such fictitiously named defendants are ascertained. Plaintiffs are informed and believe, and based thereon allege, that the Doe Defendants are directly and proximately responsible in some manner for the acts and damages complained of herein.

48. Plaintiffs are informed and believe, and based thereon alleges, that each of the fictitiously named Doe Defendants is responsible for the wrongful conduct herein alleged, and that such wrongful conduct caused harm to Plaintiffs. At all material times, each of the Doe Defendants was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of each of the other Doe Defendants, had full knowledge of, and gave substantial assistance to, the alleged activities, and, in doing the things alleged, each was acting within the scope of such agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

## III. JURISDICTION AND VENUE

49. Jurisdiction and venue are proper in this Court pursuant to paragraph 30 of the parties' Card Payment Processing Agreement described below, which states that the federal or state courts of Clark County, Nevada are the exclusive venue for disputes arising thereunder. Moreover, all of the Defendants are residents of, or primarily operate in, Nevada.

## IV. EXHIBITS

50. The Plaintiffs' claims rely upon the following contracts and documents that were filed on May 2, 2022:

| | |
|---|---|
| Exhibit 1: | Merchant Terms Acknowledgment and Payment Processing Agreement |
| Exhibit 2: | ISO - M Designation for T1 Payments, LLC |

| | |
|---|---|
| Exhibit 3: | LinkedIn Page of T1 Payments, LLC Introduction Statement |
| Exhibit 4: | Payvision Contract with TGlobal Services Limited |
| Exhibit 5: | LinkedIn Page of T1 Payments, LLC Advertising for High-Risk Clients |
| Exhibit 6: | T1/Jason Ford October 11, 2019 Email Advertising T1 to Plaintiff |
| Exhibit 7: | Merchant Services Application for T1 Payments, LLC |
| Exhibit 8: | T1/ Elisabeth Ravelo September 2, 2020 Email to Plaintiff |
| Exhibit 9: | Certificate of Formation for 36 Circles Limited |
| Exhibit 10: | Cross-Corporate Guaranty |
| Exhibit 11: | T1 Payments/Hector Grass August 21, 2020 Email to Plaintiff |
| Exhibit 12: | T1 Payments/Elisabeth Ravelo August 21, 2020 Email to Plaintiff |
| Exhibit 13: | T1 Payments May 28, 2021 Email to All Merchants |
| Exhibit 14: | Statement of Capital for Pixxles, Ltd. File Dated March 31, 2021 |
| Exhibit 15: | Statement of Capital for Pixxles, Ltd. File Dated June 4, 2021 |
| Exhibit 16: | T1 Payments/Legal Department June 10, 2021 Email to Plaintiff |
| Exhibit 17: | Resolution of Pixxles, Ltd. File Dated June 16, 2021 |
| Exhibit 18: | Kasdon's June 22, 2021, Email to Plaintiff Warning About Lawyers |
| Exhibit 19: | T1 Payments/Legal Department July 14, 2021 Email to Plaintiff |
| Exhibit 20: | T1 Payments/Legal Department August 17, 2021 Email to Plaintiff |
| Exhibit 21: | Pixxles Ltd Allotment of Shares Dated March 29, 2022 |
| Exhibit 22: | T1 Payments Website |
| Exhibit 23: | Declaration of Mr. Vahan Hadjinian |

Exhibit 24: Emails with Attorney for the Defendants

51. The Plaintiffs' claims rely upon the following exhibits that were filed on June 7, 2022:

Exhibit 25: Deposition Testimony of Donald Kasdon September 22, 2021

Exhibit 26: Deposition Testimony of Amber Fairchild September 9, 2021

Exhibit 27: Deposition Testimony of Debra King September 9, 2021

Exhibit 28: Affidavit of Christopher Jepson

52. Plaintiffs' claims further rely upon the following affidavits, testimony and Exhibits being filed simultaneously with the Second Amended Complaint:

Exhibit 29: Deposition Testimony of Joe Emig

Exhibit 30: Deposition testimony of Maria Terpstra

Exhibit 31: 2022 Arbitration Agreement between TGlobal LTD and Payvision

Exhibit 32: *Vantiv v. T1 Payments, LLC* 1:17-cv-00164-SJD in the USDC Southern Ohio

Exhibit 33: December 16, 2020 Letter to Kasdon from Payvision

Exhibit 34: December 18, 2020 Letter to Kasdon from Payvision

Exhibit 35: Chase Bank Statements for TGlobal Services, LLC

Exhibit 36: Wells Fargo Bank Statements for T1 Payments, LLC

Exhibit 37: Deep Pockets Trust Land Use Application

Exhibit 38: Deep Pockets, LLC loan from T1 Payments, LLC in May 2021.

Exhibit 39: American Express Statements for Kasdon, King, Fairchild, & Dawson, Kaye, & Strachan

## VI. FACTS

53. The Plaintiffs are online marketers of all natural supplement products derived from or containing "mitragyna speciosa," (hereinafter referred to as "kratom"). Kratom is a type of tree leaf

from Southeast Asia that is closely related to coffee plants. The Plaintiffs are one of the largest online retailers for kratom in the U.S.

54. As e-commerce merchants, 36 Circles sell their goods to customers primarily via orders over the internet so, accordingly, accepting customer payments by credit or debit cards is an essential part of their business model. T1 Payments, LLC, tightly controlled by Defendant Kasdon, fraudulently induced 36 Circles LLC to into entering a purported payment card processing relationship with T1 Payments, LLC wherein T1 Payments, LLC falsely claimed it was a Payment Facilitator ("PayFac"). T1 Payments, LLC also promised the Plaintiffs that it could and would act as Plaintiff's electronic payment processor for their online sales of kratom products to their customers. Specifically, Kasdon represented in writing that T1 Payments, LLC was a payment processing company and that had direct business relationships with the payment card brands such as Visa USA, Inc. ("Visa"), Mastercard International, Inc. ("MasterCard"), Discover Financial Services, LLC ("Discover"), American Express and/or other networks (collectively the "Payment Brands") and select merchant acquiring banks ("Acquirers") to process such electronic transactions for kratom products.

55. However, in reality, T1 Payments, LLC was not a payment processor, but rather acted solely as the name and logo on the contract, having no relationship with any of the Payment Brands and/or Acquirers that were willing or authorized to process electronic transactions for kratom products. In actuality, Kasdon, using his mother King, and using his girlfriend Fairchild, utilized a web of shell companies as mere conduits to steal funds from numerous merchants (including the Plaintiffs) by collecting, aggregating, and then submitting transactions for products that were specifically prohibited by its Acquirer relationship with Payvision and were in violation of Payment Brands and federal law.

*Kasdon's T-Company History*

56. T1 Payments, LLC *was* a VISA and Mastercard-registered Payment Facilitator ("PayFac") until 2017 in the U.S. A PayFac is a service provider that enables merchants to process credit card transactions with the help of an Acquiring Bank who has a relationship with the major credit card brands. As a PayFac, T1 Payments, LLC operated under a contract with WorldPay (then d/b/a Vantiv), a major payment processor with more than 20 billion transactions per year at the time. In March of 2017, after it discovered T1 Payments, LLC was creating fake merchant accounts and using other merchants' credit card transactions as its own, Vantiv filed a fraud complaint in the U.S. against T1 Payments, LLC. The latter subsequently chose to process its U.S. customers through a Dutch acquiring bank, Payvision B.V., up until May 28, 2021. However, Payvision was not authorized to operate in the U.S. Because Defendant Kasdon was friends with the CEO of Payvision, they decided to hide their illegal operation through front companies.

*The Vantiv Fraud Complaint*

57. Several years earlier, and only for a ten-month period (March 31, 2016, to January 25, 2017) T1 Payments, LLC was a Payment Facilitator ("PayFac") pursuant to a contract with a major payment processor called "Vantiv."[6] As a PayFac, pursuant to the agreement between T1 Payments, LLC and Vantiv (the "T1/Vantiv Agreement"), T1 Payments, LLC was authorized to sign-up merchants, take their transactions, and then submit them to Vantiv for processing. T1 Payments, LLC was also required to perform underwriting for the sub-merchants it referred to Vantiv to ensure they were legitimate businesses with acceptable profile risks, and to cover any losses associated with a chargeback resulting from a sub-merchant's transactions[7].

58. In or around September 2016, Vantiv notified T1 Payments, LLC that the transactions its sub-merchants processed through Vantiv were experiencing a rate of chargebacks that exceeded the

[6] Vantiv was the largest U.S. merchant acquirer handling more than 20 billion transactions a year until it became part of Fidelity in 2019.

[7] A chargeback is a forced transaction initiated by a cardholder or a cardholder's bank often related to fraud.

Payment Brands' maximum thresholds established by the Card Rules, mostly associated with fraud. Based on such a high rate of chargebacks, Vantiv notified T1 Payments, LLC that it could no longer sign up new sub-merchants nor submit transactions for high-risk sub-merchants (i.e., merchants that for any reason present a higher risk of fraud to the credit card processor based on business activity).

59. Two months later, in November 2016, due to T1 Payments, LLC continuing to board high-risk merchants, and continuing to exceed the chargeback rate thresholds considered acceptable by the Payments Brands under the Rules, Vantiv notified T1 Payments, LLC of its intent to terminate the T1/Vantiv Agreement as of February 1, 2017.

60. However, a week before the original deadline, on January 25, 2017, Vantiv was forced to terminate T1 Payments on the spot. Vantiv discovered that T1 Payments, LLC was using stolen credit card numbers to process fraudulent transactions for fictitious sub-merchants, the proceeds of which were deposited directly into T1 Payments' bank accounts, which it immediately cashed-out and closed, absconding with the illicitly obtained funds before Vantiv could discover the fraud. Vantiv also learned T1 Payments, LLC was the source of many of the chargebacks. Upon learning of the fraud, Vantiv promptly terminated the agreement with T1 Payments, thereby ending T1 Payments' role as a PayFac, and causing its de-registration with the Payment Brands.

61. On or about March 14, 2017, Vantiv sued T1 Payments, LLC in the United States District Court for the Southern District of Ohio for breach of contract and fraud. *See* 1:17-cv-00164-SJD, *Vantiv v. T1 Payments, LLC*, in the USDC for the Southern District of Ohio. Vantiv alleged therein that, not only did T1 Payments breach its contract with Vantiv, but it also made-up fictitious entities to defraud Vantiv, and stole money from merchants by employing a scheme to divert funds to T1 Payments, LLC's bank account that should have been settled directly to merchants. Vantiv further alleged that T1 Payments, LLC set up fake merchants by using its own bank account as the supposed bank account of the fake merchant, and then used stolen credit card numbers to submit hundreds of

fraudulent transactions to fund its own account from the accounts of the cardholders whose Payment Card numbers were stolen.

62. In May 2018, T1 Payments, LLC settled with Vantiv.

63. However, because of *Vantiv*, the credit card networks revoked T1 Payments, LLC's registration as a Payment Facilitator. Around that same time, the company's founder and CEO, Defendant Donald Kasdon, was put on the MATCH list, an industry blacklist for the card payments sector for people who cannot operate in the industry.

64. After January 25, 2017, neither Kasdon's alter ego T1 Payments LLC nor any of his alter ego T-Companies were authorized to handle merchant money or to access merchant financial accounts. Even as an "ISO-M," T1 Payments LLC was only allowed to perform ISO-M Program Services on behalf of its sponsoring acquirer (Vantiv) with respect to Visa transactions until January 25, 2017. Furthermore, given T1 Payments, LLC's total lack of registration with the Payment Brands as a "Program Service PayFac" during all times complained of the Card Rules prohibited "T1 Payments LLC" from performing PayFac Program Services. Among other things, that means that T1 Payments, LLC was prohibited under the Rules from contracting directly with merchants, without the Acquirer as a party to the merchant agreement, and from receiving settlement funds from an Acquirer on behalf of a sponsored merchant (i.e., a merchant that contracts directly with a PayFac often referred to as a sub-merchant) or any other merchant.

*The Payvision Plan*

65. After Donald Kasdon and his T1 Payments, LLC could no longer operate in the U.S. due to ongoing fraudulent activities, Kasdon applied to Payvision for support. However, since Payvision was not legally authorized to provide acquiring services in the U.S., Defendant Kasdon and his family (Defendant King and Defendants Fairchild) had to establish companies in European Economic Area ("EEA") to circumvent these regulatory obstacles. Only after Kasdon directed his family member

defendants to set up companies in the EEA did Payvision sign a Merchant Agreement with TGlobal Services, LTD (several months before that company was actually formed). On December 13, 2016, Kasdon secured a new contract with Payvision using another of Kasdon's alter ego and/or conspiring companies: "TGlobal Services Limited." Using TGlobal Ltd, Kasdon secured a master-merchant agreement with Payvision with the Isle of Man version of that company, and then another with the UK version of that company, but nothing in that Agreement would allow him or T1 Payments to process cards under the Card Rules.

66. A more detailed summary of the EEA T-Companies set up by Kasdon through King and Fairchild, to process its US merchants via Payvision are as follows:

- On January 13, 2015, Donald Kasdon applied for a partnership, personally, with Payvision, which Payvision CEO Rudolf Booker approved on 15 February 2015.
- On March 11, 2015, Donald Kasdon established T1 Payments Limited in the UK, where his mother, Debra King, is registered as director and shareowner (no website, no employees, a WeWork office).
- On April 16, 2015, Payvision entered into a Merchant Agreement with T1 Payments, LTD.
- On July 8, 2015, after a lot of chargeback requests and fraud alerts, Payvision had to end its first trial of cooperation with Kasdon through T1 Payments LTD.
- Payvision CEO Rudolf Booker personally advised Donald Kasdon to establish a shell company in the Isle of Man due to its preferable loose rules to continue the cooperation between Payvision and Kasdon.
- On December 7, 2016, Kasdon's mother, Debra King, established TGlobal Services Limited on the Isle of Man.
- On December 13, 2016, a merchant agreement was entered into between TGlobal Services Limited (Isle of Man) and Payvision. The company was dissolved in 2020.
- In November 2017, Payvision signed a payment service provider contract with TGlobal Services LTD – although TGlobal Services LTD had not yet been formed at that time and did not have a payment facilitator license with VISA or Mastercard.
- On April 10, 2018, "TGlobal Services LTD" was finally established in the UK, in England. Kasdon's mother, Defendant Debra King, and his fiancée Defendant Amber Fairchild were installed as directors.

*Payvision facilitated Kasdon's US Business*

67. In fact, however, it appears these EEA T-Companies in the Isle of Man and the UK were dormant from the beginning and, therefore, only "paper companies" with no activities except to be named in the agreements with Payvision, and then to have their name used in chain of custody of transactions for Kasdon and Payvision. These EEA entities were listed as so-called Master Merchants with Payvision.

68. Ultimately, Kasdon's "customers" were processed as EEA sub-merchants using the fake EEA T-Companies listed above. Having lost its registration and ability to offer legitimate processing services in the U.S., T1 Payments, LLC was not in the loop. Kasdon bundled all of the merchant transactions into one account and then sent them to Payvision using master merchant accounts held in the name of TGlobal Services LTD, without the merchants' knowledge. Payvision processed them through Vias and Mastercard in the Netherlands in conspiracy with Kasdon.

*Payvision Conspired with Kasdon to Commit the Fraud*

69. The "Payvision Payment Facilitator Agreement" with Payvision violated the rules promulgated by the major credit card companies regarding Payment Facilitators as well as U.S. federal law. This Agreement labeled TGlobal Services LTD as a "Master Merchant," and purported to allow that company to serve merchants such as 36 Circles. *See* the Payvision Agreement attached hereto as Exhibit 4; *and see* Section V(E) *infra*. Pursuant to the terms of the Payvision Agreement, Payvision agreed to settle all funds flowing from the agreement to TGlobal Services, LTD.

70. Instead, Payvision was sending funds to its subsidiary Payvision Risk, Inc. (New York), which was sending funds to TGlobal Services, LLC in large, aggregated wire transfers. From there, Kasdon directed weekly large wire transfers of $2,500,000.00 to Actum Processing, LLC for splitting into the various amounts owed to T1 Payments LLC's 500 merchants.

71. Had Plaintiff known their customers' transactions were being handled by a company that: (a) lost its license to operate as a payment facilitator in 2017; (b) was subject to termination by its acquiring bank at any time; and (c) that was controlled by a man who was MATCH listed and unable to work in the credit card industry; and (d) that was operating in violation of federal law, Plaintiff never would have signed the contract with T1 Payments, LLC.

72. Although the fraud committed by the T Companies, Kasdon, Fairchild, and King reached beyond their co-defendant Payvision, B.V., and its subsidiary Payvision Risk, Inc., Payvision facilitated, ratified, furthered, and materially participated in much of the theft, deception, and fraud through secret agreements with the T-Companies, Kasdon, Fairchild, and King, as well as the principal-agent relationship it formed between itself and TGlobal Services, LTD. Because Payvision first entered into written agreements with TGlobal Services, LTD as a *merchant* in 2016, but then secretly amended that agreement to a new agreement with the title of a "Payment Facilitator Agreement" *but that still only referred to TGlobal Services, LTD a "Master-Merchant" internally*, Payvision sought to surreptitiously allow Kasdon and his alter ego TGlobal Services, LTD to circumvent U.S. and Dutch laws (*See* Section V(E) *infra*) and re-sell processing services offered by Payvision in the Netherlands.

73. Furthermore, Payvision's CEO and Kasdon and his alter ego T-Companies knew that "TGlobal Services, LTD" was <u>not</u> a licensed Payment Facilitator during the time 36 Circles' transactions were flowing through their companies (between September 2, 2020, and May 28, 2021) and that Payvision was knowingly allowing the defunct T1 Payments, LLC to masquerade as a payment processor to the Plaintiff. They also knew that T1 Payments was prohibited from handling merchant funds and that by January 5, 2021, T1 Payments, LLC did not have a bank account.

74. Payvision and the T-Companies (except T1 Payments, LLC) then knowingly concealed themselves from 36 Circles so that they could rely on Kasdon and T1 Payments, LLC to continue

misrepresenting that they had direct relationships with the banks and that they would handle the transactions. Payvision and the T Companies allowed T1 Payments, LLC to pose as a processor in its own name without revealing Payvision's name, or any of the other T Companies' names. These acts allowed Payvision and the T Companies to collect and then withhold money for bogus and undocumented fees, including "termination fees" and "reserve fees" in an alleged agreement that no one disclosed to 36 Circles every day between September 2, 2020 and May 28, 2021.

75. Eventually, on May 28, 2021, Payvision terminated the ability of TGlobal Services, LTD to process payment card transactions through Payvision as a result of the unauthorized transactions TGlobal Services LTD, Kasdon, Fairchild and King completed through their myriad other bank accounts and web of shell companies servicing the so-called "high-risk" merchants. At the same time, vast sums of money were being re-directed to bank accounts controlled by Kasdon, King, and Fairchild in the US and the UK.

*Kasdon's Pixxles Scheme*

76. As Kasdon's T-Companies were being drained during the many lawsuits against T1 Payments, LLC, Kasdon directed Defendant Fairchild to set up a similar scheme in the U.S. and UK called "Pixxles." He also directed Scott Dawson, employee of T1 Payments, LLC, to direct Pixxles, LTD.

77. On December 7, 2017, Pixxles, LLC was formed in Nevada by Fairchild under orders from Kasdon.

78. On October 4, 2018, the now FCA-regulated "Pixxles LTD" was established by Defendant Amber Fairchild in the UK under orders from Kasdon.

79. On October 15, 2018, "PXLS, LLC" was formed in Nevada under orders from Kasdon.

80. On November 9, 2021, Kasdon directed the formation of "Pixxles Global LTD," a combination of the names "Pixxles" and "TGlobal." After the lawsuits against the T-Companies and

the Pixxles companies began, Kasdon directed its manager to change its name to "Premium Service Global, LTD" in 2022. TGlobal Services, LLC paid for all of Pixxles LTD's startup costs according to Chase and American Express records attached as Exhibits 35 & 39.

*Transaction Summary*

81. The numbered flow chart below shows Kasdon's convoluted business scheme, as it operated until May 28, 2021. Kasdon used this scheme without notifying the Plaintiffs of the foreign transaction fees that would be levied by the Dutch processor, or the transaction fees that would be levied by Texas processor, or that the Plaintiffs' customers' data and funds would be transacted in a foreign country or countries. Also, Kasdon obviously never used T1 Payments, LLC for anything except a logo on a website, and to accept funds, during his dealings with the Plaintiffs.

82. The Plaintiffs were forced to wait to understand Kason' scheme (mapped-out on the following page) because Kasdon, King and Fairchild concealed their network of companies in the U.S. and the UK from all merchants, including the Plaintiffs. They did so by concealing the true pathways the transactions followed and by concealing the fact that neither T1 Payments, LLC nor Kasdon were allowed to process credit card transactions during the times the Plaintiffs were in contract in with T1 Payments, LLC. Kasdon, King and Fairchild also concealed their Pixxles Companies by using third-party managers in their formation and management in the UK. The only reason the Plaintiffs were able to discover the true fraudulent conspiracy between Kasdon, King, Fairchild and their companies was because T1 Payments, LLC filed for Chapter 7 Bankruptcy protection, allowing the Plaintiffs to review the documents they sent to the trustee and allowing the Plaintiffs to subpoena Chase and Wells Fargo bank account statements for T1 Payments, LLC and TGlobal Services, LLC through the bankruptcy. See **Exhibits 35 & 36**. Further, Kasdon, his mother, and his girlfriend, all refused to respond to the discovery about their network of companies in all of the previous cases filed against them. The scheme is numbered by steps and separated by entities below:




83. To clarify the chart: (1) 36 Circles LLC's United States customers input their orders and credit card numbers into 36 Circles' website—the same website that Kasdon's employees directed 36 Circles to change to include a UK company name and address at the bottom, "36 Circles, LTD"; (2) instead of T1 Payments, LLC processing the U.S. transactions from the website as promised, a foreign company in the UK "T1 Payments, LTD" received the orders (along with all other merchants' orders who signed up with T1 Payments, LLC in the U.S.) and aggregated them all into one portfolio which it sent to TGlobal Services, LTD, its subsidiary; (3) TGlobal Services, LTD then initiated large credit card transactions from the UK to Payvision in Amsterdam as if 36 Circles LLC's customers' requests in the U.S. were TGlobal Service, LTDs customer's requests in the UK; next (4) Payvision

processed what appears to be one huge TGlobal Services, LTD transaction; then (5) Payvision paid some of the funds to TGlobal Services Limited (Isle of Man) or TGlobal Services, LTD (UK), and then some of the funds to its subsidiary, PayVision Risk, Inc., in New York City, New York. It may have also made payments to T1 Payments, LTD before 2021; (6) Payvision Risk, Inc., then paid the remaining funds to TGlobal Services, LLC's bank account in Nevada, while; (7) T1 Payments, LTD may have paid some funds from its UK bank account to T1 Payments, LLC's bank account in Nevada before 2021; then (8) TGlobal Services, LLC transferred the bulk of the merchant funds it received to Actum Processing, LLC in Austin, Texas for processing; then (9) Actum Processing separated the funds into the 500 separate merchant accounts T1 Payments, LLC was supposedly servicing; and (10) made payments to T1 Payments, LLC's customers; (11) & (12) some funds were received by T1 Payments, LLC (before 2021) and 36 Circles, LLC, respectively.

84. These transactions happened every single day from September 2, 2020, to May 28, 2021, the time during which the Plaintiffs were in contract with T1 Payments, LLC, with each company in the chain removing service fees and other miscellaneous fees, some of which T1 Payments, LLC hid by terminating one merchant every month, simply taking all of its funds without notice, and using said funds to pay out the remaining merchants, much like a pyramid scheme. Upon information and belief, Kasdon also directed some of these funds to be diverted to TGlobal Capital, LTD.

85. In all events, neither 36 Circles, LLC nor 36 Circles, LTD ever signed an agreement with Payvision or the other T-Companies. Payvision and the other T-Companies were not named anywhere on any document 36 Circles, LTD signed, and 36 Circles, LTD never would have entered into any relationship with T1 Payments, LLC, Payvision, or anyone else had it known that so many other companies were involved, much less that they would each withhold and then steal 36 Circles, LLC's money after May 28, 2021.

*Payvision's Notice of Termination of TGlobal, LTD's Contract & the Pixxles Companies*

86. On December 16, 2020, just three months after the Plaintiff was duped into signing the agreement with T1 Payments, LLC, Payvision, B.V. notified Kasdon in writing that it would no longer be a part in his scheme to secretly process T1's merchants' customers' credit card payments. At the time, ING undertook an audit of Payvision's business pending its purchase of Payvision. Doubtlessly the audit revealed Payvision's agreement with TGlobal Services LTD (which was not a licensed Payment Facilitator) and Kasdon. Payvision sent a second letter on December 18, 2019 clarifying its termination of TGlobal Service LTD's contract. Both letters notified Kasdon in clear and unambiguous terms that Payvision would be terminating TGlobal Service, LTD's account on or after March 18, 2021.

87. Instead of notifying the Plaintiffs that they should seek a real credit card processor, Kasdon increased the volume of transactions allowed for the Plaintiffs on or about December 20, 2019, which the Plaintiff believed may have been a reward for 36 Circles' good business. In reality, Kasdon was only attempting to increase the amount of Plaintiffs' money he and his companies controlled before his scheme ended. Kasdon, Fairchild and Kaisen worked together using the T Companies as alter egos, and as their instrumentalities, to continue to "process" Plaintiffs' transactions, and to gather as much money as possible from the Plaintiffs, before Payvision's termination.

88. After PayVision terminated T1 Payments, LLC's ability to transact business on May 28, 2021, by terminating TGlobal Service, LTD's ability to transact business, Defendants, jointly and in concert with one another held Four Hundred Fourteen Thousand, Three Hundred Thirty-Two Dollars & Ten Cents ($414,332.10) owed to the Plaintiffs.

89. Instead of admitting what happened and returning the Plaintiffs' funds, Defendant Kasdon announced to his employees in the shared T-Companies offices that he was initiating an emergency "corporate restructuring" of T1 Payments. Kasdon directed all of his employees to shift all of the T-Companies' business to "Pixxles, LTD," another UK company under Kasdon's control that purported

to be a payment processor, effective immediately.[6] After the announcement by Kasdon, Lisa Kaye, Vice President of Business Development for Kasdon's companies, secretly warned merchants that their merchant reserve accounts were in jeopardy of being misappropriated. T1 Payments, LLC sued Kaye into silence in California in 2021.

*Substantial Amounts of Money Began Leaving the T-Companies*

90. Also, that same day, Defendant Kasdon began exchanging phone calls and emails with the Plaintiffs, promising them they would get the $414,332.10 being withheld in 10% monthly payments each month until paid.

91. Beginning on May 28, 2021, Kasdon began shifting funds to Kaplan Cottner, LLC, Deep Pockets, LLC, as well as Pixxles Global, LTD, Pixxles, LTD, Pixxles, LLC and PXLS, LLC (hereinafter referred to collectively as the "Pixxles Companies"), among other companies. Kasdon directed his mom, King, to withdraw funds from all the U.S. T-Company accounts under her control as the manager of the T Companies and to transfer them to Kasdon's law firm, Kaplan Cottner, PLLC, and the Pixxles Companies. Kasdon then directed Fairchild, Scott Adrian Metcalfe Dawson, director of Pixxles (and former T1 Payments, LLC Employee), Salma Begum Kamaly, director of Pixxles, and Kenneth Pereira, director at Pixxles, to accept those fraudulently transferred funds through their positions as the directors of the Pixxles, LTD and Pixxles Global, LTD. He also directed all of T1 Payments, LLC's clients to Pixxles as well, and directed Fairchild, Dawson, Kamaly and Pereira to sign them up for payment services under the new brand in the UK.

92. Expecting his scheme to be terminated in March 2021, Kasdon had already directed King to transfer £1,415,001 to the Pixxles companies on March 31, 2021, through one or more of his shell

---

[6] In 2018, Kasdon directed his girlfriend (Fairchild) to form two Nevada LLC's: Pixxles, LLC, and PXLS, LLC. He also directed her to form UK companies: Pixxles, LTD & Pixxles Global, LTD. These companies had no business from their formation, until May 28, 2021, but were planned to be UK-based payment processors. Fairchild had no responsibilities at Pixxles except to follow Kasdon's instructions.

companies or through on or more of Kasdon's attorneys. After Payvision finally terminated Kasdon's scheme, Kasdon directed King to transfer $2.8 million to his attorneys at Kaplan Cottner LLC on June 8, 2021. At the same time, Pixxles, LTD received a capital increase of £1,737,212 (close to the exchange rate at the time for 2.5 million USD) either directly from Kaplan Cottner, LLC directly, or through another entity controlled by Kasdon like Pixxles Global, LTD, as directed by Kasdon.

93. Kaplan Cottner facilitated, ratified, furthered, and materially participated in the theft, deception, and fraud through this secret agreement with Kasdon, Fairchild, and King, and other illegal misconduct as well as the principal-agent relationship it formed between itself and Kasdon, Fairchild, and King, and the T-Companies.

94. Next, Kasdon directed the transfer of $3,946,820.00 to Deep Pockets, LLC which owned the Deep Pockets Trust which used the money to purchase a $5 million house on Miami Beach. See Exhibit 37 & 38. His attorneys at Kaplan and Cottner, LLC were also the registered agents for that fund.

95. Kasdon continued directing King to send the same law firm $75,000.00 in September 2021, $65,000.00 in October, 2021, $57,000 in November 2021, and $44,000.00 in December 2021.

96. Kasdon also directed King to begin taking withdrawals in the form of cashier's checks out of the T-Companies in the amounts of $300,000.00 to $500,000.00 each month thereafter, beginning with a withdrawal of $400,000.00 on June 17, 2021.

97. Kasdon also directed King to transfer $325,000.00 to Lending Club Bank in October 2021.

98. By November 9, 2021, Kasdon directed the formation of "Pixxles Global, LTD" in England apparently for use as a holder of funds from TGlobal Services, LTD to Pixxles, LTD.

99. Kasdon also directed King to transfer *$25,000.00 a week* to Venable, LLP beginning in 2022, resulting in payments to that firm in the amount of approximately $200,000.00 a month until February of 2023.

100. Between June 3, 2021 and June 3, 2022, one year after the Plaintiffs' money was withheld Kasdon's companies, King had already withdrawn or transferred away $11,899.894.40 from TGlobal Services, LLC's bank account, leaving it empty, at the direction of Kasdon.

*Partial Payments to 36 Circles, LLC*

101. T1 Payments, LLC appeared to repay the Plaintiffs $19,443.12 on June 10, 2021; $18,470.96 on July 14, 2021; and $17,546.41 on August 17, 2021, using Actum Processing, Inc. Thereafter, TGlobal Services, LLC paid the Plaintiffs $8,945.05 on October 13, 2021; $7,724.04 on November 1, 2021; and $8,422.34 on November 16, 2021. No more payments were made after that date, leaving a balance of Three Hundred Thirty-Three Thousand Seven Hundred Eighty Dollars & Eighteen Cents ($333,780.18) due to 36 Circles.

102. When 36 Circles notified Kasdon that it was preparing to file a lawsuit against him and his company, Kasdon emailed 36 Circles back, "If lawyers get involved there will be no payment." He also implied that the payment amount would be whenever and whatever Kasdon wanted to pay going forward.

103. After November 16, 2021, Kasdon directed his companies to stop making payments and stop responding to communications from the Plaintiffs. Kasdon's plan was to hold off any lawsuits until after the 1-year statute of limitations had passed by making these small payments.

104. Due to Kasdon's unlawful acts, in addition to the loss resulting from Kasdon's fraudulent inducement of Plaintiffs to contract with T1 Payments, LLC, Plaintiffs suffered further extensive losses when any of the T-Companies then failed and refused to release hundreds of thousands of dollars from Plaintiffs' reserve account. This unlawful withholding of funds was a direct violation of the written terms of the "Merchant Term Acknowledgment and Processing Agreement" Plaintiffs believed they were entering into with T1 Payments, LLC (hereinafter, the "Agreement") a true and correct copy of which is attached hereto as Exhibit 1. Defendants have wrongfully held funds due

and owing to Plaintiffs for nearly a year totaling over Three Hundred Thirty-Three Thousand, Seven Hundred Eighty Dollars & Eighteen Cents ($333,780.18).

*Legitimate Acquiring Banks Worked with Kasdon for the Money*

105. Defendant Kasdon, and Amber Fairchild and Debra Kaisen at his direction, spent a decade covertly using legitimate credit card processing companies (known as "Acquiring Banks") and secret entities controlled by themselves, to float their fake credit card processing company, T1 Payments, LLC. T1 Payments, LLC was never a real credit card processor, so in order to attract merchants, Kasdon needed Acquiring Banks with the ability to process credit card transactions to allow the Owners to use their services. To make the arrangement work, Kasdon oversaw and directed the aggregation of hundreds of merchants' credit card transactions into one account under TGlobal Services LTD (UK), which was then handled by several of his other T-Companies and then processed by the Acquiring Bank. The Acquiring Bank then paid the funds back to one of Kasdon's companies, which in turn paid the individual merchants their part of the payments their customers made. Kasdon used Atlantic Pacific Processor, Synoptic, Vantiv and then most recently, Payvision B.V. to process payments for his fake credit card companies so they could induce merchants to use their company and receive small fees for every transaction.

106. Legitimate credit card processing companies made these arrangements with people like these because the Acquiring Banks know there are tens of thousands of so-called "high-risk merchants" in the U.S. that they cannot service under the credit card rules promulgated by Visa and Mastercard and their banks. Those banking rules prohibit the Acquiring Banks from processing credit card payments for merchants that sell services and products online known to be ripe for chargebacks through no fault of the merchants.

107. As a result, these Acquiring Banks made private deals with Kasdon to create companies to be their confidential intercessor with these high-risk merchants. Numerous lawsuits and complaints

have been filed against well-known credit card companies for participating in this behavior over the past few decades.

108. Without a middleman like Kasdon and his companies, these banks would be restricted from earning all the transaction fees for processing these high-risk merchants' payments. Since these banks want to collect all that high-risk money on the table, people like Kasdon, King and Fairchild happily step in to act as middlemen, even if it means they would likely be left holding the bag if and when the Acquiring Bank gets caught by compliance investigators and are forced to terminate their arrangements with them. Indeed, this same termination has happened to the Defendant Owners several times, but they keep finding more acquirers to do business with.

*Kasdon's History with Atlantic-Pacific, Synoptic, Vantiv, and Payvision*

109. First, after Kasdon found access to payment processing through "Atlantic-Pacific Processing Systems" in 2012, he directed his mother, Defendant Kaisen, to form T1 Payments, LLC and name herself as its managing member on January 10, 2012.[7] Kasdon created a merchant contract that made it appear to merchants that they were contracting with T1 Payments, LLC as their full-service credit card processing company. The contract appeared to give T1 Payments, LLC the right to terminate any merchant contract for any reason and keep all the funds owed to the terminated merchant in some circumstances. That is the same contract involved in this case. Eventually, after being named as co-defendant in several lawsuits with Kasdon for stealing from its merchants, Atlantic-Pacific terminated T1 Payments LLC's ability to pretend to process payments.

110. Next, Kasdon found connections at Synoptic and Vantiv, other Acquiring Banks, through which the Owner Defendants could run the same scam. After several more lawsuits against T1

[7] The Owners could not use Defendant Kasdon's name in the company for fear his judgment creditor/franchisor "Cold Stone Creamery" would collect T1 Payments' assets in satisfaction of a judgment against Kasdon for a franchise lawsuit.

Payments, LLC (while it was involved with Synoptic in the U.S.) Synoptic also terminated T1 Payments, LLC's arrangement.

111. As a result of the above, Kasdon directed King and Fairchild to form T1 Payments, LTD discussed above. The new company was created to run the same scam through Payvision, B.V. in the Netherlands because Kasdon no longer had any guarantee that and acquiring bank in the U.S. would continue to work with him. Eventually, Payvision, B.V. terminated T1 Payments, LTD. due to the Owners' theft of merchant funds, and misuse of Payvision's banking system.

112. However, Kasdon and Rudolph Booker (the owner of Payvision, B.V.) were friends. As such, they decided to run the same scam again. They agreed there was too much money in the high-risk merchant arena to let it go to waste. As a result, Kasdon directed Kaisen and Fairchild to form TGlobal Services, LTD, also in U.K., on April 10, 2018.[8] Booker and Kasdon set up a similar agreement to the one Payvision had earlier with T1 Payments, LTD before it even existed.

113. The T Companies set up by Fairchild and Dawson at Kasdon's direction were all used interchangeably to hold and transfer and freely spend merchant funds that were stolen, depending on Kasdon's whim.

*Pixxles Companies Revisited*

114. As more lawsuits began piling up for more theft of merchant funds, Kasdon directed Fairchild to form the Pixxles Companies as described hereinabove. Pixxles, LTD would become an online bank registered in the U.K that has also entered into an agreement with Payvision. See Exhibit 31.

115. Kasdon transferred any new customers trying to sign up with T1 Payments into a contract with Pixxles, LTD and hoped it would shield those funds from any merchants who became judgment creditors. Defendant Fairchild was the named director. "PXLS, LLC" was formed on October 15,

[8] Even though TGlobal Services, LTD was doing business, it was always publicly designated as a dormant company since its inception.

2018, "Pixxles, LLC" was formed in Nevada on December 7, 2018, and Pixxles Global LTD was formed on September 9, 2021, as sister companies to the U.K. Pixxles. Money is freely transferred between these four companies as well without regard for accounting, just the way money was transferred freely between the T companies.

116. Using these companies, created specifically for the purpose of moving and hiding unlawfully stolen funds, these Defendants converted the funds of the Plaintiffs that were supposed to held in reserve and then paid out by T1 Payments, LLC.

117. Defendant Kasdon directed funds to Pixxles, LLC and PXLS, LLC with £1,415,001 on March 31, 2021, just days after Payvision's deadline to stop using T1 Payments to masquerade as a credit card processor, and £1,737,212.00 on June 3, 2021, just days after refusing to pay the merchants in this, and other, cases. Despite the massive funding flowing to Pixxles, neither Pixxles, LLC, nor Pixxles, LTD, nor PXLS, LLC are also doing any business according to Defendant Kasdon's September 22, 2021 testimony. Defendant Kasdon calls the Pixxles entities "a giant paperweight for Amber. It does nothing. It generates nothing, it hasn't generated anything. It has no clients, it has nothing. Zero."

118. Defendant Fairchild, the owner of record for Pixxles, LTD, Pixxles, LLC and PXLS, LLC, also testified that these companies do no business and have never generated any revenue, despite the massive funding they received—coinciding with Defendants refusal to pay the merchants like the Plaintiffs owed funds. Defendant Fairchild also testified that she could not remember why she created Pixxles, LTD, Pixxles, LLC or PXLS, LLC, and that they have never had any assets—again, despite the massive funding in 2021.

119. The Defendants set up mirroring Pixxles companies in the U.S and U.K. exactly like they set up mirroring T1 Payments companies in both countries—and funded them at exactly the same time they wrongly withheld Plaintiffs' funds. That is quite a coincidence.

120. Kasdon is currently using the funds stolen from the Plaintiffs to start a new round of theft and fraud through these "Pixxles" companies.

121. Plaintiffs file this lawsuit to protect their rights and to enjoin the Defendants from unfairly and illicitly using deceptive and fraudulent practices to continue to defraud and steal from the Plaintiffs - and to continue to do so to others in the marketplace.

*The Contract*

122. There is no dispute that Kasdon's companies are holding $333,780.18 of 36 Circles' money. In fact, T1 Payments, LLC's alleged legal department contended it was allowed to take the Plaintiffs' money—and keep it in perpetuity—in accordance with the terms of the contract. T1 Payments, LLC alleged legal department also contended it "terminated the contract" and as a result of "terminating" the contract, it is authorized to keep all processed payments indefinitely, just in case T1 Payments, LLC incurs any losses in the future related to the "termination." See MTD at 4.

123. In other words, a "legal department" for a defunct company wants this Court to believe that the Plaintiff gave the defunct company $333,780.18 to indemnify the defunct company against the cost of a legal defense against the Plaintiffs' claim for $333,780.18 presently before the Court—even though it was a defunct company. It is an absurd position to take in any court of equity, or in any court of law.

124. Unfortunately for Kasdon, that contention does not work in this case because neither he, nor and "legal department" for any of his companies terminated the contract in this case.

**A. <u>BASICS OF THE CREDIT CARD BUSINESS ENVIRONMENT</u>**

125. To make online sales and take credit card payments, a merchant like 36 Circles must first open a "merchant account" for payment processing services by entering a "merchant agreement" with an "Acquirer" contracted with a "Payment Brand" (e.g., Visa, Mastercard, etc.) as a member bank. Such Acquirers have direct agreements with the Payment Brands that enable them to process

payments made by holders of debit and credit cards ("Payment Cards") issued by the Payment Brands to purchase goods and services from merchants that contract directly with such Acquirers for merchanting processing services. This process is called "Acquiring."

126. Acquirers in turn may contract with third party organizations that provide payment processing related services ("Program Services") to merchants under the Acquirer's sponsorship with the Payment Brands (such third-party organizations are referred to in the Visa rules as "Third Party Agents," and in the MasterCard rules and hereafter as "Service Providers").

127. A Service Provider is categorized by the Payment Brands based on the nature of the Program Services to be performed. For example, an Acquirer may sponsor a Service Provider as: i) an Independent Sales Organization ("ISO" or "ISO-M") to solicit merchants for Program Services on its behalf (including application processing, customer service and statement preparation not affording access to account data or transaction data); ii) as a Third Party Processor ("TPP") to provide authorization services, clearing file preparing and submission, settlement processing (excluding possession, ownership, or control of settlement funds, which is not permitted), merchant statement preparation, fraud control and risk monitoring, and/or chargeback processing; or iii) as a "Payment Facilitator" (herein a "PayFac") to contract directly with merchants as an agent of the Acquirer, and submit to the Acquirer records of valid transactions submitted to the PayFac by its sub-merchants, timely pay sub-merchants for transactions submitted to the PayFac by the sub-merchant, and provide recurring education and training to sub-merchants to ensure their compliance with the Rules.

128. T1 Payments, LLC was registered solely as an ISO with Visa until 2017 but was not otherwise registered with the Payment Brands as a Service Provider.

129. Visa defines ISO-M Program Services in the following manner: "Conducts merchant account or transaction processing solicitation, sales, customer service, merchant training activities and/or solicitation and sales of POS terminals and/or mPOS devices. Does not have access to the merchant

cardholder data (CHD) or the cardholder data environment (CDE). May also sell or resell gateway services (i.e., white label gateway) in conjunction with selling the merchant account and allow the merchant to implement a payment system solution without installing or configuring their own system."

130. Before an entity is authorized to perform a Program Service that supports or benefits an Acquirer's acquiring program (a "Program"), the Acquirer must verify that the entity; i) is operating a bona fide business; ii) has sufficient safeguards in place to protect account and transaction data from unauthorized disclosure or use, iii) complies with applicable laws and the Rules; and iv) cause such an entity to be registered by the Payment Brands as a Service Provider. A Service Provider may perform only the type of Program Service it is registered to perform and must be registered with the Payment Brands to perform such particular category of Program Service before an Acquirer or merchant may use its services.

131. The Acquirer must at all times be entirely responsible for, and must manage, direct and control, all aspects of its Program and Program Services performed by Service Providers and establish and enforce all Program management and operating policies in accordance with the Rules. An Acquirer must not transfer or assign any part of such responsibilities, or in any way limit its responsibility, with regard to any of its Service Providers. An Acquirer must conduct meaningful monitoring of its Service Providers to ensure ongoing compliance by its Service Providers with the Rules.

132. A Service Provider must not have access to any account for funds due to a merchant or withheld from a merchant for chargebacks, unless it is a PayFac Service Provider. An Acquirer must not assign or transfer to a Service Provider an obligation to pay or reimburse a merchant if the obligation arises from the merchant's processing activity. See e.g., Mastercard Rule 7.3[1]. Discount

[1] https://www.mastercard.us/content/dam/mccom/global/documents/mastercard-rules.pdf at p. 157.

rates (or similar charges called by other terms) due to an Acquirer from a Merchant must be collected directly by the Acquirer and not by the Service Provider. See e.g., Mastercard Rule 7.6.2[2]

133. In summary, the Rules for all Payment Brands like Visa and Mastercard broadly prohibit an ISO Service Provider from (i) contracting directly with a merchant, without the Acquirer as a party to the agreement, (ii) handling or having access to the proceeds of the merchant's processing activity, including deducting fees therefrom, (iii) holding merchant reserves, and/or (iv) settling the merchant's account (i.e., paying the merchant for its transactions). The only Service Provider authorized to directly handle merchant money is a registered PayFac.

134. A PayFac is: "A type of third-party agent that can 1) sign a merchant agreement on behalf of an Acquirer, and 2) receive settlement funds from an Acquirer on behalf of a sponsored merchant. Payment Facilitators may have access to cardholder data ("CHD") or the cardholder data environment ("CDE"). For example, PayFacs that protect, secure, store, process, or transmit cardholder data are contracted with an Acquirer to provide payment services to sponsored merchants such as i) soliciting sponsored merchant for Visa/Mastercard acceptance; ii) contracting with sponsored merchants to enable Visa/Mastercard payment acceptance; iii) monitoring compliance of sponsored merchant activity in accordance with the Visa/Mastercard Rules; and iv) receiving settlement of transaction proceeds from the acquirer on behalf of the sponsored merchant. These PayFacs must be located within the acquirer's jurisdiction and cannot be listed on the Terminated Merchant File ("TMF"), or similar files, nor can they act as a sponsor for another Payment Facilitator. See e.g., Mastercard Rules 7.1[3] and 7.13[4].

135. As such, the Plaintiffs needed a legitimate payment processor relationship to (i) handle necessary compliance related issues to ensure that its kratom products were sold in compliance with

[2] Id. at p. 159.
[3] Id. at 143.
[4] Id. at 176.

the Rules to ensure that 36 Circles' customers could use Payment Brands issued Payment Cards' to make those purchases and to (ii) provide refunds to Plaintiffs' customers who request their money back for some reason, in addition to handling purchases. 36 Circles could not fully operate without contracting with a legitimate payment processor since its entire business model solely used the internet to make sales.

**B. T-COMPANY AGENTS FALSELY HELD OUT T1 AS A PAYMENT FACILITATOR**

136. Kasdon and the T-Companies' shared employees falsely held T1 out to the public as a PayFac when it allegedly entered into the agreement with the Plaintiffs[5]. As T1 Payments, LLC's LinkedIn page as of May 2021: "T1 is a whole new kind of merchant processor, a Payments Facilitator. Our services are different from your traditional merchant provider because it gives your online business an end-to-end solution from a single company, totally dedicated to our 100% satisfaction and success. Because T1 Payments is a Payments Facilitator, you do not have to deal with lengthy applications or cumbersome underwriting requirements." See **Exhibit 3**.

137. However, T1 had not been a PayFac since January 25, 2017 - and then only briefly due to its fraud and theft of funds.

**C. KASDON AGGRESSIVELY MARKETED T1 TO KRATOM MERCHANTS**

138. While kratom products are legal in the United States, the Payment Brands and Acquirers classify kratom as a "high risk" industry because it is prone to chargebacks, and because of reputational risk related to the still-stringent legal restrictions on other herbal products such as hemp and CBD. This means that kratom merchants like 36 Circles have less card payment processing

[5] A search of the Visa Global Registry of Service Providers database for "T1 Payments" as of May 21, 2021 revealed one result: T1 Payments LLC, based in Nevada, USA, was registered as an "ISO-MERCHANT" until 2017. A true and correct copy of this search result is attached hereto as Exhibit 2 and incorporated herein by this reference as though set forth in full. As of May 21, 2021, there was no listing for T1 Payments in the Mastercard List of Registered Payment Facilitators.

solutions available to them than many other classes of e-commerce merchants and that they must often pay much higher fees for those services.

139. At Kasdon's direction, shared T-Company employees aggressively marketed to these merchants. Kasdon described T1 Payments, LLC online as "one of the most reliable and longest standing kratom processors in the biz!" A representative sample of Kasdon's statements in the advertisements from T1 Payments' LinkedIn stream promoting T1 Payment's status as "one of the longest standing kratom solutions" and most "reliable kratom processors" for both U.S. and International merchants is attached hereto as **Exhibit 5**.

140. On October 11, 2019, a shared T-Company agent, Jason Ford, sent an unsolicited sales e-mail to the Plaintiffs claiming, "We are a *direct solution* based in the United Kingdom with offices in Las Vegas and Miami (where I currently am). We register all of our accounts under Visa and Mastercard in the EU to insure [sic] your longevity…This truly is processing that you can rely on for the long term. I would like to offer you a rate of 4.95%, and I went ahead and attached a Pre-qualification form for you to fill out, should you be interested in moving forward…" *See T1 Payments Email to Plaintiff Dated October 11, 2019*, attached hereto as **Exhibit 6**.

141. 36 Circles reviewed and reasonably relied upon the representations in these advertisements and solicitations in deciding to contact T1 Payments to explore the possibility of opening a merchant account for selling kratom.

142. On August 19, 2021, the Plaintiff filled out T1 Payments' Merchant Service Application under their California limited liability company, 36 Circles, LLC. *See T1 Payments Merchant Services Application* attached hereto as **Exhibit 7**.

*Kasdon's Practice of Stealing from the Merchants After they Signed Up*

143. By holding T1 Payments, LLC out as a direct payment processor, and promising the Plaintiffs that T1 Payments was a Payment Facilitator, Kasdon expected merchants like 36 Circles, LLC to

believe him. Kasdon directed T1 Payments to promote the legality and reliability of the services offered, all while lacking any authority to facilitate payments, to entice merchants like the Plaintiffs.

144. Kasdon has an established track record of using these tactics to entice unwitting kratom and other "high-risk" merchants to contract with T1 Payments for purportedly "authorized" processing services (described hereinbelow).

145. Moreover, after entering into these fraudulent agreements—instead of attempting to act as a conventional PayFac—Kasdon escalated his illegal and rule violating activities, directing T1 Payments to process merchant's transactions illegally by pooling their accounts and money into one, unrelated, third-party merchant account (a practice known as "credit card laundering," "factoring," or "aggregation"), without the merchants' knowledge. Kasdon and his companies committed this credit card laundering, all while encouraging the merchants to increase their processing activity. When merchants like 36 Circles' "merchant account" amasses a large enough sum of money, Kasdon directed T1 Payments to suddenly terminate that merchants' ability to continue processing-just before seizing the merchant's funds using sham justifications. Kasdon constantly blamed fictitious chargebacks and similar spurious risk concerns in emails to merchants as a false pretense for his conduct. Kasdon's next maneuver was to assert an Early Termination Fee ("ETF") provision contained in the underlying fraudulent agreement to justify his companies' refusal to return any portion of the merchant's funds - notwithstanding the fraudulent nature of the underlying contract as a whole, and the illegal nature of the ETF as an unlawful penalty. Finally, Kasdon withheld entire merchant accounts from merchants, including the Plaintiff, under a termination provision in the fraudulent contract. That provision was not applicable in this case.

*Kasdon's Legal History*

146. There are dozens—if not hundreds—of merchants just like the Plaintiffs who have experienced the exact same treatment and theft from T1 Payments. Kasdon made-off with millions of dollars of illicitly gained funds from its "high-risk" merchants.

147. The numerous lawsuits and counterclaims filed against Kasdon and T1 Payments speak to the nature of this conduct as part of a pattern and practice, including but not limited to the following cases on file: (1) *Dermaktive LLC et al. v. Atlantic-Pacific Processing Systems Inc. et al.*, Eighth Judicial District, Clark County Nevada, Case No. A-16- 737420-B, filed May 26, 2016; (2) *Vantiv LLC v. T1 Payments LLC*, United States District Court for the Southern District of Ohio, Western Division, Case No. 1:17-cv-00164-SJD, filed March 14, 2017; (3) *Onyx & Rose LLC v. T1 Payments LLC*, United States District Court for the District of Nevada, Case No. 2:20-cv-00008-KJD-NJK, filed July 3, 2019; (4) *PureKana LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:19-cv-01399-KJD-NJK, filed August 14, 2019; (5) *T1 Payments LLC v. New U Life Corp.*, United States District Court District of Nevada, Case No. 2:19-cv-01816-APG-DJA, filed October 17, 2019; (6) *T1 Payments, LLC v. Hannavas Enterprises, LLC*, United States District Court for the District of Nevada, Case No. 2:2020-cv-00411, filed February 27, 2020; (7) *First Capitol venture Co. v. T1 Payments, LLC*, Eighth Judicial District, Clark County Nevada, Case No. A-21-834626-B, filed May 14, 2021; (8) *Vida Davina, LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:2021-cv-01005, filed May 26, 2021; and (9) *Ibuumerang, LLC v. T1 Payments LLC*, United States District Court for the District of Nevada, Case No. 2:21-cv-01611-JCM-VCF, filed August 31, 2021.

## D. THE MERCHANT PROCESSING AGREEMENT WITH 36 CIRCLES

148. 36 Circles was introduced to T1 Payments through a salesperson's unsolicited sales e-mail on October 11, 2019, which was directed by Kasdon. **See Exhibit 6**. At that time, during the introductory communications, the agent told 36 Circles that T1 Payments, LLC: a) was a payment processor, b)

had direct relationships with the Payment Brands and Acquirers, c) was able to process electronic sales for kratom products, d) charged rates lower than the industry standard for electronic sales for kratom products, and e) required limited reserve funds for potential losses. Eventually, the Plaintiffs accepted the agent's proposal to allow T1 Payments to process 36 Circles' electronic sales for kratom products.

149. The misrepresentations made by the agent, at Kasdon's direction, to 36 Circles were consistent with other misrepresentations Kasdon historically made about Tl Payments to the public at large. For example, Kasdon held Tl Payments out publicly as a payment processor via written marketing material advertising online that stated: "Our relationships with banks across the globe mean (sic) that we can find a happy home for most any business, international and domestic, and process payments in any currency;" "For businesses large and small, old, and new, experimental, or traditional, Tl [Payments] will customize the right solution at the right price. Within hours, you will be accepting all forms of payment quickly, easily, and securely;" and "Tl Payments is the next generation merchant processing company. Our services are different from your traditional merchant providers because it gives your online business an end-to-end solution totally dedicated to your 100% satisfaction and success. All under one bill, one processor and one flat rate."[9] [10]

*i. PAYVISION REQUIRED A EUROPEAN SUBSIDIARY FOR 36 CIRCLES, LLC*

150. On or about August 20, 2020, as a result of the misrepresentations and omissions of material fact set forth above, and in reliance on those misrepresentations and lack of disclosures, 36 Circles LLC signed and delivered the completed "Merchant Services Application" to agents allegedly of T1 Payments. *See Merchant Services Application* attached hereto as **Exhibit 7**.

---

[9] See https://t1payments.com/industries/hemp-cbd/

[10] https://www.businesswire.com/news/home/20201021005194/en/Leading-CBD-Merchants-Herbstrong-Sabaidee-and-ThoughtCloud-Turn-to-T1-Payments-for-Global-E-Commerce-Processing

151. For reasons it did not elucidate, Kasdon's corporation forming entity (used for all the T-Companies & Pixxles Companies) filed a certificate of formation for "36 Circles, Ltd," a new company in Northern Ireland, on behalf of the Plaintiff. Id.; and see *September 2, 2020 Email from T1 Ravelo* attached hereto as **Exhibit 8**. The Plaintiff was assigned the UK entity as its alter-ego subsidiary. *See the Certificate of Ownership for 36 Circles Limited* attached hereto as **Exhibit 9**. Ravelo indicated that the Plaintiff would be obligated to use the new United Kingdom subsidiary for all of its payment processing through T1 Payments. *See Affidavit of Vahan Hadjinian* attached hereto as **Exhibit 23** and incorporated as if fully set forth herein.

152. On August 21, 2020, Ravelo demanded 36 Circles, LLC execute a "Cross-Corporate Parent Guaranty," acknowledging the Nevada 36 Circles LLC as the "Parent Company" of the new UK 36 Circles Limited. *See the Cross-Corporate Guaranty* attached hereto as **Exhibit 10.** The same day, Ravelo required the Plaintiffs to replace their U.S. company name and address with the new UK company and UK address on the Plaintiff's website. *See T1 Payments Hector Grass August 21, 2021* Email to Plaintiff attached hereto as **Exhibit 11.** Ravelo sent an edited website image for the Plaintiff to use in making these changes, among others, all at the behest of Kasdon. *Id.*

153. Directed by Kasdon, Ravelo reviewed and filed all of the requisite documents for the new UK company through their "European Documents Specialist." *See T1 Payments Elisabeth Ravelo August 21, 2021* Email to Plaintiff attached hereto as **Exhibit 12.**

*ii. THE MERCHANT PROCESSING AGREEMENT*

154. On September 2, 2021, the Plaintiffs entered into two additional agreements, namely, the "Payment Processing Agreement" and "Merchant Terms Acknowledgment" (collectively, the Agreement, Merchant Services Application and Merchant Terms Acknowledgment are referred to as the "Processing Agreement"). True and correct copies of the Payment Processing Agreement,

Merchant Services Application, and Merchant Terms Acknowledgment are attached hereto as **Exhibit 1.**

155. Under the Agreement, (the now known defunct company) T1 Payments agreed to provide 36 Circles payment processing services including but not limited to clearing/settling Plaintiff's electronic sales with its customers using Cards. Under Section 1 of the Agreement titled "Definitions," the term "Card" means (i) a valid credit card or debit card in the form issued under license from a Payment Brand or (ii) any other valid payment card or other payment device offered by the Payment Brands and accepted by Merchant (i.e., 36 Circles). Further, also in Section 1 of the Agreement, the term "Payment Brands" means Visa, U.S.A. ("Visa"), Inc., MasterCard International, Inc. ("MasterCard"), American Express Travel Related Services Company, Inc., DFS Services LLC (owner of Discover) and their affiliates or any other payment networks offered by T1 Payments and accepted by Merchant.

156. The subject of the Agreement as stated in Section 2 of the Agreement was that 36 Circles agreed for Tl Payments to act not as a principal, but solely as a facilitator on its behalf of 36 Circles to enable it to process such payments.

157. Under Section 4.1 of the Agreement titled "Honor All Cards," 36 Circles was required to honor all Cards (as permitted under the Agreement) when properly presented as payment in connection with a legitimate transaction.

158. The Processing Agreement required T1 Payments to promptly provide Plaintiffs with the funds that Plaintiffs earned from its customers' transactions submitted to T1 Payments. The Processing Agreement was originally for a twelve-month term, and automatically renewable absent written notice from Plaintiff. The Parties performed under the Processing Agreement until on or around May 1, 2021, when Tl Payments failed to perform according to the terms thereof, which

permanently fractured the parties' relationship, causing the subsequent events, problems and losses detailed below to occur.

*iii. 36 CIRCLES LOST SERVICE ON MAY 1, 2021*

159. On or about May 1, 2021, the Plaintiffs noticed the deposits from Actum Processing into their merchant bank account did not arrive as usual. After four more days of nonpayment, and confirmation from dozens of other kratom merchants that no one was being paid from T1 Payments, the Plaintiffs realized something was amiss. On May 5, 2021, 36 Circles stopped using T1 as its payment processor and were forced to stop accepting credit card payments. To make matters worse, if losing thousands of dollars in sales every day is not bad enough, 36 Circles was also unable to issue refunds to its customers through the usual T1 Payment channels those same customers just used to purchase their products.

160. On May 28, 2021, at Kasdon's direction, T1 Payments "legal department" sent a generic, form-email notice to all of its clients, including 36 Circles, stating without explanation that its Acquirer (Payvision) had terminated its agreement with T1 Payments. The email stated:

> "For reasons outside of T1 Payments LLC's control, the acquirer (Payvision) associated with your account terminated the agreement that enabled T1 Payments LLC to continue servicing your account for new transactions. T1 Payments has attempted to resolve this issue but unfortunately was not able to come to a successful resolution. T1 Payments LLC regrets to inform you that your merchant account will be terminated effective May 31, 2021. T1 Payments LLC will continue to service the account for chargebacks and other post-termination matters as long as circumstances permit. All provisions set forth in the Card Payment Processing Agreement that survive termination of the agreement shall remain in full force and effect. We understand these are not ideal circumstances and want to ensure you that we will be reaching out to every merchant individually in hopes to resolve this amicably. Should you have any requests for refunds they must be sent to refunds@t1payments.com." *See May 28, 2021* Email attached as **Exhibit 13.**

161. Upon close review of the May 28, 2021 email, the legal department stated Payvision terminated the agreement that enabled T1 Payments, LLC to "service" 36 Circles' account—*not that T1 Payments terminated the contract*. Id. This fact alone disallows Kasdon or any of the T-

Companies from relying on the termination provision they assert allows them to keep all merchants funds at their whim.

162. The legal department notified the Plaintiffs that their account *would be* terminated *at a later date*, yet never sent a notice of termination on May 31, 2021, nor did it send one pursuant to the terms and requirements of contract however which require certain notices be sent to specific addresses and contacts before they are deemed sent.

163. At the time of the above email, TGlobal Limited's bank account held Four Hundred Fourteen Thousand, Three Hundred Thirty-Two Dollars & Ten Cents ($414,332.10) owed to and beneficially and legally owned by 36 Circles.

*iv. PAYMENTS KASDON DIRECTED AFTER PAYVISION'S MARCH 16, 2021 DEADLINE*

164. On March 31, 2021, Kasdon directed King to transfer £1,415,001 from the TGlobal Services bank account that made its way into the bank account owned by Defendant Pixxles Limited in the United Kingdom, which is controlled by Kasdon through his girlfriend Fairchild. *See Statement of Capital for Pixxles, Ltd. File Dated March 31, 2021*, attached hereto as **Exhibit 14**

165. On June 3, 2021, Kasdon directed King to transfer $2.8 million from the TGlobal Services bank account that made its way into the bank account owned by Kaplan Cottner, LLC, and which then made its way to Defendant Pixxles Limited in the United Kingdom, controlled by Fairchild. *See Statement of Capital for Pixxles, Ltd. File Dated June 4, 2021*, attached hereto as **Exhibit 15.**

166. On June 10, 2021, Actum Processing made a payment of $19,443.12 to the Plaintiffs, leaving a balance due of $394,888.98. See June 10, 2021, *Email from Legal Department* attached as **Exhibit 16.**

167. On June 16, 2021, Kasdon directed King to transfer £322,211 that made its way into the bank account owned by Defendant Pixxles Limited in the United Kingdom. *See Resolution of Pixxles, Ltd. File Dated June 16, 2021*, attached hereto as **Exhibit 17.**

168. On June 22, 2021, Defendant Kasdon threatened Plaintiffs as follows: "If lawyers get involved there will be no payment." *See June 22, 2021, Email from Kasdon* attached hereto as **Exhibit 18.**

169. On July 14, 2021, Actum made a second payment of $18,470.96 to the Plaintiffs, leaving a balance due to Plaintiffs of $376,418.02. See July 14, 2021, *Email from Legal Department* attached as **Exhibit 19.**

170. On August 17, 2021, Actum made a third payment of $17,546.41 to the Plaintiffs, leaving a balance due of $358,871.61. *See August 17, 2021, Email from Legal Department* attached as **Exhibit 20.**

171. In 2021, Kasdon also sent nearly $4 million to his company, Deep Pockets, LLC, which owns the Deep Pockets Trust, a real estate holding trust for its beneficiary—Kasdon.

172. Beginning on October 13, 2021, TGlobal Services, LLC became the new payer for the amounts due to the Plaintiffs, at the direction of Kasdon. It is important to note that TGlobal Services LTD is the company that was actually in contract with Payvision as a PayFac until May 28, 2021. TGlobal Services, LLC, at the direction of Kasdon, made three additional payments including $8,945.05 on October 13, 2021; $7,724.04 on November 1, 2021; and $8,422.34 on November 16, 2021 before ending all communication with the Plaintiffs.

173. To date, Kasdon and his associated companies, subsidiaries and officers have refused to repay the remaining balance of Three Hundred Thirty-Three Thousand Seven Hundred Eighty Dollars & Eighteen Cents ($333,780.18) due to 36 Circles.

174. On March 29, 2022, Kasdon directed King to transfer £2,810,733.00 that made its way into the bank account owned by "Pixxles Limited. " *See Pixxles Ltd Allotment of Shares Dated March 29, 2022*, attached as **Exhibit** 21.

**E. <u>STATUTORY & PAYMENT BRAND RULE VIOLATIONS</u>**

175. Kasdon's ability to use the T-Companies to perform the services subject of the Processing Agreement between T1 Payments and 36 Circles depended on an illegal credit card laundering scheme, whereby TGlobal Services, LTD presented 36 Circles' customers' Payment Card transactions to an undisclosed bank for authorization (Payvision), and processed and settled those transactions through an account held in the name of an imposter-merchant entity (TGlobal Services, LTD), as though they were that imposter merchant's customer transactions. By doing so, Kasdon, King and Fairchild and their Defendant Companies engaged in violations of 18 U.S.C. §§1001, 1029, 1343, 1344, 1956 & 1957.

176. Furthermore, because T1 Payments' promise to process 36 Circles' transactions constitutes the object of the Processing Agreement (i.e., the thing that T1 agreed to do in exchange for consideration), and because T1 Payments' ability to perform those services depended on an illegal solution, the Processing Agreement is void as an illegal contract, and public policy prohibits T1 from charging fees, or claiming any other benefit (limitation of damages or liability, etc.) thereunder. Plaintiffs will describe in more detail below the Defendants' violations of State and Federal Law after describing the numerous and widespread administrative violations these Defendants knowingly undertook.

*i. KASDON, KING & FAIRCHILD'S PAYMENT BRAND RULE VIOLATIONS*

177. Based on Kasdon, King and Fairchild and their Defendant Companies' illegal conduct and violation of the Rules, as detailed herein, T1 Payments, Kasdon, King, Fairchild, Dawson, Kamaly and Pereira, Defendants' executives, and Defendant Companies are all subject to MATCH-listing for credit card laundering (MATCH Code 03), violation of standards (MATCH Code 10) and illegal activity (MATCH Code 13). [11]

[11] The MATCH list is a record of merchants that are considered to carry an unacceptable level of risk. Banks, payment processors, and other financial institutions use this list to identify merchants that they might not want to do business with. MATCH is the rebranded version of an older, more aptly named list, the Terminated Merchant File (TMF).

178. None of Kasdon, King and Fairchild and their Defendant Companies' acts taken pursuant to the Processing Agreement were valid under the Payment Brand Rules. The Rules mandate that, except in the case of a registered PayFac, an Acquirer must have a direct written merchant agreement with each of its merchants. *See e.g.*[12], Mastercard Rule 5.1; Mastercard Rule 7.6.1; and Visa Core Rule 1.5.2.1.[13] A review of the Mastercard Payment Facilitator list and the Visa Global Registry of Service Providers confirms that, while T1 Payments was registered as an ISO at all times complained of herein, T1 Payments was <u>not</u> registered as a PayFac.

179. Even if T1 Payments *was* a properly registered as a PayFac when it purported to be, the Rules would still require-*at a minimum*-that T1 Payments' Processing Agreement identify the Acquirer (Payvision), disclose contact information of the Acquirer to address questions and concerns, and reflect that T1 Payments entered into the Processing Agreement on behalf and as an agent of the identified Acquirer. *See, e.g.*, Mastercard Rule 7.8.1. Obviously, since T1 Payments had no contractual relationship with an Acquirer, it could not take any of these steps. Kasdon directed the transactions take place anyway.

180. Most importantly to Plaintiffs is that the Payment Brand Rule mandate that, except in the case of a properly registered PayFac, <u>the Acquirer alone must have exclusive control over merchant funds and reserves</u>. *See e.g.*, Mastercard Rule 7.2.1; Mastercard Rule 7.3; Mastercard Rule 7.6.2; *and see* Visa Core Rule 1.5.8.2. In direct contravention of the Rules, the Processing Agreement in issue provides for T1 Payments to assess and deduct service fees, withhold funds, maintain reserve account funds, and make payments to 36 Circles *directly* from the proceeds of 36 Circles' processing activity. All of which proves T1 Payments was in receipt of those funds in violation of the Rules. *See* **Exhibit**

---

[12] https://www.mastercard.us/content/dam/mccom/global/documents/mastercard-rules.pdf
[13] https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf

**11** at the Processing Agreement ¶¶ 5.7, 6.1-5, 6.8, 7, 8.1-5. T1 Payments directly violated the Rules with each of these provisions at the direction of Kasdon.

181. Even T1 Payments' website reveals that T1 Payments is in violation of the Rules requiring each registered Service Provider/Third Party Agent to disclose the sponsoring member bank on its brochures, website, and other marketing materials. Notwithstanding T1 Payment's status as a registered ISO of Visa, T1 Payments, at the direction of Kasdon, failed to disclose its relationship to any sponsoring bank on its website and marketing materials.

182. Indeed, Kasdon directed T1 Payments not to open any merchant account in the name of 36 Circles at all, but instead to process 36 Circles' transactions through a merchant account held in T1 Payments name or the name of a third-party entity. This practice is variously known as "credit card laundering," "factoring" and "aggregation," and is an illegal practice which is a variation on money laundering. Aggregation means laundering or factoring multiple merchants' transactions through a single account held in the name of a third-party entity.

*ii. KASDON, KING & FAIRCHILD'S VIOLATIONS OF STATE & FEDERAL LAW*

183. During the parties' business relationship, Kasdon directed T1 Payments to periodically offer to increase 36 Circles' processing limits while repeatedly representing that the Plaintiffs' stated monthly volume was not a "hard limit." This was because Kasdon was "cascading" or "load balancing" the merchant's transactions across multiple merchant accounts held in the names of third parties-moving the processing activity to a different merchant account each time the monthly volume limit is reached on the preceding account. Thus, if each merchant account has a monthly volume limit of $200,000.00 like the Plaintiffs began with, the processor could illegally cascade the merchant's transactions three times (*i.e.*, launder the merchant's transactions through three different MIDs) to accommodate a $600,000.00 limit.

184. The nature of T1 Payments' reporting and the lack of any merchant portal other than the third-party NMI Gateway[14] also indicated that Kasdon was illegally aggregating (laundering) transactions. Legitimate Payment Facilitators provide their merchants with real time reporting through a merchant portal. It enables the merchant to view all merchant account activity as it happens. Illegitimate processors like T1 Payments cannot provide that function because they are processing a merchant's transactions through another party's merchant account with another Acquirer/Processor/Service Provider. Thus, to provide reporting, illegitimate processors like T1 Payments provide their reporting in the form of spreadsheets instead of formalized merchant statements. Indeed, T1 Payments never provided 36 Circles with a single monthly statement, but instead provided only daily deposit reports via e-mail generated from the NMI gateway platform as ordered by Kasdon. This is another telltale sign of illegal processing activity.

185. The federal crime of access device fraud is embodied in 18 U.S.C. §1029, which provides definitions of credit card fraud, including that, "Whoever, without the authorization of the 'credit card system member' (i.e., Acquirer) or its agent, knowingly and with intent to defraud, causes or arranges for another person to present for payment, one or more evidences or records of transactions made by an 'access device' (i.e., a credit card) shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section." The sentencing guidelines are set at 10 to 20 years and forfeiture of all illicitly gained property and funds. By presenting 36 Circles' customers' Payment Card transactions to an Acquirer as another entity's customer card transactions for authorization, processing and settlement, T1 Payments engaged in access device fraud in violation of 18 U.S.C. §1029.

---

[14] The back-end user access provided by T1 Payments to 36 Circles was through the NMI gateway (NMI.com) not through a Customer Relations Management System that was proprietary to T1 Payments.

186. By using electronic communications to capture and transmit payment information from 36 Circles' customers to an Acquirer through another entity's merchant account in violation of 18 U.S.C. §1029, T1 Payments also engaged in wire fraud in violation of 18 U.S.C §1343, at Kasdon's direction.

187. 18 U.S.C. §1343 provides that, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. §1343 defines the term "scheme or artifice to defraud" to include a scheme or artifice to deprive another of the intangible right of honest services.

188. Likewise, by presenting 36 Circles' customers' Payment Card transactions to an Acquirer through another entity's merchant account, Kasdon also knowingly executed a scheme or artifice to obtain funds under the custody or control of both the card-issuing bank and the Acquirer by means of false or fraudulent pretenses. Thus, all of the Defendant Companies as well as Kasdon, Fairchild, and King also engaged in bank fraud within the meaning of 18 U.S.C. §1344. This same conduct also constitutes false statements to a bank in violation of 18 U.S.C. §1001. All of these crimes carry penalties ranging from 10 to 30 years imprisonment, and/or fines of up to $1 Million per offense.

189. Kasdon, King, Fairchild, Dawson, Kamaly and Pereira's conduct also constitutes laundering of monetary instruments. By having 36 Circles' customers' Payment Card transactions processed through another entity's merchant account and then having the proceeds deposited into T1 Payments' own bank account, T1 Payments engaged in financial transactions involving the proceeds of "specified unlawful activity" flowing from Kasdon, King and Fairchild's acts of access device, wire,

and bank fraud, as described above. Thus, their conduct constitutes violations of 18 U.S.C. §§1956 and 1957.

190. 18 U.S.C. §1956(a)(1) in relevant part provides that, "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-(A)(i) with the intent to promote the carrying on of specified unlawful activity; or ... (B)(i) knowing that the transaction is designed in whole or in part-to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity...shall be sentenced to a fine of not more than $500,000.00 or twice the value of the monetary instrument or funds involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both." 18 U.S.C. §1956(c)(7) defines the term "specified unlawful activity" to include any act or activity listed as an offense in Section 1961(1), which, in turn, defines "racketeering activity" to include, inter alia, any act which is indictable under 18 U.S.C. §§1029 (credit card fraud), 1343 (wire fraud), and 1344 (bank fraud). Kasdon King and Fairchild committed all these crimes through their scheme.

191. Separately, 18 U.S.C. §1957 makes it a federal crime to knowingly engage or attempt to engage in a monetary transaction involving more than $10,000.00 derived from any of these same types of "specified unlawful activity" such as Kasdon, King and Fairchild engaged in.

192. Finally, Kasdon, King, Fairchild, Dawson, Kamaly and Pereira also engaged in unlicensed money transmission in violation of the Bank Secrecy Act (BSA). Under the BSA, a money transmitter is a type of Money Services Business (MSB) and is defined to include a person that "provides money transmission services, or any other person engaged in the transfer of funds." 31 C.F.R. § 1010.100(ff)(5)(i)(A) and (B). The term "money transmission services" means "the acceptance of currency, funds, or other value that substitutes for currency from one person and the

transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." 31 C.F.R. §1010.100(ff)(5)(i)(A). No activity threshold applies to the definition of a money transmitter. Thus, because Kasdon, King, Fairchild, Dawson, Kamaly and Pereira engaged in the transfer of funds for their businesses, they are an MSB as a money transmitter, regardless of the amount of money transmission activity. King's transfers and withdrawals at Kasdon's request fall into this category.

193. By accepting settlement funds from Acquirers located abroad for transmission to 36 Circles' bank account in California at the direction of Kasdon, King, Fairchild, Dawson, Kamaly and Pereira engaged in money transmission within the meaning of the BSA. A search of the FinCEN MSB Registrants[15] confirms Kasdon, King and Fairchild's lack of registration as a money transmitter, or any type of MSB.

194. They also do not fall within any of the exemptions to registration as a money transmitter.

195. As such Kasdon, King, Fairchild, Dawson, Kamaly and Pereira are likely subject to a civil penalty of $5,000.00 for each violation of BSA registration requirements in an amount up to $5,000.00 for each day a registration violation continues for their failure to comply with the registration requirements set forth in 31 U.S.C. § 5330 and 31 CFR § 103.41. The individual Defendants (Kasdon, King, Fairchild, Dawson, Kamaly and Pereira) are subject to fines and imprisonment of not more than five years pursuant to 18 U.S.C § 1960(a) for knowingly conducting, controlling, managing, supervising, directing, and/or owning all or part of an unlicensed money transmitting business. They are all also subject to fines and imprisonment of not more than five years pursuant to 18 U.S.C § 1960(b)(1)(B) for operating a money transmitting business that affects interstate or foreign commerce in any manner or degree and fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330.

---

[15] https://www.fincen.gov/msb-state-selector

196. Kasdon, King, Fairchild, Dawson, Kamaly and Pereira and their Defendant Companies conduct also constitutes illegal money transmission under the laws of one or more states for the same reason, including Nevada, Florida, and California.

**F. <u>T1 PAYMENTS IS IN BREACH OF THE AGREEMENT</u>**

197. Alternatively, and without waiving the fraud allegations, pursuant to the Processing Agreement, which Defendants drafted and did not permit Plaintiffs to edit in any manner, T1 Payments was required to "deliver payouts of amounts owing to 36 Circles as promptly as practicable after processing, subject to T1 Payments' rights to offset and holdback sums due to Plaintiffs or collected from Plaintiff's sales…" *See* **Exhibit 1**. T1 Payments was to promptly deliver payments but was permitted to hold a Reserve Account of funds for nine months after the last card sale, refund, or chargeback occurred, or to hold back all funds if it properly terminated the contract. *Id.*

198. <u>T1 never actually terminated the contract—it just stopped communicating with the Plaintiffs, and kept their money anyway at Kasdon's direction, even after the nine-month period passed.</u>

199. The Merchant Terms Acknowledgment document attached as **Exhibit 11** stated the specific terms and pricing between Tl Payments and 36 Circles for credit card transactions. The most important term in the Acknowledgment was the Reserve Account terms which permitted a maximum of ten percent (10%) over the relevant 180-day period. **Exhibit 1**.

200. As of the commencement of this action, and well <u>after</u>: i) the 9-month period set forth under the Agreement; (ii) the last chargeback and/or refund had been processed under the Processing Agreement; and iii) Payvision discovered T1 Payments' fraud and terminated its ability to direct transactions under TGlobal, T1 Payments has continued to hold the Plaintiffs' funds from the associated Merchant Account and/or Reserve Account. Additionally, Tl Payments continues to attempt to justify its intentional and wrongful withholding of funds due and owing to 36 Circles in violation of the Agreement by inapplicably using the language "last transaction, chargeback, or

refund" as providing T1 Payments a contractual right to hold unilaterally these funds in perpetuity, with no intention of ever remitting these funds.

201. On numerous occasions since May 1, 2021, 36 Circles sought updates from T1 Payments regarding the transaction history related to its Reserve Account funds and demanded return of its money. Defendants, at the direction of Kasdon, have employed evasive and deceptive tactics, imposing one artificial deadline after another, to avoid paying 36 Circles the revenues that it earned by providing products to its customers i.e., the balance of the Reserve Account funds.

202. Plaintiffs expected, planned for, and relied on T1 Payments, LLC to release all revenue owed to it pursuant to the time permissible under the Processing Agreement. Kasdon, however, had other plans for the funds, and directed them dispersed to other of his Defendant Companies, Defendant Trust, and co-defendants King and Fairchild. As a result of Defendants' disregard of 36 Circles' rights, 36 Circles' business was negatively impacted.

203. Defendants, in concert and in a joint venture and in conspiracy one with another, all under the direction of Kasdon, are illegally keeping money that does not belong to them and which they have not earned, all as part of their premeditated, injurious business model. Plaintiffs' funds were included in the_millions of USD into British Pounds Sterling sent as "investments" into Kasdon's Defendant Companies in 2021, just before they stopped paying their merchants, including the Plaintiffs, including <u>£1,415,001.00</u> on April 26, 2021; <u>£1,737,212.00</u> on June 4, 2021; and <u>£2,810,733.00</u> on March 29, 2022. *See* **Exhibits 14, 15 & 21.**

204. It is Kasdon's business model to deprive merchants of their own money by directing his co-defendants to withhold funds and make false claims for fees and costs, among other pretextual bases, along with him in his correspondence. Kasdon, King and Fairchild and their Defendant Companies drag merchants along for months-or years, which is evidenced based on the previous lawsuits filed-by setting artificial, never-ending deadlines to force merchants into paying fees that they do not owe

while Defendants reap the benefits of merchants' funds. Consistent with this scheme, Kasdon, King and Fairchild have deprived 36 Circles of funds that lawfully belong to it, have caused it to incur fees and costs associated with the instant lawsuit, and forced the Plaintiffs to expend an undue amount of time, effort, and cost to recover said funds by inter alia making false claims for ETFs, non-existent chargebacks, phony, ongoing transactions that move the fraudulent goal posts ever forward and refusing to provide an accounting for Plaintiff's Reserve Account funds.

205. Moreover, T1 Payments, LLC violated the Agreement at Section 4.1 and the Introduction by failing to process the Plaintiffs' card transactions pursuant to the Card Rules, policies regulations and State and Federal Laws.

206. To date, and despite 36 Circles' numerous demands, Kasdon and T1 Payments refuse to abide by the Processing Agreement and refuses to deliver 36 Circles' own money to it.

**G. <u>THE PROCESSING AGREEMENT IS ALSO VOID AS AN ILLEGAL CONTRACT</u>**

207. Based on T1 Payments' marketing materials, including its LinkedIn advertisements and account onboarding e-mails, and the representations of T1 Payments' representatives, under the direct supervision and control of Defendants Kasdon, King, and Fairchild, 36 Circles reasonably understood and believed that T1 Payments was offering a fully legal and compliant Program, and 36 Circles truthfully and accurately disclosed the nature of its business activities to T1 Payments when it applied for the subject processing services.

208. In fact, T1 Payments' ability to provide the subject payment processing services to 36 Circles depended on T1 Payments' and Kasdon, King and Fairchild's acts of access device fraud, wire fraud, bank fraud, application fraud, money laundering and unlicensed money transmission. This is evidenced by the various Rules violations detailed above, specifically including the fact that (i) T1 Payments is not registered as a PayFac, (ii) T1 Payments' flexible monthly volume limits and

eagerness to increase those limits, and (iii) T1 Payments' deficient reporting practices, specifically including its inability to provide real time reporting to its merchants.

209. Because T1 Payments' provision of the subject processing services constitutes the purpose of the Processing Agreement, and the basis for the fees to paid by 36 Circles to T1 Payments thereunder, the Processing Agreement has an illegal object that touches and taints the rest of the contract as a whole. Thus, the Processing Agreement is void as an illegal contract. Of course, a void contract is a mere nullity, and wholly unenforceable.

210. 36 Circles reasonably relied on Kasdon and T1 Payments' repeated representations regarding the lawful and compliant nature of T1 Payments' processing solution and were justifiably ignorant as to the illegal manner in which Kasdon set up the solution and performed the services subject of the Processing Agreement. Indeed, the Plaintiffs did not learn about the illegal nature of the Processing Agreement, or the processing services provided thereunder, until their attorneys had investigated these matters and explained the illegality of Defendants' conduct to them.

211. Defendant Kasdon drafted the Processing Agreement for the purpose of defrauding the Plaintiffs, and to circumvent the Rules and federal law, and to conceal the unlawful nature of the services provided by his Defendant Companies. Kasdon, King and Fairchild are solely responsible for the illegality of the services T1 Payments provided under the Processing Agreement.

212. Thus, while public policy prohibits Defendants from claiming any benefit under the Processing Agreement, Plaintiffs may enforce their claims against T1 Payments pursuant to the doctrine of *in pari delicto*. *See* REST. CONTRACTS §§ 599(a) and 600-603; see also 6A CORBIN ON CONTRACTS (1962) §1518, p. 744 ["A party who makes such a bargain in furtherance of his wrongful purpose can not enforce it, even though it is enforceable against him by the other party if the latter is innocent of such a purpose."].

## <u>VI. PLAINTIFFS' CAUSES OF ACTION</u>

**FIRST CAUSE OF ACTION**
**CONSPIRACY TO DEFRAUD IN THE INDUCEMENT**
(As against all Defendants)

213. 36 Circles hereby restates and incorporates the allegations contained in Paragraphs 1 through 208 above as though set forth in full.

214. T1 Payments, LLC and Defendant Kasdon represented that T1 Payments, LLC was a Payment Facilitator, among the other representations described above. These statements appeared in T1 Payments LinkedIn page and on T1 Payments' website during the times the Plaintiffs were unknowingly using Payvision' services. *See* **Exhibit 3**; *see also* Footnotes 9 & 10, which are incorporated herein by this reference as though set forth in full.

215. Kasdon published various advertisements regarding T1 Payments, LLC's status as one of the longest-standing kratom solutions offering lawful and reliable global payment processing services to online marketers of kratom, a representative sampling of which is attached hereto in the form of screenshots as **Exhibit 22** and incorporated herein by this reference as though set forth in full.

216. Kasdon published various articles on T1 Payments, LLC's website that included promises that T1 Payments, LLC was a payment facilitator that had direct relationships with card brands and acquirers that would enable T1 Payments to be a one stop shop for all merchant credit card transactions and related services. The contract also included the same misrepresentations.

217. T1 Payments was not in fact a registered PayFac or MSB, nor was it in privity with a registered payment service provider. Donald Kasdon, his mother (King) and his girlfriend (Fairchild), used T1 Payments in the U.S. to illegally aggregate transactions from multiple merchants and to send those bundled transactions through Kasdon's network of companies as described in the chart above, with the assistance of King, Fairchild, Dawson, Kamaly, and Pereira, depending on whether the transaction was running through a T-Company or a Pixxles Company, or one of the companies King and Fairchild formed together. It is important to note that Kasdon denied Scott Dawson had anything

to do with T1 Payments, LLC during his September 2021 deposition in an earlier case, but Scott Dawson appeared on the T1 Payments, LLC American Express statements for T1 Payments, LLC, and then also as a director for Pixxles, LTD. Kasdon was also aggregating the U.S. sub-merchants transactions in the U.K. entities formed and operated by Fairchild at Kasdon's direction, and then into Payvision, B.V.'s payment system. Payvision, B.V. had already been operating in this manner for years with Kasdon and his entities before the Plaintiffs were sent through these alter ego sham companies and eventually ripped off. Kasdon also directed funds from his theft into the aptly named TGlobal Capital, LTD.

218. Payvision, B.V. was also in a civil conspiracy to gain access to U.S. sub-merchants like the Plaintiffs' funds through Kasdon's network of shell companies, re-route most of their funds into Payvision's bank account, distribute some amount into Kasdon's Nevada bank account.

219. 36 Circles reasonably relied on the representations made by Kasdon and T1 Payments, LLC in deciding to do business with T1 Payments, including contracting with T1 Payments for a merchant account, modifying the 36 Circles websites pursuant to T1 Payments' instructions, accepting ownership of a United Kingdom company, and submitting transactions to T1 Payments for processing pursuant to the Processing Agreement.

220. These representations were false, and Kasdon and T1 Payments and its representatives made these representations knowing they were false. In fact, T1 Payments' ability to offer the subject processing services to 36 Circles depended on Kasdon's fraudulent scheme and illegal acts.

221. These representations were part of a fraudulent scheme orchestrated by Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira (and implemented through each of the Defendant Companies in the numbered steps set forth above) pursuant to their conspiracy with each other, to deceive 36 Circles regarding the subject processing services in order to fraudulently induce 36 Circles' reliance on these representations and to fraudulently induce 36 Circles into doing business

with T1 Payments, and to fraudulently induce 36 Circles into submitting its transactions to T1 Payments for processing so that Kasdon, King and Fairchild could gain control over the proceeds of those transactions and convert them to their own benefit rather than paying those funds to 36 Circles, notwithstanding 36 Circles' entitlement to and rightful ownership of those funds.

222. Each of the T Companies (T1 Payments, LLC, T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, LTD; and TGlobal Capital LTD) were part of the conspiracy by holding and transferring funds between T1 Payments, LLC and Payvision, and assisting Kasdon in concealing transfers from the U.S to the U.K. and holding stolen funds.

223. Each of the Pixxles Companies, Fairchild, Dawson, Kamaly, and Pereira were part of the conspiracy by becoming the "denouement" of the actions taken and directed by Kasdon. Each of the Pixxles companies and managers took part in receiving the funds wrongfully transferred out of the T-Companies between March 2021 and the present time. Each of them were in agreement to use those stolen funds, including the funds stolen from the Plaintiffs, to create a new business outside of Nevada and outside of the United States, for the purpose of keeping judgment creditors and plaintiffs from collecting the funds due to them in Nevada.

224. King, Fairchild, Dawson, Kamaly, and Pereira were a part of this conspiracy as voluntary strawmen for Kasdon. Notably, neither Fairchild nor King knew anything about the companies they purported to manage in their depositions, instead allowing Kasdon to use their names and email accounts and identities to run "their" companies himself. Both admitted in their depositions in an earlier lawsuit that they agreed to assist Kasdon in whatever way he needed, which was actually to accomplish this scheme.

225. Actum Processing, LLC was part of the conspiracy in that it knowingly helped T1 Payments, LLC to appear to be processing payments in the U.S. by breaking up the bundled wire transfers of

$2,500,000.00 that were sent to Actum from the T-Companies several times a week and paying expected amounts to the merchants.

226. Each of the defendant managers of the Pixxles companies in the UK were knowingly in conspiracy by allowing their UK companies to be used to keep U.S. judgment creditors and U.S. Plaintiffs from collecting the funds due to them in Nevada.

227. All of the Defendants were also in conspiracy to conceal themselves from the Plaintiff, to allow T1 Payments, LLC to appear to be a real credit card payment company. All of the T Companies and Pixxles companies were used by Kasdon as a "shell game" to move and hide stolen money. Each of the Defendants knew and understood and agreed to assist Kasdon's goal of inducing merchants into contracts with a fake credit card company. Each of the Defendants knew and understood and agreed to assist Kasdon's goal of transferring, accepting and hiding the stolen funds in UK companies.

228. 36 Circles has suffered in excess of $333,780.18 in damages as a direct and proximate result of Defendants' fraudulent conspiracy.

229. 36 Circles' reasonable reliance on Kasdon's and T1 Payments' false representations was a substantial factor in 36 Circles' harm because, but for those representations and the trust 36 Circles reposed in Kasdon, and the other T1 Payments' representatives and sister companies, 36 Circles would never have done business with nor submitted its transactions to T1 Payments for processing, and Kasdon would have never gained control over 36 Circles' funds.

230. Defendants' wrongful acts as described herein were intentional, malicious, oppressive and fraudulent, and were committed with reckless disregard of harm to 36 Circles, in willful and conscious disregard of 36 Circles' rights, such that 36 Circles is entitled to recover punitive and exemplary damages against Defendants in an amount that is sufficient and appropriate to punish Defendants, as well as to deter them from committing similar acts in the future.

**SECOND CAUSE OF ACTION**
**FRAUD BY OMMISSION**
(As against Kasdon, King and Fairchild)

231. Plaintiffs hereby restate and incorporate the allegations contained in Paragraphs 1 through 226 above as though set forth in full.

232. Kasdon, King and Fairchild knew that T1 Payments, LLC was not able to handle merchant funds under the Card rules and under federal law, but they promised it would anyway. Kasdon, King and Fairchild also knew Payvision notified Kasdon of the termination of Kasdon's scheme since December 16, 2020, but omitted and concealed that information from the Plaintiffs (and all of the other merchants that signed up for T1 Payments' "service") to induce them to continue to taking customer transactions through their websites that included new foreign company information. Kasdon, King and Fairchild induced the Plaintiffs to continue taking transactions so that the Plaintiff would grow the amount of money held by Kasdon, King and Fairchild's T-Companies (T1 Payments, LLC, T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, LTD; and TGlobal Capital LTD) before Payvision cut-off the ability to take any more transactions. Further, Kasdon directed T1 Payments, LLC to notify the Plaintiffs that their transaction limit was raised, after he became aware of the pending shutdown, to accumulate even more funds. Kasdon, King, and Fairchild's concealed their true situation in order to amass as much money as possible before transferring the money (and new clients) over to the Pixxles brand through one of its agents or shell companies, on May 28, 2021, without warning.

233. Kasdon, King and Fairchild failed to disclose these material facts and circumstances which they were under an obligation to disclose because of the duty of good faith and fair dealing, under the terms of the contract, under the NDTPA, and because they utilized the concealment to further the already-fraudulent scheme the Plaintiff were trapped in.

234. Kasdon, King and Fairchild knowingly and with the intent to defraud, engaged in these acts above, in the course of business, employing a scheme which operated as a fraud or deceit upon 36 Circles, LLC and its subsidiary 36 Circles, LTD, by means of the omission of a material fact that Kasdon, King and Fairchild knew to be omitted. Kasdon, King and Fairchild intended the Plaintiffs to rely on their previous understanding of the scheme by omitting the new information, which resulted in the Plaintiffs increased transactions and amount of money under Kasdon, King and Fairchild's control, and then to a complete loss of those funds by the Plaintiffs who relied on the previous understanding of the scheme, before the omission. Plaintiffs relied on them because there was no public information to the contrary, and the letters were private correspondence between Payvision and Kasdon. Plaintiffs also still believed that T1 Payments, LLC was a legitimate credit card processor.

235. The Plaintiffs did not become aware of the fraudulent concealment of the notifications from Payvision of the shutdown of Kasdon's scheme until T1 Payments, LLC provided those letters to the bankruptcy trustee on November 20, 2023. The Plaintiffs could not have become aware of the letters earlier because none of the Defendants have participated in the production of any discovery as of the date of this amended filing.

236. 36 Circles has suffered in excess of $333,780.18 in damages as a direct and proximate result of Defendants' fraud.

**THIRD CAUSE OF ACTION**
**FRAUDULENT INDUCEMENT**
(As to Kasdon)

237. Plaintiffs hereby restate and incorporate the allegations contained in Paragraphs 1 through 232 above as though set forth in full.

238. On or about May 28, 2021, during a phone call to 36 Circles' principal, Kasdon promised to pay the Plaintiffs the <u>Four Hundred Fourteen Thousand, Three Hundred Thirty-Two Dollars & Ten</u>

Cents ($414,332.10) owed to 36 Circles in monthly payments of ten-percent of the total due. He also stated that the payments would continue as long as no attorneys got involved.

239. That also turned out to be a lie. Kasdon used this new lie to induce 36 Circles to delay filing a lawsuit until after the contract's one-year statute of limitations had run. This, in turn, allowed Kasdon more time to direct his companies and agents to move all of the funds in his possession out of the reach of 36 Circles, into UK or Isle of Man bank accounts.

240. Kasdon never made any payments of 10% of the debt, instead making payments of 5% of the debt through the end of the year in 2021, even though 36 Circles met its end of the bargain and refrained from involving lawyers in the dispute.

241. Kasdon made these false representations knowing the representations were false with the intent that the Plaintiffs consent to the agreement and refrain from involving attorneys, which the Plaintiffs did, consenting to the contract's formation. The Plaintiffs justifiably relied upon the misrepresentations because they still believed that T1 Payments, LLC was a real credit card processor. 36 Circles has suffered in excess of $333,780.18 in damages as a direct and proximate result of Defendants' fraud.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
(As against all Defendants)

242. Plaintiffs hereby restate and incorporate the allegations contained in Paragraphs 1 through 237 above as though set forth in full.

243. By these actions and omission described hereinabove, Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira in conspiracy with one another and in conspiracy with the T-Companies and the Pixxles Companies, violated the Nevada Deceptive Trade Practices Act (NDTPA). There was an agreement between Kasdon, King, Fairchild, and all of the Defendant Companies named herein to commit an unlawful act (namely the fraudulent conspiracy to gain control of the Plaintiffs'

customers' funds). There was also an agreement between Kasdon, King, Fairchild, and all of the Defendant Companies named herein to commit a lawful act by unlawful means—specifically to perform the credit card services under the contract through violations of the Card Rules and the federal statutes listed a and described in Section V(F)(i-ii) Supra.

244. These Defendants engaged in a conspiracy to commit a "deceptive trade practice" when in the course of their business scheme they knowingly: (i) passed off services for sale as those of another person; (ii) made a false representation as to the source, sponsorship, approval or certification of services for sale; (iii) made a false representation as to affiliation, connection, association with or certification by another person; (iv) used deceptive representations or designations of geographic origin in connection with services for sale; (v) made a false representation as to the characteristics of services for sale, and a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith; (vi) advertised services with intent not to sell as advertised; (vii) advertised services for sale with intent not to supply reasonably expectable demand; (viii) conducted their business scheme without all required state, county or city licenses; (ix) made false representations in a transaction; (x) failed to disclose a material fact in connection with the sale of services. See NRS 598.0915.

245. Kasdon, in conspiracy with King, Fairchild, Dawson, Kamaly, and Pereira and the Defendant Companies misrepresented the history T-Payments, LLC and omitted telling 36 Circles about the numerous complaints, lawsuits, and allegations made against them for the sale of the same or substantially similar "credit card services."

246. Defendants' inability to perform their promised obligation, to either 36 Circles or other merchants, clearly indicates their false representations regarding the underlying transaction, i.e., the failure to disclose that 36 Circles would not receive the service as promised.

247. The actions and omissions of the Defendants described herein proximately caused damages to the Plaintiffs in the amount of $333,780.18.

**FIFTH CAUSE OF ACTION**
**CONSPIRACY TO COMMIT CONVERSION**
(As against all Defendants)

248. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 243 above as though set forth in full.

249. 36 Circles owns and has a right to immediate access and control of no less than $333,718.18 in funds being held by all of the Defendants in conspiracy with one another.

250. Defendants intentionally and substantially interfered with 36 Circles' right to possession by taking possession of these funds through agreement in the network of companies and individuals complained of, preventing 36 Circles from having access to these funds, and refusing to return these funds to 36 Circles after it demanded their return.

251. 36 Circles did not consent to Defendants' conduct.

252. 36 Circles suffered harm in the amount of no less than $333,718.18 by being deprived of possession of these funds.

253. Defendants' conduct was a substantial factor in causing 36 Circles' harm as described above.

254. Defendants' wrongful acts as described herein were intentional, malicious, oppressive, and fraudulent, and were committed with reckless disregard of harm to 36 Circles, in willful and conscious disregard of 36 Circles' rights, such that 36 Circles is entitled to recover punitive and exemplary damages against Defendants in an amount that is sufficient and appropriate to punish Defendants, as well as to deter them from committing similar acts in the future.

**SIXTH CAUSE OF ACTION**
**CONSPIRACY TO COMMIT THEFT**
(As against all Defendants)

255. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 250 above as though set forth in full.

256. All of the Defendants, have conspired to engage in acts of theft as described above with respect to Plaintiff's property by allowing Kasdon to control and keep no less than $333,718.18 in funds belonging to 36 Circles with the intent to deprive 36 Circles of those funds; converting no less than $333,718.18 in funds belonging to 36 Circles and entrusted to T1 Payments, LLC for the limited purpose of processing and settling 36 Circles' customer card payment transactions; obtaining no less than $333,718.18 in funds belonging to 36 Circles by a material misrepresentation with the intent to deprive 36 Circles of those funds. Such misrepresentations include the fraudulent misrepresentations described above, and the false pretense that Kasdon was increasing 36 Circles' monthly processing volume to ensure that 36 Circles could keep processing without interruption when in fact the increase was merely a device to get 36 Circles to process more transactions so Kasdon could gain control over more funds before his scheme was shut down.

257. By this conduct, Defendants have committed an offense involving stolen property within the meaning of section 1 of NRS 205.275 by receiving, possessing and withholding no less than $333,718.18 in funds belonging to 36 Circles for Defendants' own benefit and to prevent 36 Circles from possessing those funds, knowing those funds constitute stolen property and under such circumstances as should have caused a reasonable person to know that those funds constitute stolen property.

258. Based on the foregoing, the 36 Circles Plaintiffs bring this civil action against Kasdon pursuant to NRS 41.580 as the recipients, possessors and withholders of no less than $333,718.18 in funds belonging to 36 Circles, including an interest incurred therein, and seek treble damages of no less than $1,001,154.54, plus 36 Circles' costs of suit and reasonable attorneys' fees in connection with bringing this action.

259. Further, 36 Circles brings a civil action for conspiracy to commit theft under the same authority against the web of Defendants named in this lawsuit through their combined actions and omissions described hereinabove.

**SEVENTH CAUSE OF ACTION**
**MONEY HAD AND RECEIVED**
(As against Kasdon)

260. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 255 above as though set forth in full.

261. Kasdon received no less than $333,718.18 in funds due and owing to 36 Circles as a result of 36 Circles' submission of its customer Payment Card transactions to T1 Payments, LLC for processing and settlement. Kasdon has in his hands money, which, in equity and good conscience, belongs to the plaintiff.

262. While the transaction proceeds were paid to one or more of the T Companies and the Pixxles Companies, ultimately Kasdon has wrongfully withheld and refused to pay this amount to 36 Circles.

263. As a result, 36 Circles is entitled to a return of no less than $333,718.18, plus any additional amounts that discovery reveals these conspiring Defendants have wrongfully retained and withheld from 36 Circles.

**EIGHTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
(As against all Kasdon and his alter ego, T1 payments, LLC)

264. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 259 above as though set forth in full.

265. Alternatively, and without waiving the foregoing, 36 Circles LLC entered into a Processing Agreement with T1 Payments on or about August 18, 2020. 36 Circles, LTD entered into the same agreement on September 2, 2020 at the demand of Kasdon.

266. 36 Circles performed all conditions, terms, covenants, and agreements to be performed by 36 Circles thereunder. To the extent that 36 Circles owed any other obligation to T1 Payments under the Processing Agreement, 36 Circles' performance of any other such condition, term, covenant, or agreement has been excused, waived, or rendered impossible by T1 Payments.

267. T1 Payments has materially breached the terms of the Agreement by violating Section 4.1 and failing to process 36 Circles' payment transactions pursuant to the terms of this Agreement, the Payment Brand Rules, program rules and policies of its third party processors, and all applicable laws and regulations. T1 Payments, LLC simply never processed the Plaintiffs' transactions.

268. T1 Payments has materially breached the terms of the Agreement by violating Section 6.2. Specifically, Tl Payments failed to deliver payment of amounts owing to 36 Circles as promptly as is practicable after processing.

269. T1 Payments also breached the Agreement's Section 8.1 through 8.4 by withholding 36 Circles' settled funds in addition to the Reserve Account funds described therein. T1 Payments, LLC failed to actually trigger any of these reserve account increases because it failed to send the required notices of the same pursuant to the notice section of the Agreement.

270. T1 Payments also breached the Agreement by withholding funds under illegal and unenforceable provisions in the contract, including those in 8.1-8.4; and 6.8.

*Alter-Ego Allegations*

271. At all times complained of T1 Payments, LLC, T1 Payments, LTD, TGlobal Services, LLC and TGlobal Services, LTD (the "T-Companies") were all the alter egos of Kasdon: (i) the T-Companies were always solely influenced and governed by Kasdon, using his mother and girlfriend as straw men; (ii) there was such unity of interest and ownership that the T-Companies and Kasdon were inseparable from the other, which became apparent when Kasdon continued to use T1 Payments, LLC as his "card servicer" even after both he and T1 Payments, LLC lost their ability to

merchant money at the same time, and even after it was detrimental to his scheme; and (iii) the facts are such that adherence to the corporate fiction of T-Companies as separate entities would, under the circumstances, sanction fraud or promote injustice.

272. Further evidence of a unity of interest existing between Kasdon and the T-Companies exists because: (i) Kasdon and the T-Companies relied on one tax return each year; (ii) they co-mingled funds since Kasdon did not have his own bank account; (iii) the T-Companies were undercapitalized when it notified the Plaintiffs they would not be getting their funds back; (iv) Kasdon diverted the T-Companies funds for his own use and treated the corporate assets as his own; and (v) Kasdon failed to observe corporate formalities by failing to keep yearly corporate formalities between the T Companies. Kasdon used the bank accounts of the T-Companies interchangeably, moving funds between them for expenses that were shared between them. In fact, Kasdon shared an office and assets and debts with all of the T-Companies.

273. As a direct and proximate result of T1 Payments' breach of its contractual obligations to 36 Circles, 36 Circles has suffered in excess of at least $333,718.18 in damages in an amount to be proven at trial. Such damages are clearly ascertainable both in nature and in origin.

**NINTH CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
(As against Kasdon and his alter ego T1 Payments, LLC)

274. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 269 above as though set forth in full.

275. Alternatively, and without waiving the foregoing, the Processing Agreement between Kasdon and his alter ego T1 Payments and 36 Circles contained an implied covenant of good faith and fair dealing.

276. This implied covenant of good faith and fair dealing required that T1 Payments act in good faith so as not to defeat the purpose, or deprive 36 Circles of the benefits, of the Processing

Agreement. T1 Payments LLC performed in a manner that was unfaithful to the contract's purpose, 36 Circles' justified expectations were denied, and actual damages resulted.

277. Kasdon and T1 Payments breached the implied contractual covenant of good faith and fair dealing by doing the acts alleged herein, including but not limited to misreporting the amounts due and owing to 36 Circles, seizing 36 Circles' settled funds and Reserve Account funds without having triggered the contractual right to do so, or having relied on illegal and unenforceable provisions that render the Agreement illusory, and continuing to withhold a significant amount of 36 Circles' funds after it blamed the termination on Payvision—while the contract requires one of the parties to terminate the contract before total withholding is triggered.

278. As a direct and proximate cause of Kasdon and his alter-ego T1 Payments' breach of the implied covenant of good faith and fair dealing, 36 Circles has suffered in excess of $333,718.18 in damages in an amount to be proven at trial. Such damages are clearly ascertainable both in nature and in origin.

**TENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
(As against all Defendants)

279. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 274 above as though set forth in full.

280. Alternatively, because 36 Circles alleges fraudulent inducement in the Agreement, 36 Circles alleges it conferred benefits to Kasdon, his alter ego T-Companies, King and Fairchild, and the Pixxles Companies in the amount of at least $333,718.18 in the form of cash and Defendants appreciated and retained those benefits. These funds were withheld from 36 Circles ultimately at the direction of Kasdon, using the network of Defendants described above.

281. Kasdon accepted and continue to retain the benefits from 36 Circles' customers (i.e., payments made for kratom products shipped and marketed by 36 Circles) in his new ventures, that

were intended for 36 Circles, and failed to pay 36 Circles, such that under the circumstances it would be inequitable for Defendants to retain the benefit without payment of the value thereof.

282. As a direct and proximate result of it being unjustly enriched, Defendants have caused 36 Circles to suffer damages exceeding $333,718.18 to be proven at trial.

283. 36 Circles should be awarded its reasonable attorneys' fees and costs incurred in bringing this action.

**ELEVENTH CAUSE OF ACTION**
**VIOLATION OF THE NEVADA CIVIL RICO STATUTE**

284. Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira, in conspiracy with and using Kasdon's alter-ego T-Companies, and in conspiracy with and through the Pixxles' Companies, engaged in racketeering activities as defined in NRS 207.360 & 207.390 and a racketeering enterprise as is defined in NRS 207.380.

285. Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira, acting directly and in conspiracy with one another, and through syndicates, participated directly in racketeering activity by engaging in at least two crimes related to racketeering as discussed in Section IV(F)(ii) supra, including but not limited to: (i) obtaining possession of money or property valued at $650 or more, or obtaining a signature by means of false pretenses; (ii) embezzlement of money or property valued at $650 or more; (iii) fraudulent conduct under NRS 91.230; and (iv) multiple transactions involving fraud or deceit in course of enterprise or occupation under NRS 205.377.

286. The enterprise is the union, association and other group of persons associated in fact although not a legal entity described in the chart on page 20 supra, as well the Pixxles Companies and their managers handpicked by Donald Kasdon.

287. Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira's activities have the same or similar pattern, intent, results, accomplices, victims, and methods of commission, and are interrelated by distinguishing characteristics, and are not isolated events. The transactions that were handled by the

T-Companies occurred hundreds of times a day. The transactions that benefited the Pixxles Companies and each Pixxles Company's hand-picked directors began occurring on December 7, 2017, and continued until the last dollar was transferred out of the T-Companies in January 2023 for the benefit of the Pixxles Companies.

288. Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira formed and maintained directly or indirectly an interest in, or control of the T-Companies and the Pixxles Companies to conduct or participate directly or indirectly in the affairs of the overall Kasdon-enterprise through their racketeering activities.

289. As set forth hereinabove, Kasdon, King, Fairchild, have maintained these same racketeering activities since at least 2012 when Kasdon, King, and Fairchild began using T1 Payments, LLC to masquerade as a payment processor for "high-risk" merchants. As the 2016 *Dermaktiv* complaint explains, (See Case 2:16-cv-00739:JAD-PAL in the U.S.D.C. Nevada), T1 Payments originally had access to sub-merchants' money by secretly using payment processing company "Atlantic-Pacific Processing Systems," beginning in 2012.

290. Kasdon, Fairchild and King never disclosed they, and their front company T1 Payments, LLC, was a middleman, instead misleading sub-merchants into believing they were operating a licensed, legitimate payment processing company. Once Kasdon, King and Fairchild had the merchants' money, they stole millions of dollars by utilizing dubious clauses in the merchants' fraudulently induced contracts. In the process, Kasdon, King and Fairchild used the money they stole from the unsuspecting merchants as leverage for settlements at a fraction of the amount stolen.

291. Later, Kasdon, King, and Fairchild did the exact same thing using "Merrick Bank," "Synovis Bank" (See Merchant Agreement published on T1 Payments' website at FAC at Exhibit 22), and then "Vantiv" (1:17-cv-00164-SJD in the USDC Southern Ohio).

292. Kasdon, King, Fairchild, added Dawson, Kamaly, and Pereira to the enterprise in 2017 and continued masquerading the T-Companies as legitimate payment processors under the T1 Payments, LLC name for years as set forth in these following cases while transferring stolen money to the Pixxles Companies through Kasdon's intermediaries: (i) *Onyx & Rose LLC v. T1 Payments LLC*, United States District Court for the District of Nevada, Case No. 2:20-cv-00008-KJD-NJK, filed July 3, 2019; (ii) *PureKana LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:19-cv-01399-KJD-NJK, filed August 14, 2019; (iii) *T1 Payments LLC v. New U Life Corp.*, United States District Court District of Nevada, Case No. 2:19-cv-01816-APG-DJA, filed October 17, 2019; (iv) *T1 Payments, LLC v. Hannavas Enterprises, LLC*, United States District Court for the District of Nevada, Case No. 2:2020-cv-00411, filed February 27, 2020; (v) *First Capital Venture Co. v. T1 Payments, LLC*, Eighth Judicial District, Clark County Nevada, Case No. A-21-834626-B, filed May 14, 2021; (vi) *Vida Davina, LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:2021-cv-01005, filed May 26, 2021; and (vii) *Ibuumerang, LLC v. T1 Payments LLC, United* States District Court for the District of Nevada, Case No. 2:21-cv-01611-JCM-VCF, filed August 31, 2021; and (viii) *36 Circles Ethnobotanical, LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:22-cv-01046, filed May 18, 2022.

293. Kasdon "terminated" several large T-Company sub-merchants' accounts each year, keeping millions of dollars for himself and his new venture Pixxles in the UK. King, Fairchild, Dawson, Kamaly, and Pereira all assisted Kasdon in transferring wealth out of the U.S. merchants and into the new UK venture, away from the plaintiffs and judgment creditors in Nevada.

294. Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira acquired or maintained directly or indirectly an interest in each of the T-Companies and Pixxles Companies. Kasdon, King, Fairchild,

Dawson, Kamaly, and Pereira are also employed by the enterprise to conduct or participate directly or indirectly in the affairs of the enterprise through the racketeering activity described above.

295. Since 2014, there have been numerous lawsuits filed against these defendants, but it is only becoming clear now how they structured their fraud through all these entities and countries.

296. The Plaintiffs' injuries flow from Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira conspired to violate the a predicate Nevada RICO acts listed above, and jointly followed through with the conspiracy. The Plaintiffs' injury was proximately caused by Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira's violations of the predicate acts in the amount of $333,780.18.

297. None of the Plaintiffs participated in the commission of these predicate act.

298. The Plaintiffs are also entitled to institute a civil action for recovery of treble damages proximately caused by the RICO violations.

**TWELVE CAUSE OF ACTION**
**DECLARATORY RELIEF**

299. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 294 above as though set forth in full.

300. 36 Circles seeks a declaration from this Court that the Contract between the Plaintiffs and T1 Payments, LLC is void as illegal.

301. 36 Circles also seeks a declaration from this Court that the contract in issue was fraudulently induced.

302. 36 Circles seeks a declaration from this Court that T1 Payments, LLC did not terminate the contract in issue in this case pursuant to the terms of the contract.

303. 36 Circles seeks a declaration from this Court that T1 Payments, LLC was not allowed to withhold any funds from the Plaintiffs.

304. 36 Circles also seeks a declaration from this Court that the T-Companies (T1 Payments, LLC, T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, LTD; and TGlobal Capital LTD) and the Deep Pockets, LLC and Trust are the alter ego of Donald Kasdon.

305. 36 Circles also seeks a declaration that the provisions in section 8 of the Agreement that allow for T1 to hold funds as reserves in perpetuity have not been triggered in this case.

306. 36 Circles also seeks a declaration that the reserve amount or percentage was never increased pursuant to section 8 of the Agreement.

307. 36 Circles also seeks a declaration that T1 Payments did not terminate the contract in issue by way of the May 28, 2021 email to the shareholder of the Plaintiffs.

308. 36 Circles also seeks a judicial declaration that the all of the provisions purporting to allow T1 Payments unilateral rights to change or limit or terminate the contract without cause are severed out of the contract pursuant to the severability clause at §28 as <u>unenforceable provisions</u>.

309. Finally, 36 Circles seeks a declaration from the Court that Kasdon has control, whether direct or indirect, over each of the following Defendants in this case: (i) T1 Payments, LLC; (ii) T1 Payments, LTD; (iii) TGlobal Services Limited (Isle of Man); (iv) TGlobal Services LTD (UK); (v) TGlobal Capital, LTD; (vi) Pixxles Global, LTD; (vii) Pixxles, LTD; (viii) Pixxles, LLC; (ix) PXLS, LLC; (x) Deep Pockets LLC; and (xi) Deep Pockets Trust.

310. An actual controversy has arisen and now exists between 36 Circles and the Defendants concerning their respective rights and duties as set forth above, whereas Defendants dispute these contentions and contends that they did nothing wrong.

311. 36 Circles desires a judicial determination of the parties' rights and duties, and a declaration as to the above.

312. A judicial declaration is necessary and appropriate at this time under the circumstances in order hat 36 Circles may avoid any further financial burden in connection with these matters by an improper attempt by Defendants to withhold and keep 36 Circles' money.

**THIRTEENTH CAUSE OF ACTION**
**APPOINTMENT OF A RECEIVER**
(Against T-Companies and Pixxles Companies and
Deep Pockets, LLC and Deep Pockets Trust)

313. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 308 of this Complaint as though set forth in full.

314. Plaintiffs have been and will continue to be exposed to irreparable harm in that Kasdon, King and Fairchild have throughout and will continue to use each and every business they control as their own personal assets and instrumentalities, depleting and diverting all assets and money to themselves, thereby leaving Plaintiffs without a viable remedy at law.

315. In addition, Kasdon, King and Fairchild, by diverting corporate funds, assets and opportunities to themselves, has placed the assets of the Defendant Companies in danger of waste, sacrifice and loss.

316. Kasdon, King and Fairchild have, and continue to, grossly mismanage the T-Companies and the Pixxles Companies affairs by continually using them as their own personal assets and instrumentalities and by depleting and diverting all assets and money to themselves.

317. In order to prevent the Plaintiffs from sustaining ongoing irreparable harm it is imperative the court appoint a receiver over Pixxles, LLC, Pixxles, LTD, PXLS, LLC, Pixxles Global, LTD (n/k/a Premium Services Global LTD), TGlobal Services, LLC, TGlobal Services LTD (UK), TGlobal Services Limited (Isle of Man), TGlobal Capital, LTD, T1 Payments, LLC and T1 Payments LTD, who would be fully empowered to take control over all bank accounts and assets and to secure all management functions so that the companies can be orderly dissolved and wound down and so

that Kasdon, King and Fairchild cannot continue to divert and abscond with corporate assets and opportunities.

**ELEVENTH CAUSE OF ACTION**
**VIOLATION OF THE UNIFORM FRAUDULENT TRANSFERS ACT**
(As against Kaplan Cottner, LLC, Kaplan Young, LLC, The Cottner Firm, LLC, Deep Pockets LLC, Deep Pockets Trust, TGlobal Capital, LTD, Pixxles, LTD; Pixxles, LLC; PXLS, LLC, Pixxles Global, LTD, (n/k/a Premium Services Global, LTD); Lending Club Bank; Kasdon, Fairchild, and King

318. 36 Circles hereby restates and incorporates the allegations contained in paragraphs 1 through 313 of this Complaint as though set forth in full.

319. Defendants Kasdon using his alter-ego TGlobal Services, LLC, funded the Pixxles Companies with £1,415,001 on March 31, 2021 and £1,737,212.00 on June 3, 2021, just days after refusing to pay the merchants in this, and other, cases.

320. Defendant Fairchild, the owner of record for the Pixxles Companies, testified that she could not remember why she created the Pixxles Companies, and that they have never had any assets—again, despite the massive funding in 2021.

321. The Defendants set up mirroring Pixxles companies in the U.S and U.K. exactly like they set up mirroring T1 Payments companies in both countries—and funded them at exactly the same time they wrongly withheld Plaintiffs' funds.

322. Furthermore, Defendant Kasdon, Defendant King and Defendant Fairchild all testified that they received "distributions" from one or more of the Defendant T-Companies during their depositions in September 2021. Each and every "distribution" of money was made while the Defendant Companies were withholding merchant funds from the Plaintiffs and hundreds of other merchants. After these distributions from the T-Companies to Defendant Kasdon, King and Fairchild, the Defendant Companies were left without the due and owing funds to the Plaintiffs as well as hundreds of other merchants.

323. Also, Kasdon directed the transfer of $3,946,820.00 to Deep Pockets, LLC which owned the Deep Pockets Trust which used the money to purchase a $5 million house in which he lived on Miami Beach.

324. Next, Kasdon directed the transfer of several large payments worth over $3.5 million to Kaplan Cottner, LLC while Kasdon's T-Companies owed the Plaintiffs $333,780.18. Upon information and believe, These payments were not settlements or payments for attorneys fees.

325. Also, TGlobal Services, LLC began making $500,000.00 monthly wire payments to a savings account at Lending Club Bank in October 2021, after the withheld funds were due to the plaintiffs.

326. All of the above actions of the Defendants were taken in violation of NRS 112.180 because the transfers made were fraudulent as to the Plaintiffs, whose claim arose before and also continued accruing after the transfers were made or the obligations was incurred, and Kasdon, King and Fairchild made the transfer or incurred the obligation through Kasdon's T-Companies and Pixxles Companies: (a) with actual intent to hinder, delay or defraud the Plaintiff creditors of the Defendants; and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the Defendants: (1) were engaged or were about to engage in a business or a transaction for which the remaining assets of the Defendants were unreasonably small in relation to the business or transaction; and/or (2) Intended to incur, or believed or reasonably should have believed that the Defendants would incur, debts beyond their ability to pay as they became due.

## VII. TOLLING

327. Plaintiffs plead the Discovery Rule with respect to each of the claims above, which starts the statute of limitations when the Plaintiffs discover, or reasonably should have discovered, the material facts for the action. Plaintiffs could not have discovered all of the facts regarding the conspiracy to defraud and the fraud by omission, because Kasdon's *entire scheme relied on the fraudulent*

*concealment of the actual names of the companies, correspondence between those companies, and persons Defendants used in furtherance of their fraud as described hereinabove.*

328. Plaintiffs also could not have pieced together the network of companies exchanging funds without the bank account statements, which were not produced until after Chase Bank and Wells Fargo records were produced in the T1 Payments, LLC's bankruptcy in 2023. Nor could the Plaintiffs have known about the communications between Kasdon and Payvision until those letters were produced in the bankruptcy in 2023.

329. Moreover, Defendants Kasdon, King, Fairchild, the T-Companies and the Pixxles Companies have all completely refused to engage in any discovery in this case, including responding to requests for production or sitting for their properly noticed and scheduled depositions, which resulted in the lack of information Plaintiffs could utilize in this case before the deadline to amend pleadings on March 20, 2024.

**PRAYER**

WHEREFORE, Plaintiffs respectfully pray that they receive judgment of this Court against the Defendants as follows:

1. For general and economic damages according to proof;

2. For special damages according to proof;

3. For exemplary and punitive damages according to proof and in an amount sufficient to punish and set an example of Defendants, and each of them;

4. For imposition of a constructive trust over funds belonging to Plaintiffs but retained by Defendants and each of them;

5. For treble damages against Defendants in an amount according to proof;

6. For all declaratory relief as requested hereinabove;

7. For all statutory and civil penalties permitted under law;

8. For all attorneys fees' and costs according to proof;

9. For prejudgment and post-judgment interest against Defendants; and

10. For any such other and further relief, whether at law or equity, to which it is justly entitled and/or the Court deems appropriate.

## I. CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiffs judgment against the Defendants, and for any such other and further relief, whether at law or equity, to which it is justly entitled and/or the Court deems appropriate.

DATED this 23rd day of April, 2024.

Respectfully submitted,

MINCIN LAW, PLLC

By: /s/ David Mincin
David Mincin, Esq.
Nevada State Bar No. 5427
7465 W. Lake Mead Boulevard, #100
Las Vegas, Nevada 89128

&

Adam Allen, Esq.
ALLEN & ASSOCIATES
2777 Allen Parkway, Suite 1000
Houston, Texas 77019
*Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of April, 2024, Pursuant To Nevada Rules Of Civil Procedure 5(b) and EDCR 7.26(a), I by via electronic transmission through the Eighth Judicial District Court's Odyssey E-File and Service System, a true and correct copy of the foregoing PLAINTIFFS' SECOND AMENDED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF to the persons listed as follows:

Jeffry R. Hall Esq.
Matthew S. McLaughlin, Esq.
HUTCHISON & STEFFEN, PLLC
Peccole Professional Park
10080 W. Alta Drive, #200
Las Vegas, Nevada 89145
Emails: jhall@hutchlegal.com
hshepherd@hutchlegal.com
bbenitez@hutchlegal.com
mmclaughlin@hutchlegal.com
*Attorney for Pixxles LLC, PXLS LLC, Pixxles Ltd, Donald Kasdon, Debra Kaisen & Amber Fairchild*

Carlos A. Rodriguez, Esq.
CARLOS A. RODRIGUEZ LAW, PLLC
9271 SW Terrace
Miami, FL 33165
Emails: carlos@,crodriguezlaw.com
*Attorney for Pixxles LLC, Pxls LLC,*
*Pixxles Ltd, Donald Kasdon,*
*Debra Kaisen & Amber Fairchild*

By: *\/s/ Carol Burke*
An Employee of Mincin Law, PLLC

# EXHIBIT H

ELECTRONICALLY SERVED
5/7/2024 7:58 PM

**MRCN**
Jeffrey R. Hall (9572)
Matthew S. McLaughlin (16110)
HUTCHISON & STEFFEN, PLLC
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, NV 89145
Tel: (702) 385-2500
Fax: (702) 385-2086
jhall@hutchlegal.comp
mmclaughlin@hutchlegal.com

*Attorneys for Pixxles, LLC; PXLS, LLC; Pixxles, Ltd; Donald Kasdon, Debra King; Amber Lynn Fairchild*

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| 36 CIRCLES, LLC, a California Limited Liability Company dba PAYLESS KRATOM,<br><br>Plaintiff,<br><br>vs.<br><br>T1 PAYMENTS, LLC, a Nevada Limited Liability Company; T1 PAYMENTS, LTD., a Limited Company Organized Under The Laws Of England; 7 PROCESSING, LLC, a Nevada Limited Liability Company; TGLOBAL SERVICES, LLC, a Nevada Limited Liability Company; PIXXLES, LLC, a Nevada Limited Liability Company; PXLS, LLC, a Nevada Limited Liability Company; PIXXLES, LTD, and at all times relevant was, a United Kingdom Private Limited Company; MNJA, LLC, a Nevada Limited Liability Company; AQUANAUT 1, LLC, a Nevada Limited Liability Company; DAK ENTERPRISES, LLC, a Nevada Limited Liability Company; TEQ VENTURES, LLC, a Nevada Limited Liability Company; PAYVISION B.V. is, and at all times relevant was, a Netherlands Limited Company; SCOTT BODILY, an Individual; JOE EMIG, an Individual; DONALD | Case No. A-22-851903-B<br><br>Dept. No. 13<br><br>**MOTION TO STAY DISCOVERY AND MOTION FOR RECONSIDERATION OF THE ORDER GRANTING IN PART PLAINTIFFS' MOTION TO STRIKE ANSWERS AND ENTER DEFAULT JUDGMENTS FOR DISCOVERY ABUSES**<br><br>**(HEARING ON OST REQUESTED)** |

KASDON, an Individual; DEBRA KING aka KAISEN, an individual, and AMBER LYNN FAIRCHILD, an Individual, DOES 1 through 10, inclusive,

Defendants.

Defendants Donald Kasdon ("Kasdon"), Debra King ("King"), Amber Fairchild ("Fairchild"), Pixxles LLC, Pixxles Ltd., and PXLS LLC (collectively, "Defendants"), by and through their counsel of record, the law firm of Hutchison & Steffen, PLLC ("H&S"), hereby files their Motion to Stay Discovery and Motion for Reconsideration of the Order Granting in Part Plaintiffs' Motion to Strike Answers and Enter Default Judgments for Discovery Abuses ("Motion").

This motion is made pursuant to EDCR 2.24 and based on the pleadings and papers on file herein, the attached memorandum of points and authorities, any exhibits attached hereto, and any oral argument permitted at the time of hearing on this matter.

DATED this 7th day of May, 2024.

HUTCHISON & STEFFEN, PLLC

*/s/ Matthew S. McLaughlin*

Jeffrey R. Hall (9572)
Matthew S. McLaughlin (16110)
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, NV 89145

*Attorneys for Pixxles, LLC; PXLS, LLC; Pixxles, Ltd; Donald Kasdon, Debra Kaisen; Amber Lynn Fairchild*

**DECLARATION OF MATTHEW S. MCLAUGHLIN**

I, Matthew S. Mclaughlin, declare under penalty of perjury as follows:

1. I am over the age of 18, have personal knowledge of the matters set forth herein and, unless otherwise stated, am competent to testify to the same if called on to do so.

2. I am an associate with Hutchison & Steffen PLLC, counsel of record for Defendants Kasdon, King Fairchild, Pixxles LLC, Pixxles LTD, and PXLS LLC ("Defendants"), in this matter.

3. I make this declaration in support of the Motion to Stay Discovery and Motion for Reconsideration of the Order Granting in Part Plaintiffs' Motion to Strike Answers and Enter Default Judgments for Discovery Abuses ("Motion").

4. On April 19, 2024, Defendant T1 Payments LLC's Chapter 7 Bankruptcy Trustee filed a Motion to Approve Sale of Estate Interest in Certain Litigation Claims under 11 U.S.C. 363 ("Motion to Approve Sale") in Bankruptcy Court, Case No. BK-23-10290-MKN. *See* Motion to Approve Sale, **Ex. A.**

5. Included in the Motion to Approve Sale are claims made by Plaintiffs in the instant case Kasdon, King, and Fairchild in their individual capacities based on alter ego theories and which are Bankruptcy Estate Litigation Claims. *Id.* at 3:24-28. The Motion to Approve Sale includes but is not limited to Plaintiffs' claims in this action for: fraud against the individual defendants; conversion against the individual defendants; theft against the individual defendants; money had and received against the individual defendants; breach of contract against the individual defendants; breach of the implied covenant of good faith and fair dealing against the individual defendants; unjust enrichment against the individual defendants; declaratory and injunctive relief against the individual defendants; and fraudulent transfer against the individual defendants. *Id.* at 3:24-28; 4:8-16. The Motion to Approve Sale is set for Hearing in Bankruptcy Court on May 22, 2024.

6. The sale of the Bankruptcy Estate Litigation Claims will almost certainly impact the discoverable issues in this case. Indeed, the claims asserted in this case by 36 Circles are identified specifically in the Motion to Approve Sale. Kasdon has negotiated the currently pending sale and has provide the Bankruptcy Trustee with the funds called for in the motion to complete the sale. If the

Bankruptcy Court approves the sale, the issues in this case will narrow substantially, if not entirely.

7. At the April 8, 2024, Hearing on Plaintiffs' Motion to Strike, the Court ordered the depositions of Defendants Kasdon, King, and Fairchild be set within 30 days of the April 8, 2024 hearing. *See* April 8, 2024 Hearing Transcript at 10:1-19; and April 8, 2024 Court Minutes. The Court also ordered Kasdon, King, Fairchild, Pixxles LLC, Pixxles LTD, and PXLS LLC to supplement their responses to Plaintiffs' request for production of documents and without reliance on the objections that are not privilege objections. *See* April 8, 2024 Hearing Transcript at 10:13-24; and April 8, 2024 Court Minutes.

8. At no time during the April 8, 2024 Hearing did the Court order Defendants to supplement their interrogatory responses or responses to request for admissions. *See* April 8, 2024 Hearing Transcript.

9. The Court Minutes do not include an order for Defendants to supplement their interrogatory responses or responses to requests for admissions. *See* April 8, 2024 Court Minutes.

10. On April 10, 2024, Plaintiffs' counsel emailed Defendants' counsel their proposed Order relative to the April 8, 2024 Hearing ("Plaintiffs' First Proposed Order"). In addition to deposition being set and responses to requests for production of documents being supplemented, Plaintiffs' First Proposed Order incorrectly included an order that Defendants supplement their responses to interrogatories.

11. Plaintiffs' First Proposed Order did not include an order that Defendants supplement their responses to requests for admissions.

12. On the morning of April 17, 2024, Plaintiffs emailed their proposed order to the Court, stating that the order was circulated on April 10, 2024 with no response. *See* April 17, 2024 emails between counsel and the Court, **Ex. B**.

13. Shortly thereafter on the morning of April 17, 2024, Defendants' counsel emailed Plaintiffs' counsel advising that their submission of Plaintiffs' First Proposed Order to the Court was premature under EDCR 5.706 and NRCP Rule 6, as Defendants had through April 17, 2024 to advise of any objections to the terms or form of Plaintiffs' First Proposed Order. In that same email,

Defendants' counsel also submitted to Plaintiffs' counsel Defendants' proposed revisions to Plaintiffs' First Proposed Order. *See* April 17, 2024 emails between counsel, **Ex. C.** Most significantly, Defendants' proposed revisions included removal of the order for Defendants to supplement their interrogatory responses.

14. Plaintiffs' counsel, David Mincin, quickly responded that morning, advising that Plaintiffs could work with most of defendants' proposed revisions except for the deletion of the language requiring Defendants to supplement their interrogatory responses. *Id.*

15. Attached to Mr. Mincin's reply email was Plaintiffs' second proposed order ("Plaintiffs' Second Proposed Order"). Plaintiffs' Second Proposed Order incorporated all of defendants proposed revisions but added language requiring Defendants supplement their responses to Plaintiffs' request for interrogatories AND requests for admissions.

16. Plaintiffs' *pro hac vice* counsel, Adam Allen, also responded to Defendants' counsel in a separate email, objecting to Defendants' proposed removal of the instruction for Defendants to supplement their interrogatory responses, and went further by arguing that the Court had ordered Defendants to supplement ALL discovery. *See* April 17, 2024 email from Adam Allen, **Ex. D**.

17. In short, both Plaintiffs' First Proposed Order and Second Proposed Order included orders that the Court never made, with Plaintiffs Second Proposed Order being even more broad and inaccurate than the first.

18. In response to Mr. Mincin's and Mr. Allen's April 17, 2024 emails, Defendants' counsel provided a copy of the Court Minutes from the April 8, 2024 Hearing requiring only that Defendants depositions be set and their responses to requests for production of documents supplemented. *See* April 17, 2024 emails between counsel, **Ex. C**. Defendants' counsel also noted that Plaintiffs' First Proposed Order that was submitted to the Court earlier that day, and which was ultimately signed by the Court on April 23, 2024, did NOT include an order for Defendants to supplement their responses to requests for admissions. *Id.* Defendants' counsel requested that Plaintiffs' counsel advise whether they still disagreed with Defendants' proposed revisions to Plaintiffs' First Proposed Order and Plaintiffs'

Second Proposed Order in light of this information, and if so, to advise Defendants so that an alternative order could be submitted. *Id.* Plaintiffs' Counsel never responded.

19. After emailing Plaintiffs' counsel Defendants' revisions to Plaintiffs' First Proposed Order on the morning of April 17, 2024, Defendants' counsel alerted the Court that: (i) Plaintiffs' submission of Plaintiffs' First Proposed Order was premature under EDCR 5.706 and NRCP Rule 6; (ii) that Defendants had notified plaintiffs of their proposed revisions that same morning; and (iii) if the parties could not agree on the terms of the proposed order, defendants would be submitting a proposed alternative order for the Court's consideration under EDCR 5.706(c). *See* April 17, 2024 emails to the Court, **Ex. B**.

20. On April 23, 2024, before seven days had elapsed since Plaintiffs submitted Plaintiffs' First Proposed Order on April 17, 2024, the Court signed Plaintiffs' First Proposed Order, which included the improper order that Defendants supplement their interrogatory responses. *See* April 23, 2024 Oder.

21. Later on April 23, 2024, before seven days had elapsed since Plaintiffs submitted Plaintiffs' First Proposed Order on April 17, 2024, Defendants submitted to the Court their alternative Order ("Defendants Alternative Order") under EDCR 5.706(c), with an explanation as to why the submission was timely. *See* April 23, 2024 email submission, Ex. **E**; and Defendants Alternative Order, Ex. **F**.

22. On April 24, 2024, Plaintiffs' counsel emailed the Court advising their objection to Defendants' April 23, 2024 email to the Court and Defendants' Alternative Order. *See* Plaintiffs' April 24, 2024 email to Court, **Ex. E.**

23. In addition to the issues identified with the drafting of the order, Defendants seek reconsideration of the order in its entirety based on the pending sale of the claims at issue in the bankruptcy proceeding. Prior to the filing of Plaintiffs' Motion to Strike Answers and Enter Default for Discovery Abuses and Defendants' Opposition to said motion, Defendants agreement for the purchase of the Bankruptcy Litigation Claims had not been submitted to the bankruptcy court for approval. Now that the Court has the benefit of the filed Motion to Approve Sale and the agreement for Kasdon's

purchase of the claims, the Court should reconsider its order concerning the discovery since the claims at issue will be narrowed, if not completely eliminated by an approved sale. At a minimum, no discovery should be conducted until and Motion to Approve Sale is heard and there is clarity on what claims, if any, will be going forward in this litigation.

23. Defendants respectfully submit that good cause exists to hear the motion on shortened time pursuant to EDCR 2.26, as the current deadline under the Court's April 23, 2024 Order for the parties to set the depositions of Kasdon, King, and Fairchild, and for Defendants to supplement their responses to request for production of documents and interrogatories, is May 8, 2024.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

DATED this 7th day of May, 2024.

*/s/ Matthew S. McLaughlin*

Matthew S. McLaughlin, Esq.